No. 24-1468

---

𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕹𝖎𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

ZAYN AL-ABIDIN MUHAMMAD HUSAYN, also known as Abu Zubaydah,

*Plaintiff-Appellant,*

---v.---

JAMES MITCHELL; JOHN JESSEN, also known as Bruce Jessen

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
Case No. 2:23-CV-0270-TOR
Honorable Thomas O. Rice

**APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD**

**VOLUME 1 OF 1**

BLANK ROME LLP
James T. Smith
Brian S. Paszamant
Ann E. Querns
Jeffrey N. Rosenthal
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
(215) 569-5791

Arash Beral
2029 Century Park, East
6th Floor
Los Angeles, CA 90067
(424) 239-3400

EVANS, CRAVEN & LACKIE, P.S.
James B. King, WSBA #8723
Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Ste. 250
Spokane, WA 99201
(509) 455-5200
(509) 455-3632 facsimile

*Attorneys for Defendants-Appellees*

# <u>INDEX</u>

**<u>Page</u>**

Defendants' Reply Memorandum in Support of
Defendants' Motion to Dismiss,
Docket No. 40 (filed February 5, 2024) ....................................................3

Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion to Dismiss,
Docket No. 30 (filed January 5, 2024) ..................................................33

Defendants' Motion and Memorandum in Support of
Defendants' Motion to Dismiss,
Docket No. 27 (filed November 13, 2023) ..........................................87

1  **EVANS, CRAVEN & LACKIE, P.S.**
2  James B. King, WSBA #8723
   818 W. Riverside, Suite 250
3  Spokane, WA 99201-0910
   (509) 455-5200; fax (509) 455-3632
4
5  **BLANK ROME LLP**
   James T. Smith (admitted *pro hac vice*)
6  Brian S. Paszamant (admitted *pro hac vice*)
7  Ann E. Querns (admitted *pro hac vice*)
   One Logan Square, 130 N. 18th Street
8  Philadelphia, PA 19103
   (215) 569-5500; fax (215) 832-5674
9
10 Attorneys for Defendants
11 James Mitchell and John "Bruce" Jessen
12
13                UNITED STATES DISTRICT COURT
14          FOR THE EASTERN DISTRICT OF WASHINGTON
15 ZAYN AL-ABIDIN MUHAMMAD HUSAYN          | Case No.: 2:23-cv-00270
16 also known as ABU ZUBAYDAH,
17                          Plaintiff,      | **DEFENDANTS' REPLY
                                              MEMORANDUM IN
18         v.                                 SUPPORT OF
                                              DEFENDANTS' MOTION
19 JAMES MITCHELL and JOHN "BRUCE"          | TO DISMISS
   JESSEN,                                    PLAINTIFF'S
20                                            COMPLAINT
21                          Defendants.       PURSUANT TO FRCP
                                              12(b)(1) AND 12(b)(6)**
22
23                                          Hearing Date, February 15,
                                            2024.
24
25
26
27
28

# **TABLE OF CONTENTS**

Page(s)

I.    INTRODUCTION ........................................................................... 1

II.   THE MCA DIVESTS THE COURT OF JURISDICTION. ............................... 1

    A.    Plaintiff Misstates the Law of Agency. ...................................... 1

    B.    Plaintiff Misstates the Facts He has Pled. .................................. 3

III.  DEFENDANTS ARE ENTITLED TO IMMUNITY. ..................................... 5

    A.    Defendants are Entitled to *Yearsley* Immunity Because the
        Government's Authority to Interrogate "Enemy Combatants" was
        Validly Conferred to Defendants and Defendants Did Not Exceed
        the CIA's Instructions Regarding Plaintiff's Interrogation. ............. 5

    B.    Plaintiff Cannot Defeat Defendants' Right to *Filarsky* Immunity. ......... 8

IV.   COLLATERAL ESTOPPEL CANNOT BE APPLIED HERE. ...................... 10

    A.    Defendants Are Not Precluded From Arguing the MCA Applies. .......... 11

    B.    Defendants Are Not Precluded From Arguing Immunity Applies. ......... 13

V.    THE POLITICAL QUESTION DOCTRINE APPLIES TO CIA
    "CONTRACTORS." ....................................................................... 14

VI.   PLAINTIFF HAS NOT ALLEGED COGNIZABLE ATS CLAIMS ............... 17

    A.    State Acquiescence Is Insufficient Under the ATS. ....................... 17

    B.    Finding Plaintiff Alleged Non-Consensual Medical
        Experimentation Would Greatly Expand Pfizer ........................... 19

    C.    Defendants Are Not Liable For Plaintiff's Entire Detention ............... 19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009) ........................................................... 19

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
  416 F.3d 1242 (11th Cir. 2005) ...................................................... 18

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) ...................................................... 7, 8

*Braswell v. Shoreline Fire Dep't*,
  No. C08-924-RSM, 2012 WL 1857858 (W.D. Wash. May 22, 2012) ............... 9

*Brosseau v. Haugen*,
  543 U.S. 194, (2004) ...................................................................... 6

*Brown v. DirecTV, LLC*,
  562 F. Supp. 3d 590 (C.D. Cal. 2021) .............................................. 4

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016) ................................................................... 5, 7

*Chaser Shipping Corp. v. United States*,
  649 F. Supp. 736 (S.D.N.Y. 1986) ................................................ 15

*Childs v. San Diego Family Hous. LLC*,
  22 F.4th 1092 (9th Cir. 2022) ............................................... 7, 8, 13

*Cunningham v. Gen. Dynamics Info. Tech.*,
  888 F.3d 640 (4th Cir. 2018) ....................................................... 5, 6

*Doe I v. Unocal Corp.*,
  395 F.3d 932 (9th Cir. 2002) ........................................................ 18

*Filarsky v. Delia*,
  566 U.S. 377 (2012) ............................................................... *passim*

*Ford v. Anderson Cty.*,
  No. 6:19-CV-384-JDK, 2022 WL 1424973 (E.D. Tex. May 5, 2022) .............. 10

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004)..................................................................................6

*Harbury v. Hayden,*
522 F.3d 413 (D.C. Cir. 2008)..............................................................15

*Hmong 2 v. United States,*
799 Fed. App'x. 508 (9th Cir. 2020) .....................................................15

*Householder Grp., LLLP v. Van Mason,*
No. CV 09-2370-PHX-MHM, 2010 WL 5093117 (D. Ariz. Dec. 8,
2010) ........................................................................................................13

*In re: KBR, Inc.,*
893 F. 3d 241 (4th Cir. 2018) ................................................................16

*In re: KBR, Inc. Burn Pit Litigation,*
744 F. 3d 326 (4th Cir. 2014) .............................................................6, 7

*In re Oil Spill by the Oil Rig "Deepwater Horizon*
No. MDL 2179, 2016 WL 614690 (E.D. La. Feb. 16, 2016)...............14

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"*
2016 U.S. Dist. LEXIS 101175 (E.D. La. Aug. 2, 2016)....................14

*Jensen v. Lane County,*
222 F.3d 570 (9th Cir. 2000) ...................................................................9

*Kadic v. Karadzic,*
70 F.3d 232 (2d Cir. 1995) ...............................................................17, 18

*Karki v. Holder,*
715 F.3d 792 (10th Cir. 2013) ...............................................................17

*Little v. Barreme,*
6 U.S. (2 Cranch) 170 (1804) ...................................................................7

*Littlejohn v. United States,*
321 F.3d 915 (9th Cir. 2003) .................................................................12

*Liu Bo Shan v. China Const. Bank Corp.,*
421 Fed. App'x. 89 (2d Cir. 2011) ........................................................20

*Luben Indus., Inc. v. United States,*
707 F.2d 1037 (9th Cir. 1983) ..........................................................12, 13

iii

*Ludwig v. Arizona by & through Brnovich*,
   790 Fed. App'x. 849 (9th Cir. 2019) ................................................. 11

*Maciel v. Comm'r*,
   489 F.3d 1018 (9th Cir. 2007) ........................................................ 11

*Martinez v. City of Los Angeles*,
   141 F.3d 1373 (9th Cir. 1998) ....................................................... 20

*McAdory v. M.N.S. & Assocs., LLC*,
   No. 3:17-CV-00777-HZ, 2021 WL 2321634 (D. Or. June 7, 2021) .................... 4

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985) (Stevens, J., concurring) .................................... 10

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*,
   176 F.R.D. 329 (C.D. Cal. 1997) ...................................................... 18

*Padilla v. Yoo*,
   678 F.3d 748 (9th Cir. 2012) ..................................................... 6, 16

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) ............................................................. 11, 12

*Perniciaro v. Lea*,
   901 F.3d 241 (5th Cir. 2018) ...................................................... 8, 9

*Reyes-Reyes v. Ashcroft*,
   384 F.3d 782 (9th Cir. 2004) ........................................................ 17

*Richardson v. McKnight*,
   521 U.S. 399 (1997) .................................................................. 9

*Saldana v. Occidental Petroleum Corp.*,
   774 F.3d 544 (9th Cir. 2014) ........................................................ 17

*Salim v. Mitchell (Salim I or Salim)*
   183 F.Supp.3d 1121 (E.D. Wash. Apr. 28, 2016) ................................ *passim*

*Salim v. Mitchell (Salim II)*
   No. CV-15-0286-JLQ, 2017 WL 390270 (E.D. Wash. Jan. 27, 2017) ........ 11, 12

*Salim v. Mitchell (Salim III)*
   268 F.Supp.3d 1132 (E.D. Wash. Aug. 7, 2017) ................................. 14

*Schneider v. Cal. Dept. of Corrs.*,
    151 F.3d 1194 (9th Cir. 1998) ........................................................... 20

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009) ........................................................ 17

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) .......................................................................... 19

*Syverson v. Int'l Bus. Machines Corp.*,
    472 F.3d 1072 (9th Cir. 2007) ................................................... 11, 12

*Thomas v. I.N.S.*,
    35 F.3d 1332 (9th Cir. 1994) ............................................................. 2

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) ............................................................................. 5

*Turkmen v. Hasty*,
    789 F.3d 218 (2d Cir. 2015) ............................................................ 10

*United States v. Zubaydah (1782 Litigation)*,
    595 U.S. 195 (2022) ................................................................. 4, 12, 13

*Williams v. PillPack LLC*,
    644 F. Supp. 3d 845 (W.D. Wash. 2022) .......................................... 4

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940) .................................................................... *passim*

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ......................................................................... 10

**Statutes**

42 U.S.C. § 1983 ........................................................................... 13, 18, 19

Alien Tort Act ......................................................................................... 17

Clean Water Act ..................................................................................... 14

Torture Victim Protection Act ............................................................... 17

**Other Authorities**

152 Cong. Rec. H7 (Sept. 29, 2006) (statement of Rep. Sensenbrenner) ................ 5

1

RESTATEMENT (THIRD) OF AGENCY ................................................................ 1, 2, 3

2

U.S. CONST. art II, § 2, cl. 1 ................................................................ 16

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

When the law is applied to the facts alleged, Plaintiff's claims fail for all the reasons detailed in Defendants' Motion to Dismiss. Seeking to avoid this outcome, Plaintiff goes to great lengths to mischaracterize both the facts and the applicable law. Plaintiff consistently misstates the law by relying on inapplicable authority—proclaiming definitive legal conclusions absent support, and distorting the governing authority cited by Defendants. He similarly misstates the facts pled—endeavoring to paint a false picture in which Plaintiff had no Al Qaeda involvement (despite his having detailed information about imminent attacks and identifying Mokhtar), and in which Defendants were rogue actors interrogating Plaintiff with little CIA involvement (despite the CIA observing and controlling the entire process from the next room, including when Defendants could stop interrogation).

Plaintiff deploys this deception because his Complaint fails. The ATS claims require Plaintiff to allege that Defendants acted under color of law, but the MCA divests the Court of jurisdiction if Defendants were agents of the U.S. Thus, Plaintiff tries to create a space between (i) ATS jurisdiction and (ii) MCA applicability, by misrepresenting ATS and agency law, as well as the relationship between Defendants and the CIA. No such space exists, and Plaintiff's claims should thus be dismissed under the MCA. Moreover, even if the MCA was found inapplicable, derivative sovereign immunity and the political question doctrine mandate the dismissal of this action nonetheless.

## II.    THE MCA DIVESTS THE COURT OF JURISDICTION.

Plaintiff admits if Defendants were "agents" of the Government, the MCA strips this Court of jurisdiction. Opp'n 7. Despite this concession, Plaintiff wrongly concludes that Defendants do not qualify as agents based on numerous legal/factual misstatements.

### A.    Plaintiff Misstates the Law of Agency.

For a principal-agency relationship to exist, an agent need *not* have the power to bind the principal in contracts. RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (2006)

DEFENDANTS' MOTION TO DISMISS

Page 1

("Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf."). And the lone case Plaintiff cites to claim Defendants could not be agents unless they could "bind" the Government is off point. At issue in *Thomas v. I.N.S.*, was whether a U.S. Attorney had actual authority to enter a contract that bound the Immigration and Naturalization Services. 35 F.3d 1332, 1338 (9th Cir. 1994). But *Thomas* only analyzed whether, as a government agent, there was actual authority to make a plea deal—*not* whether an agency relationship existed. Defendants do not claim authority to offer plea agreements or contract on behalf of the Government, thus rendering *Thomas* irrelevant.

Plaintiff also misstates the Restatement's guidance that an agent acts on "behalf of another person with *power to affect the legal rights and duties of the other person*." Opp'n 7 (emphasis in original). This does *not* mean an agent must be able to bind a principal to create an agency relationship. Rather, it addresses only whether the person can actually take the action at issue. RESTATEMENT § 3.05 cmt b ("An agent's power to affect the principal's legal relations is usually limited only by the agent's ability to take action."). For instance, representing a person as a lawyer requires the representative be a lawyer. *Id.* It is then the scope of the agent's actual (or apparent) authority that defines the extent the agent can impact the legal relations of another. *Id.* (explaining one who acts with apparent authority has "power to affect the legal relations of another person even though actual authority" is lacking). Thus, Plaintiff's purposeful confusion of the elements of an agency relationship to suggest none exists here must be rejected. The Restatement clearly explains, "[i]f the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists." *Id.* § 1.01 cmt c.

Next, Plaintiff overstates the importance of the term "independent contractor" used in Defendants' contracts. The Restatement and interpretive caselaw is unequivocal that a party labeled "independent contractor" *can still be an agent*. Mot. 9. The existence of an agency relationship is determined through an "assessment of the facts of the

DEFENDANTS' MOTION TO DISMISS
Page 2

relationship and not based on how the parties define their relationship." RESTATEMENT § 1.02. Thus, Plaintiff's supposition notwithstanding, *see* Opp'n 7, the MCA need not use the term "contractor" to apply to Defendants—agents as the Complaint establishes.[1]

### B.    Plaintiff Misstates the Facts He has Pled.

Contrary to Plaintiff's assertion, his Complaint plainly alleges Defendants were Government agents. Plaintiff claims after the CIA took over his interrogation, Defendants interrogated him at a top-secret CIA black site, applying top-secret interrogation techniques which were approved by the DOJ's highest levels, while the CIA observed and provided direction. Compl. ¶¶57-58, 76-80, 82, 85. And Plaintiff admits this occurred when the CIA was "under immense pressure to produce actionable intelligence" after the September 11 intelligence failures and while the Vice President urging the CIA to "use any means at our disposal." *Id.* ¶¶4, 30. Given these allegations, how could Defendants not have been agents of the U.S.? Indeed, absent agency how would Defendants have gained access to a top-secret CIA black site, the location of which the Supreme Court ruled Defendants cannot disclose because it would harm foreign relations? To distract from the facts pled, Plaintiff claims Defendants must be "authorized representatives of the U.S.," or have "the power to bind the U.S."—but cites *no* supportive authority (or even define his chosen phrases). Opp'n 11. In any event, as explained above, no such finding is necessary to establish agency.

The Complaint also alleges far more than some "very limited and irrelevant [CIA] direction over" Defendants. Opp'n 11; *see* Compl. ¶¶62, 79, 80, 82, 85. Deploying revisionist history, Plaintiff now claims Defendants were rogue actors. This is displayed

---

[1] Plaintiff faults Defendants for not placing their contracts before the Court. Plaintiff misunderstands Defendants' position. *The Complaint alone* establishes Defendant's agency relationship. Thus, no further evidence—including Defendants' contracts—is needed to show the MCA's applicability. Should the Court disagree, Defendants request limited jurisdictional discovery so this threshold issue can be quickly resolved.

DEFENDANTS' MOTION TO DISMISS

Page 3

by his attempt to rebuff Justice Gorsuch's dissent as only "ascrib[ing] some level of responsibility to the CIA," Opp'n 21, even though Justice Gorsuch detailed how Defendants acted on the CIA's behalf, and at its direction, when Defendants sought to end Plaintiff's interrogation—but the CIA overrode them. *1782 Litigation*, 595 U.S. 195, 238 (2022) (Gorsuch, J., dissenting). The Complaint also alleges Defendants were acting with at least "apparent (though not bona fide) authority," Compl. ¶117, which cannot exist but-for an agency relationship. And this is consistent with Plaintiff's admission that Defendants' actions were ascribed to the Government. Opp'n 39 (quoting Press Conference by President Obama in which he stated "[W]e tortured some folks."); *1782 Litigation*, 595 U.S. 238 (Gorsuch, J, dissenting) (noting Plaintiff sought information about his interrogation "at the hands of the CIA"). The Complaint's allegations provide the very evidence Plaintiff claims is absent. *See* Opp'n 8-9.

Regardless of any superficial label, Defendants were acting as agents of the CIA when they interrogated Plaintiff. Defendants cited three cases identifying that finding an agency relationship here aligns with rulings across the Ninth Circuit—all of which post-date *Salim.* Mot. 10. Plaintiff attempts to distinguish this authority as involving non-governmental independent contractors, even though Plaintiff admits the common-law applied in those cases controls the agency analysis here. Opp'n 7. Plaintiff also claims the authority is distinguishable because it addresses vicarious liability and apparent authority, "not actual agency." Opp'n 11-12. This is illogical and wrong. Before apparent authority can be analyzed, an agency relationship must be found. This is why the cited cases address, in detail, how agency existed despite the parties being labeled independent contractors, then proceeded to address the grant of authority. *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 609-10 (C.D. Cal. 2021); *Williams v. PillPack LLC*, 644 F. Supp. 3d 845, 852-54 (W.D. Wash. 2022); *McAdory v. M.N.S. & Assocs., LLC*, No. 3:17-CV-00777-HZ, 2021 WL 2321634, at *8-9 (D. Or. June 7, 2021). Notably, in assessing whether an agency relationship existed, *none* of the cases use the term "bind," let alone analyze Plaintiff's other manufactured agency

DEFENDANTS' MOTION TO DISMISS

Page 4

requirements. In sum, Plaintiff fails to distinguish this authority and agency should be found to exist here, just as it was found to exist in those cases. The MCA divests the Court of jurisdiction.[2]

## III.   DEFENDANTS ARE ENTITLED TO IMMUNITY.

The Opposition grossly mischaracterizes Defendants' immunity arguments and fails to rebut the applicability of derivative sovereign immunity to this matter.

### A.   Defendants are Entitled to *Yearsley* Immunity Because the Government's Authority to Interrogate "Enemy Combatants" was Validly Conferred to Defendants and Defendants Did Not Exceed the CIA's Instructions Regarding Plaintiff's Interrogation.

Plaintiff acknowledges, Opp'n 14, the first test for *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), immunity is whether the "authority" delegated to the contractor was "validly conferred,"—*i.e.*, the government "acted within its constitutional power." *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016); *see also Cunningham v. Gen. Dynamics Info. Tech.*, 888 F.3d 640, 643 (4th Cir. 2018). But Plaintiff cannot show any lack of validly delegated authority from the Government to Defendants here.

Plaintiff cannot impugn Congress's authority to delegate national security matters to the executive branch. Nor can he challenge the executive branch's prerogative to then assign contractors to complete tasks flowing therefrom. Mot. 25. So he instead criticizes the OLC's supposed "circular logic" in approving the use of the

---

[2] Finally, it is worth noting the MCA's legislative history demonstrates it was intended to be "a protection bill for the interrogators." 152 Cong. Rec. H7, 947-48 (Sept. 29, 2006) (statement of Rep. Sensenbrenner). Yet, Plaintiff argues the MCA cannot apply because Defendants' contracts label them independent contractors. This argument effectively reads the term "agent" out of the MCA's Section 2241(e)(2). Simply put, to whom would that term apply if not Defendants, the individuals the CIA tasked with interrogating Plaintiff? It is axiomatic that statutes, including the MCA, should not be construed to render words superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

DEFENDANTS' MOTION TO DISMISS

interrogation techniques on suspected terrorists and cites a former OLC lawyer's testimony *from eight years later* to backstop his position. Opp'n 15. This, however, does not alter that, *at the pertinent time (2001-03)*, there was "considerable debate" over whether *applying these very techniques* constituted "torture." Mot. 34 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (immunity doctrines "judged against the backdrop of the law at the time of the conduct")). And because Defendants' conduct was *not* decidedly "torture" in mid-2002, it cannot be said that the government did not "act[] within its constitutional power" when tasking Defendants with interrogating suspected terrorists using these techniques. *Padilla v. Yoo*, 678 F.3d 748, 768 (9th Cir. 2012) ("[A]lthough we hold that the unconstitutionality of torturing an American citizen was beyond debate *in 2001-03*, *it was not clearly established at that time that the treatment Padilla alleges he was subjected to amounted to <u>torture</u>*.") (emphasis added).[3] This is especially true for "enemy combatants"—like Plaintiff. *Id.* at 761 ("Even [in 2004], it remain[ed] murky whether an enemy combatant detainee may be subjected to … methods of interrogation that would be unconstitutional if applied in the ordinary prison and criminal settings.") (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533-35 (2004)).

Plaintiff also erroneously conflates the distinct concepts of a contractor's "authority to act" under government instruction with an act's "legality." Opp'n 14; *see* Mot. 26 & n.5 (citing *Cunningham*, 888 F.3d at 648 ("The question is not whether [the conduct] violated the law, but rather whether Congress had the authority to assign [the contractor] to complete that task.")). Appellate courts have rejected the claim that "the government cannot 'validly confer' the authority to engage in conduct that violates the law"—calling it a "misinterpretation" of *Yearsley*, and an "overinclusive interpretation of what constitutes a 'valid conferral' of authority." *Cunningham*, 888 F.3d 648-49 (citing *Yearsley*, 309 U.S. at 20; *In re KBR Inc., Burn Pit Litigation*, 744 F.3d 326, 342,

---

[3] Plaintiff does not explain why Defendants could be liable for the same treatment for which Yoo was found to be immune. Mot. 19-20.

DEFENDANTS' MOTION TO DISMISS
Page 6

344 n.7 (4th Cir. 2014)). And if Plaintiff believes the alleged "acts of torture and abuse … would be illegal for government employees," Opp'n 15, why has he not sued these employees?

As to the second *Yearsley* test, Plaintiff does not plausibly allege Defendants took any action that "exceeded" the CIA's instructions.[4] Mot. 27-28. At best, Plaintiff merely asserts Defendants "misled" officials about the proposed "tactics," Opp'n 16, and that his treatment "crossed legal limits." *Id.* Noticeably absent, however, is an allegation *Defendants did anything other than what the CIA instructed*. This is fatal. *Campbell-Ewald*, 577 U.S. at 166 (contractor loses "derivative immunity" only when it "violates *both* federal law *and* the Government's explicit instructions") (emphasis added); *Ali v. Rumsfeld*, 649 F.3d 762, 770, 774-78 (D.C. Cir. 2011) (affirming dismissal of ATS claim for "arbitrary detention, torture, and cruel, inhuman or degrading treatment" where government officials and employees were "acting within the scope of their employment"). Nothing in the Complaint (or elsewhere) supports Plaintiff's bare assertion that Defendants—contractors working alongside the CIA—somehow "retain[ed] full operational control over each day's interrogation." Opp'n 16. In fact, Plaintiff's allegations undercut any such notion. *See* Compl. ¶85 (Defendants were required to send "CIA Headquarters a . . . summary of the day's interrogation, and maintained data records concerning the techniques used"); *id.* ¶¶58, 95, 97 (CIA unilaterally decided which black site(s) to send Plaintiff, including sites where Defendants were not located).

Finally, Plaintiff's reliance on *Childs v. San Diego Family Hous. LLC*, 22 F.4th 1092 (9th Cir. 2022), as "confirm[ing]" the supposed "no discretion" limiter for

---

[4] The Ninth Circuit has recognized that the proper inquiry under *Yearsley* is whether a contractor performed per its contractual terms. Mot. 24. Plaintiff's reliance on *Little v. Barreme*, 6 U.S. (2 Cranch) 170, 179 (1804), Opp'n 15—decided 136 years *before Yearsley*, and that did *not* involve a private contractor—is thus misplaced.

DEFENDANTS' MOTION TO DISMISS
Page 7

*Yearsley* immunity is unfounded. Opp'n at 16. For one, *Childs* only addressed whether the court had appellate jurisdiction over the denial of a derivative sovereign immunity defense. 22 F.4th at 1098 (holding it did not). Anything else is *dicta*. Regardless, *Childs* noted the same distinction as Defendants, Mot. 28-30, between the "government contractor defense" under *Boyle* (which considers discretion) and "derivative sovereign immunity" under *Yearsley* (which, when properly interpreted, does not).[5] *Childs* further opined how the "public interest" underlying *Yearsley* is to extend sovereign immunity to agents "carrying out the . . . government's directions," as is the case here. *Id.* at 1097.

## B. Plaintiff Cannot Defeat Defendants' Right to *Filarsky* Immunity.

Immunity under *Filarsky v. Delia*, protects government contractors—like Defendants—from "facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." 566 U.S. 377, 391 (2012). It is undisputed that Defendants and particular CIA employees all engaged in the "same activity" with respect to Plaintiff's treatment and interrogation. Mot. 30-31; *Ali v. Rumsfeld*, 649 F.3d at 774-78. Plaintiff does not argue to the contrary.

Instead, Plaintiff argues two of *Filarsky*'s four elements are absent. Opp'n 16-17. Specifically, Plaintiff claims *Filarsky* immunity is only available to contractors "performing governmental functions that traditionally enjoyed qualified immunity, if [they] did not violate clearly established rights in order to avoid unwarranted timidity." *Id.* 17. Defendants easily satisfy both considerations, entitling them to immunity.

First, Defendants have explained how "general principles of immunity at common law" in 1871 permitted private psychologists to assert qualified immunity where, as here, they "work[ed] in a public institution … alongside government employees [and] their public counterparts would be entitled to assert qualified immunity." Mot. 32-33 (citing *Perniciaro v. Lea*, 901 F.3d 241, 252 (5th Cir. 2018)).

---

[5] *Childs*, 22 F.4th at 1097 n.3 (observing how both doctrines "derived from *Yearsley*" before the Supreme Court "expanded" the government contractor defense in *Boyle*).

DEFENDANTS' MOTION TO DISMISS

Page 8

Plaintiff's retort is to claim *Perniciaro* represents a "split" from cases like *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000). Opp'n 17. Not so. *Perniciaro* correctly criticized *Jensen*: (i) for its overly narrow reading of the need for historical immunity at common law; and (ii) because *Jensen* was decided *12 years* before *Filarsky*. Mot. 33 n.8. If *Jensen* had *Filarsky*'s guidance, the outcome would have been different. Indeed, *Jensen* relied heavily on *Richardson v. McKnight*, 521 U.S. 399 (1997), which *Filarsky* clarified "was not meant to foreclose all claims of immunity by private individuals," and that the "particular circumstances of [*Richardson*]—'a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms'—combined sufficiently to mitigate the concerns underlying recognition of governmental immunity[.]" 566 U.S. at 393. As in *Filarsky*, and unlike *Richardson*, "[n]othing of the sort is involved here[.]" *Id.* Thus, *Jensen*—which described *Richardson*'s rationale as "instructive," and opined "[*Jensen*] is similar to *Richardson* in many respects"—is readily distinguishable. 222 F.3d at 578.

Regardless, courts in the Ninth Circuit have also distinguished *Jensen* where, as here, the "privatization and market forces arguments that the Ninth Circuit found persuasive in *Jensen* and the Supreme Court relied upon in *Richardson* play little to no role." *Braswell v. Shoreline Fire Dep't*, No. C08-924-RSM, 2012 WL 1857858, at *6 (W.D. Wash. May 22, 2012). Here, Plaintiff concedes the CIA recruited and retained Defendants—who were the "only candidate[s] considered" that the CIA "thought to be knowledgeable[.]" Compl. ¶¶ 49-50; *cf. Jensen*, 222 F.3d at 578 (observing "concerns about [contractor] timidity are moderated by the likelihood [defendant's] failure to adequately complete the … duties for which it has contracted will lead to its replacement by competitors.").[6] Indeed, the case for immunity is actually heightened

---

[6] That Defendants were compensated for their specialized services—for which the CIA sought them out, Compl. ¶¶ 49-53—does not change the immunity analysis. Mot. 33

DEFENDANTS' MOTION TO DISMISS

Page 9

where, as here, the "specialized" work concerns perilous matters of "national security." *Mitchell v. Forsyth*, 472 U.S. 511, 541-42 (1985) (Stevens, J., concurring) ("Persons of wisdom and honor will hesitate to answer the President's call to serve … if they fear that vexatious and politically motivated litigation … will squander their time and reputation[.]"); *Turkmen v. Hasty*, 789 F.3d 218, 281 (2d Cir. 2015) (Raggi, J., dissenting) ("It is difficult to imagine a public good more demanding of decisiveness or more tolerant of reasonable, even if mistaken, judgments than the protection of this nation and its people from further terrorist attacks in the immediate aftermath of the horrific events of 9/11"), *reversed in part and vacated and remanded in part sub nom. Ziglar v. Abbasi*, 582 U.S. 120, 152-56 (2017) (officials and wardens held immune to civil conspiracy claims by alien detainees challenging confinement conditions imposed after 9/11). Denying immunity here fosters the "timidity" *Filarsky* strived to prevent.

Second, as noted above, Defendants did not "violate well-established prohibitions" against "torture" in 2001-03 by applying the DOJ-approved interrogation techniques to Plaintiff—an "enemy combatant." *See* Sec. III.A. Finally, Plaintiff has no response to Defendants' cited authority holding that contractors are entitled to immunity where, as here, they "direct[ly]" contracted with the government and/or acted under its "close official supervision." Mot. 34. This too is a sufficient basis to grant immunity.

## IV.    COLLATERAL ESTOPPEL CANNOT BE APPLIED HERE.

Plaintiff, attempting to patch his arguments' fatal flaws, claims Defendants are estopped from arguing the Court lacks jurisdiction under the MCA or that Defendants are entitled to immunity, because the *Salim* court issued interim rulings when faced with *Salim*'s facts. Opp'n 18-22. Not so. Offensive nonmutual issue preclusion is discretionary, and "appropriate only if (1) there was a full and fair opportunity to litigate the *identical* issue in the prior action; (2) the issue was actually litigated in the prior

_____

(citing *Ford v. Anderson Cty.*, No. 6:19-CV-384-JDK, 2022 WL 1424973, at *17 (E.D. Tex. May 5, 2022) (private physician paid $1,500/month held to be immune)).

1    action; (3) the issue was decided in a final judgment; and (4) the party against whom

2    issue preclusion is asserted was a party or in privity with a party to the prior action."

3    *Syverson v. Int'l Bus. Machines Corp*., 472 F.3d 1072, 1078 (9th Cir. 2007) (internal

4    citations omitted) (emphasis added). Plaintiff cannot establish these elements.

5         **A.    Defendants Are Not Precluded From Arguing the MCA Applies.**

6         *Salim* declined to apply the MCA because those detainee-plaintiffs were not

7    properly determined to be "enemy combatants," and because Defendants had not

8    established they were agents "based on the record submitted." *Salim II*, 2017 WL

9    390270, at *4-7. That ruling has no preclusive effect. First, Defendants did *not* have a

10   "full and fair opportunity" to litigate the "identical issue." Specifically, while Plaintiff

11   claims *Salim* engaged in a substantive analysis concerning Defendants' agent status, *see*

12   Opp'n 20, *Salim denied* Defendants' request for an evidentiary hearing to address

13   agency. 2017 WL 390270, at *7. This renders the *Salim II* ruling inappropriate for

14   offensive nonmutual collateral estoppel: "If procedural opportunities unavailable in the

15   first action could readily cause a different result in the second action, then the results of

16   the first action generally should not be given preclusive effect." *Maciel v. Comm'r*, 489

17   F.3d 1018, 1023 (9th Cir. 2007) (internal quotations omitted); *cf. Ludwig v. Arizona by

18   & through Brnovich*, 790 Fed. App'x. 849, 852 (9th Cir. 2019) (holding party had "full

19   and fair opportunity" to litigate issue following a two-day evidentiary hearing).

20        The *Salim* court presumably refused to hold an evidentiary hearing because its

21   ruling on agency was not outcome determinative: even if Defendants were found to be

22   agents, the MCA was inapplicable because the *Salim* plaintiffs were not enemy

23   combatants. Conversely, here, Plaintiff is an "enemy combatant"—rendering the

24   present issue "not identical." *Syverson*, 472 F.3d at 1081 (issues not sufficiently

25   identical where prior ruling did not end with the issue at hand, but also included facts

26   specific to prior case). Further, for application of issue preclusion, "the issue in the prior

27   litigation must have been a critical and necessary part of the judgment in the earlier

28

DEFENDANTS' MOTION TO DISMISS
Page 11

1  action." *Littlejohn v. United States*, 321 F.3d 915, 923 (9th Cir. 2003). Because agency
2  was unnecessary to the *Salim II* ruling, it cannot be used offensively.

3     Additionally, the *Salim II* ruling was not a "final judgment" on this issue. The
4  *Salim* court clarified its agency ruling was limited by "the record submitted," and did
5  not foreclose the possibility that a more fulsome record would establish agency (despite
6  stymying Defendants' ability to develop such a record). *Salim II*, 2017 WL 390270, at
7  *7. Such a tentative ruling is not "sufficiently firm" to be accorded conclusive effect.
8  *See Luben Indus., Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983). Thus,
9  Defendants are not estopped from invoking the MCA. And even if all four elements had
10 been met, courts should "take potential shortcomings or indices of unfairness into
11 account when considering whether to apply offensive nonmutual issue preclusion."
12 *Syverson*, 472 F.3d at 1078 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331
13 (1979)). It would be particularly unfair to apply collateral estoppel when Defendants
14 were previously denied the chance to develop such evidence.

15     Plaintiff, hoping to rehabilitate his infirm collateral estoppel argument, curiously
16 argues the *1782 Litigation* supports precluding Defendants from invoking the MCA
17 because Defendants appealed other issues in that litigation, but not the finding the MCA
18 was inapplicable. Opp'n 21. This argument is misdirected. *Defendants appealed no*
19 *issues* in the *1782 Litigation* and, critically, *were not even active participants*. 595 U.S.
20 at 197. The U.S. intervened early in *1782 Litigation* via a motion to quash—asserting
21 the MCA divested the court of jurisdiction, and that the states secret privilege applied
22 because if Defendants were to divulge the location of the CIA black sites, it would harm
23 national security interests. *Id.* at 203. The district court granted the U.S.' motion—so
24 there was no need to appeal—as the U.S. obtained the relief sought. *Id.* It was Plaintiff
25 who appealed to the Ninth Circuit, which reversed the application of the state secret
26 privilege. *Id.* In response, the U.S. appealed to the Supreme Court, where the privilege
27 was found to apply, and the subpoena remained quashed. *Id.* at 207.

28

DEFENDANTS' MOTION TO DISMISS
Page 12

Ironically, Plaintiff now faults Defendants for not appealing the district court's ruling that *granted* the U.S.' motion because that ruling also made a superficial finding that the MCA was inapplicable because no additional evidence had been presented on the issue of agency. Plaintiff, petitioner in the *1782 Litigation*, knows Defendants played no part in those appeals, and, therefore, do not afford him the desired preclusive effect. The Court should address Defendants' argument that the MCA applies on the Complaint before it and allow jurisdictional discovery to give Defendants the opportunity to fully and fairly litigate the issue in the event the MCA's dispositive impact is not clear on the Complaint's face—an opportunity they were denied in *Salim*.

**B.    Defendants Are Not Precluded From Arguing Immunity Applies.**

Plaintiff similarly claims Defendants are precluded from advancing their entitlement to derivative sovereign immunity because *Salim* already ruled on this issue. Opp'n 18-20. Plaintiff is again incorrect. The rulings addressing Defendants' claimed immunity were *not* final judgments. "[A] district court order denying a claim of derivative sovereign immunity is not immediately appealable under the collateral order doctrine." *Childs*, 22 F.4th at 1094. Thus, had Defendants sought to appeal the *Salim* rulings, their appeal would have been dismissed for lack of jurisdiction. *Id.* Plaintiff instead tries to delude the Court, broadly claiming "*qualified* immunity" rulings are immediately appealable. Opp'n 20 (emphasis added). But derivative sovereign immunity under *Yearsley* (and even *Filarsky*) is a distinct legal doctrine from traditional "qualified immunity" under 42 U.S.C. § 1983. That *Salim*'s rulings were not appealable weighs heavily against their finality for preclusion purposes. *See Luben*, 707 F.2d at 1040; *Householder Grp., LLLP v. Van Mason*, No. CV 09-2370-PHX-MHM, 2010 WL 5093117, at *3 n.2 (D. Ariz. Dec. 8, 2010) (observing appealability is of "paramount importance" for estoppel).

Collateral estoppel is also inapplicable because Defendants did *not* have a "full and fair opportunity" to litigate an "identical issue" in *Salim*. While *Salim* mentions Plaintiff's early treatment as a precursor to the three specific detainee-plaintiffs in that

case, the court did *not* decide Defendants' entitlement to immunity *as to Plaintiff*. At both the motion to dismiss and summary judgment phases, the court observed an "inquiry [was] required into whether the contractor 'exceeded his authority,' or whether the government authority 'was not validly conferred'" in the context of the *Salim* plaintiffs. *Salim I*, 183 F. Supp. 3d at 1130; *Salim III*, 268 F. Supp. 3d at 1148. And at summary judgment, the focus was whether "Defendants, being on site, exercised significant control *during individual interrogations*." *Salim III*, 268 F. Supp. 3d at 1150 (emphasis added). Thus, *Salim* recognized that the context of the *individual* detainee's treatment properly determines whether a contractor "exceeded his authority." And no such ruling occurred as to Plaintiff. To that end, courts have also made independent immunity determinations with respect to *different contractors* working on the same project, and under the same delegated authority. *See In re Oil Spill by the Oil Rig "Deepwater Horizon* No. MDL 2179, 2016 WL 614690, at *10 (E.D. La. Feb. 16, 2016) (private contractors who operated under the valid conferral of government authority from the Clean Water Act in connection with the Deepwater Horizon disaster, and who followed government instructions, held immune); *In re Oil Spill by the Oil Rig "Deepwater Horizon*," 2016 U.S. Dist. LEXIS 101175, at *36 (E.D. La. Aug. 2, 2016) (additional contractors immune). Because *Salim* did not specifically assess Plaintiff's interrogation, it is improper to apply issue preclusion with respect to immunity here.[7]

## V.  THE POLITICAL QUESTION DOCTRINE APPLIES TO CIA "CONTRACTORS."

Contrary to Plaintiff's suggestion, Defendants do *not* "tacitly concede" their political question doctrine argument falters under the *Baker* standard. Opp'n 37-38. Moreover, Plaintiff misunderstands that the *Taylor* test does not supplant the *Baker* factors; rather, it *focuses and distills* the *Baker* factors to apply to the modern world in which contractors are increasingly used to support and accomplish executive branch

---

[7] Should this case proceed to discovery, discretion-based discovery would be different than in *Salim*, further establishing this is *not* an identical issue previously considered.

DEFENDANTS' MOTION TO DISMISS
Page 14

1  functions—the exact issue *Taylor* presents. Defendants suggest usage of the *Taylor* test
2  because it is most on point. But the outcome is the same under either test.

3      That Plaintiff insinuates the CIA is somehow outside the government because it
4  is a "civilian intelligence agency" defies logic and a basic understanding of our nation's
5  structure. Opp'n 39. And Plaintiff cites *nothing* to support his bare supposition the CIA
6  (or a CIA contractor) should be treated differently than the military (or a military
7  contractor). This manufactured distinction is especially baseless considering the CIA
8  was making decisions similar to its military counterparts in response to the 9/11 attacks.
9  Indeed, Plaintiff acknowledges the CIA was taking actions in defense of the country—
10  as instructed by the Vice President. Compl. ¶30.

11      Further, the CIA and its contractors do not fall outside of the scope of the political
12  question doctrine simply because the CIA is not part of the "military," as defined by
13  Plaintiff again without support. Opp'n 39-40. In fact, the political question doctrine has
14  been applied to CIA decisions innumerous times. *See e.g.*, *Hmong 2 v. United States*,
15  799 Fed. App'x. 508, 509 (9th Cir. 2020) (suit against CIA and U.S. nonjusticiable
16  because decision to grant aid to foreign military group was a political decision entangled
17  with conduct of foreign relations); *Harbury v. Hayden*, 522 F.3d 413, 420 (D.C. Cir.
18  2008) (common law tort claims arising from CIA's alleged torture and killing of the
19  plaintiff's husband in Guatemala in the early 1990's presented a political question);
20  *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736, 737 (S.D.N.Y. 1986) (suit
21  where plaintiff claimed CIA negligently placed land mines in Nicaraguan harbor that
22  damaged plaintiff's ships found nonjusticiable). Plaintiff's claimed distinction is
23  baseless.

24      Plaintiff's analysis of the *Taylor* test is similarly flawed. Plaintiff relies
25  exclusively on conclusory statements that "there was no military control," and
26  "Defendants exceed their authority," to support his argument there could be no
27  "intertwinement between national defense decisions and Defendants conduct." Opp'n
28  39-40. But, the record does not support these statements and does not rebut Defendants'

DEFENDANTS' MOTION TO DISMISS

Page 15

1    detailed analysis. Mot. 14-18. Critically, Plaintiff alleges a "CIA takeover" of Plaintiff's
2    interrogation, with Defendants' use of enhanced interrogation techniques undertaken at
3    the request of, and pursuant to, the direct supervision of the CIA and only after DOJ
4    approval. Compl. ¶¶16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140. The application of
5    those techniques was inextricably intertwined with the CIA's actions and judgements
6    in response to the Al Qaeda threat. *Id.* Plaintiff's newly-manufactured conclusory
7    statements cast no doubt on either prong of *Taylor*'s test. *In re: KBR, Inc*., 893 F. 3d
8    241, 259-60 (4th Cir. 2018); *Taylor*, 658 F.3d at 411.

9        Next, Plaintiff is incorrect that *Salim* and *Al-Shimari* control the outcome. Opp'n
10   37, 40. As Defendants' detailed, the *Taylor* test has garnered additional support since
11   *Salim* was decided, and the cases relied upon in *Salim* simply do not support that
12   Plaintiff's interrogation by Defendants is justiciable. Mot. 23. And the stark
13   dissimilarities between the conduct at issue in *Al-Shimari* and the instant conduct
14   renders inapt any unlawfulness conclusion sough to be derived therefrom. Mot. 21-22.

15       Finally, even if the Court is inclined to utilize the *Baker* factors in their raw form
16   to analyze the presence of a political question, such a question clearly exists. A textually
17   demonstrable commitment to the executive and legislative Branches over decisions
18   involving war and foreign policy is undeniable. *See* U.S. CONST. art II, § 2, cl. 1; art. I,
19   § 1, cls. 12-14; art. II, § 2. And because the Ninth Circuit has determined there was no
20   clearly recognized definition of "torture" during the period in which Defendants'
21   alleged conduct took place, neither can there be judicially manageable standards. *Yoo*,
22   678 F.3d at 764. It is also undebatable that the interrogation techniques' application was
23   inherently entangled with political decisions because those judgments were themselves
24   inextricably intertwined with the CIA's actions and determinations in response to the
25   Al Qaeda threat. Compl. ¶¶16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140. Lastly, Plaintiff
26   tries to sidestep the political question doctrine's application because "every branch has
27   [after-the-fact] described Defendant's acts as torture." Opp'n 38-39. In light of the
28   uncertainty of the legality of the conduct in 2002, as discussed *supra*, the Court should

DEFENDANTS' MOTION TO DISMISS
Page 16

1   not be swayed by these post-hoc politically-motivated pronouncements, but perform the

2   "discriminating case-by-case analysis" into whether a political question is so

3   inextricably tied to the case. *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 551

4   (9th Cir. 2014) (citations omitted). In sum, Plaintiff does not and cannot meaningfully

5   contest the application of the political question doctrine under either the *Taylor* test or

6   the *Baker* factors.

## VI.   PLAINTIFF HAS NOT ALLEGED COGNIZABLE ATS CLAIMS

### A.   State Acquiescence Is Insufficient Under the ATS.

9       Plaintiff admits "private conduct without government involvement" cannot

10  support Counts I, II, and IV, Opp'n 23, and concedes that if Defendants are U.S. agents,

11  the Court lacks jurisdiction. *Id.* at 7. Thus, Defendants do not divine a "catch-22"—the

12  law creates it. Plaintiff, desperate to escape this dilemma, misrepresents the law.

13  Plaintiff curiously claims Defendants somehow devised the (well-established) state

14  action requirement applicable to ATS torture claims. *Id.* at 23-24; *but see Sinaltrainal*

15  *v. Coca-Cola Co.*, 578 F.3d 1252, 1266 (11th Cir. 2009) (failure to allege state action

16  is fatal to an ATS claim); Mot. 35. Plaintiff also errantly claims he must show only that

17  the government "acquiesced" in Defendants' conduct—citing no authority addressing

18  an ATS claim. Rather, Plaintiff relies exclusively on the CAT to support this assertion.

19  Opp'n 23-26. But the CAT merely defines "torture;" it does not impact the ATS' state

20  action requirement—as evidenced by the fact that none of Plaintiff's cited cases concern

21  the ATS or state action requirement. *See Reyes-Reyes v. Ashcroft*, 384 F.3d 782, 787

22  (9th Cir. 2004) (discussing CAT's torture definition for an asylum claim); *Karki v.*

23  *Holder*, 715 F.3d 792, 806 (10th Cir. 2013) (assessing CAT's Art. 3 in asylum context).

24       Worse, in an attempt to distinguish the on-point ATS cases Defendants identify,

25  Plaintiff warps the law. For example, he argues *Kadic*'s § 1983 color of law language

26  only applies in the Torture Victim Protection Act ("<u>TVPA</u>") context, when that court

27  explicitly states, "the color of law jurisprudence … is a relevant guide to whether a

28  defendant has engaged in official action for purposes of jurisdiction under the Alien

DEFENDANTS' MOTION TO DISMISS

Page 17

Tort Act." *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995). Indeed, Plaintiff misconstrues the court's distinction between the ATS and the TVPA. While the ATS is broader, this is only because it dispenses with the state action requirement for certain of its claims (none applicable here), while TVPA liability always requires such showing. *Id.* at 241. In fact, *Kadic* highlights the distinction between the CAT and the ATS' state action requirement in that it cites the CAT solely to "defin[e] torture." *Id.* at 244. Torture's definition is not disputed in this action. Plaintiff also attempts to distinguish *Aldana v. Del Monte Fresh Produce, N.A., Inc*., 416 F.3d 1242 (11th Cir. 2005). But *Aldana* repudiates Plaintiff's acquiescence standard. *Id.* at 1248. ("Guatemala's registration and toleration of private security forces does not transform those forces' acts into state acts."). *Aldana* then adds, "[t]his lack of state action is *particularly definite* where, as here, Plaintiffs do not allege sufficient facts to warrant the inference that the National Police knew of and purposefully turned a blind eye to the events." *Id.* (emphasis added). Plaintiff interprets this as saying that had the Police known, the state action requirement would have been met. Wrong. This statement is merely explaining that the state action requirement was completely out of reach, i.e. even had the police known, the requirement would not have been met—the police's lack of knowledge simply made that determination more definite.

Contrary to Plaintiff's representations, a "threshold question in any AT[S] case against a private party … is whether the alleged tort requires the private party to engage in state action for AT[S] liability to attach, and if so, whether the private party in fact engaged in state action." *Doe I v. Unocal Corp.*, 395 F.3d 932, 945 (9th Cir. 2002). No ATS case addressing torture, non-consensual medical experimentation, or arbitrary detention has held that acquiescence alone satisfies this threshold issue. And while Plaintiff attempts to deny it absent authority, "courts look to the standards developed under 42 U.S.C. § 1983 to determine whether the [ATS] claim [against a private actor] will stand." *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 345 (C.D. Cal. 1997). Specifically, courts look to whether "a private individual acts under

color of law within the meaning of section 1983" by acting together with state officials or with significant state aid. *Id.* The Complaint concedes this is the relevant standard; it alleges Defendants "acted under color of law … in that they acted with apparent (though not bona fide) authority." Compl. ¶117. Plaintiff attempts to lessen the standard required for state action only because he now recognizes that in alleging Defendants acted under color of law, he has pled an agency relationship resulting in MCA applicability.

## B. Finding Plaintiff Alleged Non-Consensual Medical Experimentation Would Greatly Expand Pfizer

In interpreting the ATS' bounds, the Supreme Court has stressed restraint and caution. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004); Mot. 37. Plaintiff asks this Court to extend the holding in *Abdullahi v. Pfizer, Inc.*, the sole case allowing non-consensual medical experimentation to support an ATS claim, beyond large-scale testing of drugs without informed consent, thereby stripping this already tenuous claim of the only shred of specificity it maintains. 562 F.3d 163,185 (2d Cir. 2009) ("[T]he prohibition in question applies to the testing of drugs without the consent of human subjects on the scale Pfizer allegedly conducted"). Plaintiff asserts confining the scope of *Pfizer* to the very parameters the Second Circuit defined would be a "novel limitation." Opp'n 33. But, specificity is a critical element in establishing new ATS claims, and, as such, expanding *Pfizer* is the novel approach. *Sosa*, 542 U.S. 692 at 738. Plaintiff's invitation should be declined.

## C. Defendants Are Not Liable For Plaintiff's Entire Detention

The Complaint advances a claim for arbitrary detention, seeking to hold Defendants liable for Plaintiff's decades-long detention at U.S. black sites and military bases, which plainly contradicts Plaintiff's claim Defendants were not agents. Compl. ¶¶137-44. Plaintiff recognizes he has overreached, so he now seeks to divide his claim into multiple "detentions, both short and long." Opp'n 34-37. But, Plaintiff is not entitled to replead his claim via motion practice; Plaintiff's claim as pled is not limited to the period of Defendants' interrogation—Plaintiff claims Defendants are the direct

1   cause of his *entire* detention. Pivoting, Plaintiff now introduces new allegations, such

2   as "[Plaintiff's] torture has left the government apparently unwilling to release him for

3   fear that somehow he may have been radicalized and poses a continuing threat … or—

4   much more likely that he would further publicize details of his treatment to the

5   detriment of the CIA's bureaucratic interests," Opp'n 36, and, that "the purported

6   'confessions' they extracted from him, have created political risk of any country to

7   accept him out of Guantanamo." *Id.* at 37. These allegations cannot be considered.

8   *Schneider v. Cal. Dept. of Corrs.*, 151 F.3d 1194, 1198 n.1 (9th Cir. 1998).

9        Moreover, Plaintiff presses his claim against the wrong party. Detention is

10  arbitrary when it is "not accompanied by notice of charges; if the person detained is not

11  given early opportunity to communicate with family or to consult counsel; or is not

12  brought to trial within a reasonable time." *Martinez v. City of Los Angeles*, 141 F.3d

13  1373, 1384 (9th Cir. 1998). But, Defendants are not alleged to have control over

14  charging, prosecuting or making counsel available to Plaintiff.[8] Thus, Defendants

15  cannot be liable for his alleged arbitrary detention. *See Liu Bo Shan v. China Const.*

16  *Bank Corp.*, 421 Fed. App'x. 89, 92-93 (2d Cir. 2011). In *Liu Bo Shan*, the court held

17  that a Chinese Bank could not be held liable for arbitrary detention claims even if it

18  facilitated the plaintiff's arrest, manufactured false evidence against him and knew the

19  manner in which he would be treated during his detention. *Id.* Notably, the Bank

20  operated as an arm of the government and was not an entirely private entity. *Id.* at 92.

21  Nevertheless, the Bank could not be held an instrumentality for all of the government's

22  actions, just as Defendants cannot be held liable for 22 years of Plaintiff's detention at

23  the hands of the executive branch or the military. Moreover, adopting Plaintiff's theory

24  would extend Defendants' liability for his detention in perpetuity and extend liability

25  for his detention to every individual and entity involved. Plaintiff's theory is absurd.

26

27

28  [8] As such, any UN decision concerning Plaintiff's detention is inapposite. Opp'n 33.

DEFENDANTS' MOTION TO DISMISS
Page 20

1    DATED this 5th day of February, 2024.

2

3                                        **EVANS, CRAVEN & LACKIE, P.S.**

4                                By:    */s James B. King*

5                                       James B. King, WSBA #8723

6                                       Attorneys for Defendants

7                                       Evans, Craven & Lackie, P.S.

8                                       818 W. Riverside Ave., Ste. 250

9                                       Spokane, WA 99201

10                                      (509) 455-5200

11                                      (509) 455-3632 facsimile

12                                      jking@ecl-law.com

13                                      **BLANK ROME LLP**

14                               By:    */s James Smith*

15                                      James Smith (*Pro Hac Vice*)

16                                      Brian Paszamant (*Pro Hac Vice*)

17                                      Ann Querns (*Pro Hac Vice*)

18                                      Attorney for Defendants

19                                      One Logan Square

20                                      130 North 18th Street

21                                      Philadelphia, PA 19103

22                                      Phone: (215) 569-5791

23                                      *Counsel for Defendants*

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS
Page 21

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Jeffry K. Finer, Esquire (Jeffry@FinerWinn.com)

Finer Winn

2850 East Rockhurst Lane, Suite 356

Spokane, WA 99223

(509) 981-8960

*Counsel for Plaintiff*

Solomon B. Shinerock, Esquire (Solomon.Shinerock@lbkmlaw.com)

Adam Kaufmann, Esquire (Adam.Kaufmann@lbkmlaw.com)

Elizabeth M. Velez, Esquire (Elizabeth.Velez@lbkmlaw.com)

Anika Conrad, Esquire (Annika.Conrad@lbkmlaw.com)

Lewis Baach Kaufmann Middlemiss PLLC

The Chrysler Bldg, 405 Lexington Avenue, 64th Floor

New York, NY 10174

(212) 826-7001

Eric L. Lewis, Esquire (Eric.Lewis@lbkmlaw.com)

David Short, Esquire (David.Short@lbkmlaw.com)

Alexander Bedrosyan (**alexander.bedrosyan@ibkmlaw.com**)

Lewis Baach Kaufmann Middlemiss PLLC

1101 New York Avenue NW, Suite 1000

Washington, DC 20005

*Counsel for Plaintiff*

DEFENDANTS' MOTION TO DISMISS
Page 22

1

                              **EVANS, CRAVEN & LACKIE, P.S.**

2

             By <u>s/ James B. King, WSBA #8723</u>

3

                  James B. King, WSBA #8723

4

                  Attorneys for Defendants

5

                  Evans, Craven & Lackie, P.S.

6

                  818 W. Riverside Ave., Ste. 250

7

                  Spokane, WA 99201

8

                  (509) 455-5200

9

                  (509) 455-3632 facsimile

10

                  jking@ecl-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS
Page 23

1    FINER WINN
2    2850 East Rockhurst Lane, Suite 356,
3    Spokane, WA 99223
4    (509) 981-8960
5
6
7                UNITED STATES DISTRICT COURT
8              EASTERN DISTRICT OF WASHINGTON
9
10   _____
11   ZAYN AL-ABIDIN MUHAMMAD HUSAYN
12   also known as ABU ZUBAYDAH
13
14       Plaintiff,
15
16         v.                   Case No. 2:23-cv-00270-TOR
17
18
19   JAMES MITCHELL and
20   JOHN "BRUCE" JESSEN
21
22           Defendants.
23   _____
24
25
26      PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
27      DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION .........................................................................................1

FACTUAL BACKGROUND AND THE *SALIM* CASE ..............................2

LEGAL STANDARD ....................................................................................5

ARGUMENT .................................................................................................6

I.   The Complaint Adequately Alleges That Defendants Violated Clearly Established Rights As Private Contractors, Not U.S. Agents, And Acted Outside the Scope of Authority .............................................................6

   A. The MCA Does Not Apply Because Defendants Lacked the Authority to Bind the U.S. and were not U.S. Agents .......................................7

      1. Defendants fail to proffer any evidence to demonstrate an agency relationship, and their own contracts with the United States plainly rebut such a relationship ...............................................................8

      2. The Complaint does not and need not allege that Defendants were agents of the U.S. .....................................................................................11

   B. Defendants' Roles and Conduct Defeat Their Immunity Arguments .........13

      1. Torture and similar abuses can never be validly authorized, and Defendants abused Plaintiff outside the scope of any authority that would entitle them to Yearsley immunity ..........................................14

      2. Defendants violated clearly established rights and are not entitled to Filarsky immunity ...........................................................................16

   C. Defendants should be Collaterally Estopped from Relitigating This Court's Previous Denials of Their MCA and Immunity Arguments ......................18

      1. Defendants had a full and fair opportunity to litigate their MCA and immunity theories, and they lost ............................................................18

      2. The Court's rejections of Defendants' arguments were "final judgments" for estoppel purposes...........................................................................19

      3. Resolution of the MCA issue in Plaintiff's § 1782 Action lends further weight to the case for collateral estoppel ..............................................21

II.  Defendants' Conduct as Private Actors Violated Substantive Laws Cognizable Under the ATS ................................................................................22

A. An Agency Relationship Between Defendants and the State is Not Required to Support the Claims Plaintiff Asserts ......................................................23

  1. Plaintiff may prevail on a torture claim where private defendants act with the acquiescence of the state ..............................................................23

  2. Plaintiff may prevail on claims for arbitrary detention and non-consensual scientific experimentation where private defendants act with state acquiescence................................................................................28

B. Defendants Committed Nonconsensual Scientific Experimentation as Recognized at International Law....................................................................30

C. Defendants Are Responsible for Plaintiff's Arbitrary Detention...............33

III. The Political Question Doctrine Has No Applicability Here Because the Complaint Implicates Unauthorized Conduct of CIA Contractors, Not Any Government Action..........................................................................................37

CONCLUSION ..........................................................................................................40

CERTIFICATE OF SERVICE .................................................................................42

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullahi v. Pfizer*,
    562 F.3d 163 (2d Cir. 2009) .................................................... 30-31, 33

*Adickes v. S. H. Kress & Co.*,
    398 U.S. 144 (1970) ........................................................................... 12

*Al-Quraishi v. Nakhla*,
    728 F.Supp.2d 702 (D. Md. 2010) .............................................. 12, 28

*Al Shimari v. CACI Premier Tech., Inc.*,
    263 F.Supp.3d 595 (E.D.Va. 2017) ............................................. 28, 40

*Aldana v. Del Monte*,
    416 F.3d 1242 (11th Cir. 2005) ........................................................ 27

*ANA Int'l, Inc. v. Way*,
    393 F.3d 886 (9th Cir. 2004) .............................................................. 7

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 6

*Baker v. Carr*,
    369 U.S. 186 (1962) ...................................................................... 38-39

*Barrett Bus. Servs., Inc. v. Colmenero*,
    No. 1:22-CV-3122-TOR, 2022 WL 21320230 (E.D. Wash. Dec. 19, 2022) ...... 6

*Behrens v. Pelletier*,
    516 U.S. 299 (1996) .......................................................................... 20

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ 6

*Berry v. King County*,
    19 Wash.App.2d 583 (Wash. App. 2021) ......................................... 35

*Brown v. DirecTV, LLC,*
   562 F.Supp.3d 590 (C.D. Cal. 2021) ........................................................ 11-12

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.,*
   797 F.3d 720 (9th Cir. 2015) ......................................................................16

*Campbell-Ewald Co. v. Gomez,*
   577 U.S. 153 (2016)........................................................................... 13-14

*Center for Bio. Diversity v. Mattis,*
   868 F.3d 803 (9th Cir. 2007) ......................................................................39

*Childs v. San Diego Fam. Hous. LLC,*
   22 F.4th 1092 (9th Cir. 2022) ....................................................................16

*Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*
   80 F.Supp.3d 1180 (E.D. Wash. 2015) ........................................................5

*Doe v. Qui,*
   349 F.Supp.2d 1258 (N.D. Cal. 2004) ......................................................35

*Doe I v. Nestle USA, Inc.,*
   766 F.3d 1013 (9th Cir. 2014) ..................................................................35

*Eastman Kodak v. Kavlin,*
   978 F.Supp. 1078 (S.D.Fla.1997) ............................................................35

*Filarsky v. Delia,*
   566 U.S. 377 (2012)........................................................... 14, 16-18

*Fisher v. Le Vian Corp.,*
   815 F. App'x 170 (9th Cir. 2020) ................................................................8

*Gomez v. Campbell-Ewald Co.,*
   768 F.3d 871 (9th Cir. 2014) ..............................................................14, 16

*Hamad v. Gates,*
   732 F.3d 990 (9th Cir. 2013) ......................................................................7

Plaintiff's Opposition to Motion to Dismiss
Page v

*Husayn v. Mitchell*,
  938 F.3d 1123 (9th Cir. 2019) ...............................................21

*In re Est. of Ferdinand Marcos Hum. Rts. Litig.*,
  25 F.3d 1467 (9th Cir. 1994) .................................................28

*In re Zayn Al-Abidin Muhammad Husayn*,
  No. 2:17-CV-0171, 2018 WL 11150135 (E.D. Wash. Feb. 21, 2018) .............21

*Jensen v. Lane Cty.*,
  222 F.3d 570 (9th Cir. 2000) ...............................................17

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 2009) .................................................27

*Karki v. Holder*,
  715 F.3d 792 (10th Cir. 2013) ..............................................26

*Little v. Barreme*,
  6 U.S. (2 Cranch) 170 (1804) ...............................................15

*Lopez v. Stages of Beauty, LLC*,
  307 F.Supp.3d 1058, 1064 (S.D. Cal. 2018) ...................................9

*Luben Indus., Inc. v. United States*,
  707 F.2d 1037 (9th Cir.1983) ............................................ 19-20

*McAdory v. M.N.S. & Assocs., LLC*,
  No. 3:17-CV-00777-HZ, 2021 WL 2321634 (D. Or. June 7, 2021)................11

*Mehinovic v. Vuckovic*,
  198 F.Supp.2d 1322 (N.D. Ga. 2002)...................................... 33-34

*MGIC Indem. Corp. v. Moore*,
  951 F.2d 361 (9th Cir. 1991) (unpublished) ..................................8

*Montana v. United States*,
  440 U.S. 147 (1979).........................................................18

Plaintiff's Opposition to Motion to Dismiss
Page vi

*Nicholes v. Jano*,
No. 8:18-CV-774-T-60AEP, 2020 WL 2615529 (M.D. Fla. May 22, 2020) ....13

*NLRB v. Amax Coal Co.*,
453 U.S. 322 (1981)..................................................................................7

*Pacheco v. United States*,
21 F.4th 1183 (9th Cir. 2022) ..............................................................35

*Perniciaro v. Lea*,
901 F.3d 241 (5th Cir. 2018) ...............................................................17

*Peterson Builders, Inc. v. United States*,
26 Cl. Ct. 1227 (Cl. Ct. 1992)..............................................................8

*Posada v. Cultural Care, Inc.*,
66 F.4th 348 (1st Cir. 2023)...............................................................16

*Resol. Tr. Corp. v. Keating*,
186 F.3d 1110 (9th Cir. 1999) ...........................................................18

*Reyes-Reyes v. Ashcroft*,
384 F.3d 782 (9th Cir. 2004) ..............................................................26

*Richardson v. McKnight*,
521 U.S. 399 (1997)..................................................................13, 17

*Saleh v. Titan Corp.*,
580 F.3d 1, 15 (D.C. Cir. 2009) .........................................................27

*Salim v. Mitchell*,
183 F.Supp.3d 1121 (E.D. Wash. 2016) ("*Salim I*")................................*passim*

*Salim v. Mitchell*,
No. CV-15-0286, 2017 WL 390270 (E.D. Wash. Jan. 27, 2017)
("*Salim II*")...............................................................................*passim*

*Salim v. Mitchell*,
268 F.Supp.3d 1132 (E.D. Wash. 2017) ("*Salim III*") ...............................*passim*

*Sec. People, Inc. v. Medeco Sec. Locks, Inc.*,
   59 F.Supp.2d 1040 (N.D. Cal. 1999) ..................................................20

*Syverson v. International Business Machines Corp.*,
   472 F.3d 1072 (9th Cir. 2006) ..........................................................20

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
   658 F.3d 402 (4th Cir. 2011) ....................................................... 38-40

*Terenkian v. Rep. of Iraq*,
   694 F.3d 1122 (9th Cir. 2012") ................................................... 20-21

*Thomas v. I.N.S.*,
   35 F.3d 1332 (9th Cir. 1994) ..............................................................8

*United States v. Bonds*,
   608 F.3d 495 (9th Cir. 2010") ............................................................8

*United States v. Cox*,
   836 F.Supp.1189 (D. Md. 1993) ........................................................13

*United States v. Zubaydah*,
   595 U.S. 195 (2022)...............................................................21, 39

*Williams v. PillPack LLC*,
   644 F.Supp.3d 845 (W.D. Wash. 2022) ............................................11

*Wolfe v. Strankman*,
   392 F.3d 358 (9th Cir. 2004) ..............................................................6

*Yearsley v. W.A. Ross Const. Co.*,
   309 U.S. 18 (1940)...................................................................... 14-16

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) ............................................................14

*Zheng v. Ashcroft*,
   332 F.3d 1186 (9th Cir. 2004") ........................................................26

*Zivotofsky v. Clinton*,
    132 S.Ct. 1421(2012) ........................................................................38


**Statues & Regulations**

28 U.S.C. § 2241 ("MCA") ..................................................................*passim*

30 U.S.C. § 1716 ......................................................................................7

8 C.F.R. § 208.18(a)(1), (7) ....................................................................24

45 C.F.R. § 46.102(e) ..............................................................................33


**International Cases**

*Case of Husayn (Abu Zubaydah) v. Poland*, App. No. 7511/13 (July 24,
    2014), *available at*
    https://hudoc.echr.coe.int/#{%22itemid%22:[%22001-146047%22]} .............25

*Commission nationale des droits de l'Homme et libertés v. Chad*,
    Communication 74/92, Afr. Comm'n H.P.R., ¶¶ 5, 20-22 (1995),
    *available at* http://hrlibrary.umn.edu/africa/comcases/74-92.html ....................29

*Hajrizi Dzemajl et al. v. Yugoslavia*, Communication No. 161/2000,
    Committee Against Torture, U.N. Doc. CAT/C/29/D/161/2000 (2002),
    *available at*
    https://docstore.ohchr.org/SelfServices/FilesHandler.ashx?enc=6QkG1
    d%2fPPRiCAqhKb7yhssh2tXWBbyLwahMw00Sn91WFLbogS4lNHI
    Fmi9l4qQUu4yr8GaoCEvocLp34m5r6cVXtHIA4y9KELip8FEd%2be
    ec0NRY5aGjGUiW7IVrCRFoVzQvkAkrdVd6CsJPe7UCihHJYfqh%
    2bPGp70mnBSm4s%2f5E%3d ........................................................25

*Medov v. Russia*, ECtHR, App. No. 25385/04 (2009), *available at*
    https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-90645%22]} ..........29

*Mr. Ibn al-Shaykh al-Libi and 25 other persons v. United States of America*, WGAD Opinion No. 29/2006, U.N. Doc. A/HRC/4/40/Add.1 (2006), *available at* https://documents-dds-ny.un.org/doc/UNDOC/GEN/G07/106/04/PDF/G0710604.pdf ....................... 34

*Osman v. United Kingdom*, ECtHR, App. No. 23452 (Oct. 28, 1998), *available at* https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-58257%22]} ................................................................................... 29

*Riera Blume v. Spain*, ECtHR, App. No. 37680/97 (1999), *available at* https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-58321%22]} .......... 29

*United States Diplomatic and Consular Staff in Tehran (U.S. v. Iran)*, Judgment, 1980 I.C.J. Rep. 3 (May 24, 1980), *available at* https://icj-cij.org/sites/default/files/case-related/64/064-19800524-JUD-01-00-EN.pdf ........................................................................................................ 29

*United States v. Brandt (The Medical Case)*, International Military Tribunal, Judgment, Aug. 20, 1947, *available at* https://www.legal-tools.org/doc/c18557/pdf .................................................................. 31

*United States v. Milch*, 2 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10 (Apr. 16, 1947), *available at* https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1002 &context=nmt2 ....................................................................................... 31

*Velásquez Rodriguez v. Honduras*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4 (July 29, 1988), *available at* https://www.corteidh.or.cr/docs/casos/articulos/seriec_04_ing.pdf ................... 29

*Zayn al-Abidin Muhammad Husayn (Abu Zubaydah) v. United States of America, et al.*, WGAD Opinion No. 66/2022, U.N. Doc. A/HRC/2022/66 (2022), *available at* https://www.ohchr.org/sites/default/files/documents/issues/detention-wg/opinions/session95/A-HRC-WGAD-2022-66-Advance-Edited-Version.pdf........................................................................................... 33

**Other Authorities**

Comm. Against Torture and Other Cruel, Inhuman or Degrading Treatment
    or Punishment, General Comment No. 2, U.N. Doc. CAT/C/GC/2 (Jan.
    24, 2008), *available at* https://www.ohchr.org/en/documents/general-
    comments-and-recommendations/catcgc2-general-comment-no-2-
    2007-implementation ...........................................................................25

Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85 ("CAT"),
    *available at*
    https://treaties.un.org/doc/Publication/UNTS/Volume%201465/volume
    -1465-I-24841-English.pdf .......................................................*passim*

Convention on the Rights of Persons with Disabilities, Dec. 12, 2006, 2515
    U.N.T.S. 3, *available at*
    https://treaties.un.org/doc/Publication/UNTS/Volume%202515/v2515.
    pdf ..........................................................................................................30

H. Comm. on the Judiciary, 111th Cong. 113-115 (May 26, 2010) (interview
    with Jay Bybee, Fmr. Assistant Attorney General) ...........................15

*ICRC Commentary on Geneva Convention (III)*, Art. 130, ¶ 5257 (2020),
    *available at* https://ihl-databases.icrc.org/en/ihl-treaties/gciii-
    1949/article-130/commentary/2020...................................................31

*ICRC Commentary on Additional Protocol (I) to the Geneva Conventions*
    (1987), *available at* https://ihl-databases.icrc.org/en/ihl-treaties/api-
    1977/article-11/commentary/1987................................................. 31-32

PHYSICIANS FOR HUMAN RIGHTS, NUREMBERG BETRAYED: HUMAN
    EXPERIMENTATION AND THE CIA TORTURE PROGRAM (June 2017),
    *available at* https://phr.org/wp-
    content/uploads/2017/06/phr_humanexperimentation_report.pdf ...................33

Press Conference by the President, Office of the Press Secretary, Aug. 1,
    2014, *available at* https://obamawhitehouse.archives.gov/the-press-
    office/2014/08/01/press-conference-president ..................................39

*Report of the Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No. 113-288 (Dec. 9, 2014) ...............................................................39

Restatement (Third) of Foreign Relations Law, § 702 (1987) ......................... 33-34

Restatement (Third) Of Agency § 1.01 (2006).................................................... 7-8

Rule 12(b)...........................................................................................................5

Third Geneva Convention on Prisoners of War, Aug. 12, 1949, 75 U.N.T.S. 135, *available at* https://treaties.un.org/doc/Publication/UNTS/Volume%2075/volume-75-I-972-English.pdf...............................................................................30

U.N. Human Rights Committee, General Comment 31, U.N. Doc. CCPR/C/21/Rev.1/Add.13 (2004), *available at* https://digitallibrary.un.org/record/533996 ......................................................29

U.S. Instrument of Ratification to CAT, § II. (1)(d), Oct. 21, 1994, 1830 U.N.T.S. 321 .........................................................................................24

U.S. Observations on U.N. Human Rights Committee General Comment 31 (Dec. 27, 2007)*, available at* https://2001-2009.state.gov/s/l/2007/112674.htm..............................................................24

**INTRODUCTION**

Plaintiff was the unfortunate "guinea pig" for an interrogation/torture program devised and implemented by Defendants. Defendants designed this program to test the bounds of human tolerance and resistance, and ultimately to win valuable follow-on contracts that earned them tens of millions of dollars. Their tools—based on recognized torture methods—included sleep deprivation, physical restraint, physical abuse, isolation, and at least 83 applications of waterboarding. Plaintiff suffered horrific abuses under Defendants' cruel, amateur hands as Defendants forced him way beyond any lawful, authorized interrogation and into a netherworld of pain, terror, and deliberate psychological destabilization. Defendants now seek to evade accountability for their misconduct by hiding behind the government whose authority and laws they flouted, and rewriting the facts surrounding their personal, unlawful infliction of torture and other abuses. That they inflicted impermissible torture has been recognized by everyone from U.S. Presidents to Supreme Court justices to international adjudicative bodies, yet Defendants persist in a fantasy world where they can ignore their monstrous deeds.

Defendants rely upon factual characterizations to support their motion and ask the Court to determine whether they were U.S. agents (they were not), and whether their tortious misconduct fell within the scope of any valid authorization (it did not). A motion to dismiss is not the place to dispute facts, and the well-pleaded allegations

1  suffice to show that, as this Court has already found, Defendants were independent

2  contractors, not agents, and their actions with respect to Plaintiff were clearly illegal

3  and outside the scope of any authority they may have had. These facts are dispositive

4  of their arguments under the Military Commissions Act and immunity doctrines.

5  There are no new facts or law to justify revisiting this Court's prior, well-reasoned

6  adjudications rejecting Defendants' arguments. Defendants are collaterally estopped

7  from raising them in the hopes of a different result.

8      Nor must Plaintiff show an agency relationship to prevail on his standalone

9  claims for torture and other violations of international human rights law. The

10 Complaint plausibly alleges that Defendants acted with official acquiescence, and

11 no more is required. These claims are properly pleaded, and causation is a fact-bound

12 analysis that will be addressed at trial. The political question doctrine is also

13 inapplicable: the Complaint is addressed to Defendants' unauthorized misconduct

14 and the use of torture, which this Court and others have already addressed.

15  **FACTUAL BACKGROUND AND THE _SALIM_ CASE**

16     On March 28, 2002, Plaintiff was captured by the CIA, which mistakenly

17 believed he was a high-ranking member of Al Qaeda. Plaintiff promptly provided

18 useful information to the FBI interrogation team. Compl. ¶¶ 42-48.

19     In April 2002, the CIA engaged Defendants as independent contractors to

20 help interrogate Plaintiff. Defendants had no information-gathering experience or

1    anti-terrorism training. Rather, they had worked as interrogation *resistance* trainers

2    for the US Air Force's SERE school. This involved mock applications of torture,

3    including waterboarding, under limited circumstances, controlled to prevent a risk

4    of long-term harm. *Id*. at ¶¶ 17-27, 33-37. In early 2002, Jessen specifically

5    promoted the use of those methods for detainees outside the protections of the

6    Geneva Convention. *Id*. at ¶ 52.

7        When Defendants failed to elicit any additional information from Plaintiff,

8    they claimed that he was resisting interrogation. Having presented this "problem" to

9    the CIA, they also proposed a solution: the experimental use of interrogation

10   techniques, based on those at SERE, for which they would enjoy, as private

11   contractors, fees of $1800 per day, plus travel expenses. *Id*. at ¶¶ 49-66.

12       The CIA ultimately approved Defendants' proposal, including the use of ten

13   "enhanced" interrogation techniques. Approval was based on the close control of the

14   techniques as at SERE, and noted that techniques that could cause permanent mental

15   anguish or physical harm could violate the U.S. criminal prohibition against torture.

16   *Id*. at ¶¶ 70-78. The proposed safeguards proved meaningless.

17       After receiving limited approval for enhanced interrogation techniques,

18   Defendants "ignore[d] CIA legal advice" and commenced on a repeated basis

19   activities "forbidden by U.S. law," engaging in torture, arbitrary detention, and

20   unconsented experimentation "well beyond the representations and limitations that

1    they had offered when seeking authority to implement their interrogation program."

2    *Id.* ¶¶ 83, 87. Defendants did not disclose the actual severity of their interrogation

3    plan, or that the safety protocols from the SERE program would not be implemented.

4    *Id.* at ¶ 74. They were simultaneously the persons committing the acts of torture,

5    those whose proposals were being tested, those who stood to benefit if their

6    "experiment" proved a success, and also those responsible for avoiding permanent

7    mental anguish. *Id.* at ¶¶ 28, 56, 90, 126. This squalid episode made a mockery of

8    both the scientific method and the rule of law.

9        Waterboarding, in particular, departed from the safeguards provided in SERE.

10   Defendants used substantially more water, for greater durations, and far more

11   applications of waterboarding. *Id.* at ¶¶ 83-84. Mitchell justified the departure from

12   the SERE program safeguards—and thus any legal approval—so that the

13   waterboarding of Abu Zubaydah would be "for real." *Id.* at ¶ 84. Unlike in SERE, it

14   was all too real. And Plaintiff suffers from Defendants' decisions to this day.

15       ***The* Salim *Action*:** On October 13, 2015, other victims who had suffered

16   psychological and physical torture at Defendants' hands filed an action here. *See*

17   *Salim v. Mitchell*, No. CV-15-0286 (E.D. Wash) (the "*Salim* Action" or "*Salim*").

18       Defendants twice moved to dismiss the *Salim* Action, collectively asserting

19   the principal arguments they advance here: the Court lacks jurisdiction under the

20   political question doctrine and the Military Commissions Act, 28 U.S.C. § 2241 (the

1  "MCA"), and Defendants are entitled to derivative sovereign immunity. The Court

2  rejected each of these arguments. *See* 183 F.Supp.3d 1121, 1133 (E.D. Wash. 2016)

3  (Quackenbush, J.) ("*Salim I*"). In a second opinion, the Court found that for the

4  purposes of the MCA, Defendants were *not* agents of the U.S., and the MCA did not

5  bar the Court's exercise of jurisdiction. *See* No. CV-15-0286, 2017 WL 390270, at

6  *7 (E.D. Wash. Jan. 27, 2017) ("*Salim II*").

7      Defendants moved for summary judgment, relitigating the political question

8  doctrine and sovereign immunity issues. After considering the evidence, the Court

9  denied that motion for substantially the same reasons that it denied the motions to

10  dismiss. *See* 268 F.Supp.3d 1132, 1160-61 (E.D. Wash. 2017) ("*Salim III*"). The

11  parties then reached a settlement. *Salim*, No. CV-15-0286, ECF No. 259. The

12  opinions of the *Salim* Court have not been withdrawn and remain good law.

13                **LEGAL STANDARD**

14      Defendants move to dismiss under Rules 12(b)(1) and 12(b)(6). A

15  jurisdictional challenge under Rule 12(b)(1) "may be either facial, where the court's

16  inquiry is limited to the allegations in the complaint; or factual, where the court may

17  look beyond the complaint to consider extrinsic evidence." *Cmty. Ass'n for*

18  *Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F.Supp.3d 1180, 1206 (E.D.

19  Wash. 2015) (Rice, J.). Except for Plaintiff's "enemy combatant" status (which is

20  undisputed), Defendants present a facial attack. Defendants' Motion to Dismiss,

1    ECF No. 27 ("MTD"), 7-8. In resolving the facial attack, all allegations in the

2    Complaint are presumed to be true and all reasonable inferences drawn in the

3    Plaintiff's favor. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The same

4    is true for resolving Defendants' 12(b)(6) motion. *Barrett Bus. Servs., Inc. v.*

5    *Colmenero*, No. 1:22-CV-3122-TOR, 2022 WL 21320230, at *3 (E.D. Wash. Dec.

6    19, 2022) (Rice, J.). The Court's review is limited to the Complaint, documents

7    incorporated therein by reference, and judicial notice. *Id.* A 12(b)(6) motion must be

8    denied if the Complaint alleges "sufficient factual matter, accepted as true, to 'state

9    a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

10   (2009), quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007).

11                                  **<u>ARGUMENT</u>**

12   I.   **<u>The Complaint Adequately Alleges That Defendants Violated Clearly</u>**
13        **<u>Established Rights As Private Contractors, Not U.S. Agents, And Acted</u>**
14        **<u>Outside the Scope of Authority</u>**

15   As alleged in the Complaint, Defendants had no agency relationship to the U.S., and

16   this is dispositive of their arguments under the MCA. The Complaint plausibly

17   alleges that their conduct was clearly illegal and outside the scope of any authority

18   they enjoyed. As a result, they are unable to claim derivative sovereign immunity.

19   Defendants have fully litigated these issues in Article III courts, and they have been

20   fairly adjudicated to an appealable status against the Defendants. Defendants should

21   be estopped from re-litigating these issues again here.

Plaintiff's Opposition to Motion to Dismiss
Page 6

## A. The MCA Does Not Apply Because Defendants Lacked the Authority to Bind the U.S. and were not U.S. Agents

The MCA deprives the Court of jurisdiction only where a complaint asserts claims "against the United States or its agents." 28 U.S.C. § 2241(e); *Hamad v. Gates*, 732 F.3d 990, 995 (9th Cir. 2013). Because Congress did not define "agents" within the MCA, this Court must refer to the common law definition of the word. *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981). A jurisdiction-stripping statute is "not to be expanded beyond its precise language," because of the presumption of judicial review. *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 891 (9th Cir. 2004) (quotation and citation omitted)). Congress knows how to protect government contractors, and when it wants to, it does so explicitly. *See, e.g.*, 30 U.S.C. § 1716 (defining covered "person" as "any agent or employee of the United States and any independent contractor"). It did not do so here. This Court need not reverse its previous finding on the subject by expanding the MCA beyond its precise language.

"As defined by the common law, the concept of agency posits a consensual relationship in which one person … acts as a representative of or otherwise acts on behalf of another person with *power to affect the legal rights and duties of the other person*" vis-à-vis third parties. Restatement (Third) Of Agency § 1.01 (2006) (emphasis added). The person represented, in turn "has a right to control the actions of the agent." *Id*. This means that agency looks both inward—"between the agent and the principal"—and outward—among the "third-parties with whom the agent

interacts." *Id.* "[C]ontrol alone does not establish an agency relationship." *Fisher v. Le Vian Corp.*, 815 F. App'x 170, 171 (9th Cir. 2020). While Defendants also cite the Restatement, they omit and entirely ignore the requirement that to be an agent of the Government, they must *have the power to bind the Government. Cf. Thomas v. I.N.S.*, 35 F.3d 1332, 1339-40 (9th Cir. 1994), as amended on denial of reh'g (Nov. 23, 1994) (U.S. Attorneys' authority to enter into cooperation agreements binding the U.S. Government rendered them "agents" of the U.S.). Defendants never had any such power.

### 1. Defendants fail to proffer any evidence to demonstrate an agency relationship, and their own contracts with the United States plainly rebut such a relationship

"Unlike employees, independent contractors are not ordinarily agents." *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010). "The law presumes that a party acts for himself, and the party asserting an agency relationship bears the burden of proving the agency." *MGIC Indem. Corp. v. Moore*, 951 F.2d 361 (9th Cir. 1991) (unpublished). "A finding of an agency relationship between the government and contractor is unusual absent extraordinary contract provisions." *Peterson Builders, Inc. v. United States*, 26 Cl. Ct. 1227, 1230 (Cl. Ct. 1992).

Defendants submitted evidence relating to other parts of their MCA argument, *i.e.* MTD App. A, but, notably and dispositively, fail to proffer any evidence or argument to meet their burden of overcoming the presumption against agency for

1   contractors. Their failure to carry their burden was fatal to their MCA argument

2   when they moved to dismiss in *Salim*—a fact the Court remarked upon in denying

3   their motion—and they did not even advance the position in their motion for

4   summary judgment in that case.

5        Here, Defendants have not even submitted their own contracts to try and show

6   that they were agents of the U.S., and the Court may infer from that omission that

7   the contracts would show that they were independent contractors who were paid to

8   provide services for the U.S., not to act as agents.

9        The *Salim* docket makes it clear that the contracts reviewed by the *Salim* court

10  include those retaining Defendants as independent contractors for the enhanced

11  interrogation of Plaintiff. *Salim*, No. 2:15-cv-00286, ECF. Nos. 84-1, 84-2, and 84-

12  3 (collectively, the "Contracts"); *Lopez v. Stages of Beauty, LLC*, 307 F.Supp.3d

13  1058, 1064 (S.D. Cal. 2018) (this Court may take judicial notice that these

14  documents were filed in *Salim*). These include a December 2001 consulting services

15  agreement, which, on April 4, 2002, shortly after Plaintiff was captured, was

16  modified to pay Mitchell $1800 per day for work outside the U.S. and $17,000 in

17  travel expenses. Contracts at PgID 1592, 1602. This contract was extended through

18  October 2002, and therefore covers the period Plaintiff's torture at the hands of

19  Defendants as relevant here. *Id*. at PgID 1602-1605. Jessen entered into a similar

20  agreement in July 2002, with similar modifications. *Id*. at PgID 1641, 1647, 1649.

Plaintiff's Opposition to Motion to Dismiss
Page 9

As this Court recognized in *Salim*, the contracts that Defendants entered into with the CIA conclusively rebut the baseless assertion that Defendants were agents. *Salim II* at *3. Defendants' contracts identify them as "Independent Contractor[s]" who were retained for "consulting and research." Contracts at PgID 1592, 1597. Mitchell's contract, for example, explicitly states that it should not "be construed as requiring or authorizing the contractor to perform inherently Government functions" and emphasizes that his "legal status is that of an independent contractor." *Id.* at PgID 1593, ¶ 5. Jessen's contract contains identical language. *Id*. at PgID 1644, ¶ 13. As alleged in the Complaint, the text of the Contracts at issue conclusively rebuts the claim of agency. Defendants' motion does not challenge that inference.

In addition to these unequivocal expressions of Defendants' status as contractors, not agents, the substantive rights and obligations established in the contracts are alleged to confirm that there was no agency relationship. This includes Defendants' obligations (consulting and research services), and absence of authority to act as representatives of the U.S., both of which are inconsistent with an agency relationship. The contracts do not grant—indeed they directly disclaim—any power or authority of Defendants to act on behalf of or bind the U.S., or act as representatives of the U.S., or to perform government functions. These key elements of an agency relationship are absent from Defendants' contracts, and Defendants do not argue otherwise.

1
2

### 2. *The Complaint does not and need not allege that Defendants were agents of the U.S.*

3    Nor does the Complaint support an argument that Defendants were somehow

4    agents. Indeed, the Complaint's allegations support an inference to the contrary. The

5    Complaint does not allege or imply that Defendants were authorized representatives

6    of the U.S, or otherwise had the power to bind the U.S. in dealings with any third

7    party. Defendants cite cherry-picked interactions that they had with U.S. personnel,

8    as well as ways in which U.S. personnel exercised certain very limited and irrelevant

9    direction over their services. Even if such interactions could somehow be construed

10    to demonstrate control by the U.S., such control is insufficient to establish an agency

11    relationship if Defendants lacked the authority unilaterally to affect the legal rights

12    and duties of the U.S. Indeed, the fact that the CIA accepted some of Defendants'

13    proposals (as emphasized by Defendants, *see* MTD 16) and rejected others itself

14    shows that Defendants lacked this power.

15    Defendants cite three cases involving non-governmental independent

16    contractors—but all three recognize this grant of authority as a requirement of actual

17    agency. *See Williams v. PillPack LLC*, 644 F.Supp.3d 845, 854 (W.D. Wash. 2022);

18    *Brown v. DirecTV, LLC*, 562 F.Supp.3d 590, 609 (C.D. Cal. 2021); *McAdory v.*

19    *M.N.S. & Assocs., LLC*, No. 3:17-CV-00777-HZ, 2021 WL 2321634, at *5 (D. Or.

20    June 7, 2021) (holding DNF authorized MNS "negotiate debts on its behalf" and

21    "tell its debtors that MNS was settling their debts on DNF's behalf"). Furthermore,

1   two are vicarious liability cases against the principal that address apparent authority

2   and ratification, not actual agency. *Williams*, 644 F.Supp.3d at 854; *Brown*, 562

3   F.Supp.3d at 609 (declining to determine whether agent was actually authorized to

4   collect principal's debt, when principal ratified agent's actions).

5        Defendants also argue that the allegation that Defendants were "acting under

6   color of law" is tantamount to an allegation that they were acting as agents of the

7   U.S. This, too, is incorrect. The term "color of law" means that someone is acting

8   under a ***pretense*** of law, even if the government did not authorize that person to take

9   specific actions. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 211 (1970)

10  (Brennan, J., concurring in part) ("[T]he word 'color,' as in 'color of authority,'

11  'color of law,' 'color of office,' 'color of title,' and 'colorable,' suggests a kind of

12  holding out and means 'appearance, semblance, or simulacrum,' but not necessarily

13  the reality."). "The Supreme Court long ago accepted that a person may act under

14  color of law even when there is no legal basis or authority for his or her actions." *Al-*

15  *Quraishi v. Nakhla*, 728 F.Supp.2d 702, 752 (D. Md. 2010) (holding that allegations

16  that defendants acted under color of law did not make them agents for purpose of

17  immunity analysis), *rev'd on other grounds then reinstated*. The Complaint alleges

18  that Defendants tortured Plaintiff with the acquiescence—but not the legal

19  approval—of the CIA in violating the law of nations, and that they used their position

1  as independent contractors to do so. Compl. ¶¶ 115-117. That does not make

2  Defendants agents of the U.S.

3      In claiming that acting under "color of law" is tantamount to acting as an

4  agent, Defendants cite two cases, MTD 11, but neither case involved the common-

5  law definition of agency—those cases merely involved the term "agent" (in dictum)

6  as shorthand for working for the government. *See Nicholes v. Jano*, No. 8:18-CV-

7  774-T-60AEP, 2020 WL 2615529, at *5 (M.D. Fla. May 22, 2020) (citing a

8  "government *employee* . . . performing a governmental duty" (emphasis added) as

9  an example of an agent, but finding that the issue before it—whether defendant

10 police officers acted in an "official capacity"—was distinct); *United States v. Cox*,

11 836 F.Supp.1189, 1197 n.9 (D. Md. 1993) (irrelevant whether defendant informant

12 was a government agent because he consented to a recording).

13     **B. Defendants' Roles and Conduct Defeat Their Immunity**
14         **Arguments**

15     Federal contractors "do not" "share the Government's unqualified immunity

16 from liability and litigation." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156

17 (2016). This is because contractors have different incentives and legal requirements

18 than government employees. *See Richardson v. McKnight*, 521 U.S. 399, 411 (1997)

19 (contractors can "offset any increased employee liability with higher pay").

20     "[I]mmunity must be extended with the utmost care" because it violates a key

21 principle of justice: "that individuals be held accountable for their wrongful

Plaintiff's Opposition to Motion to Dismiss
Page 13

1    conduct." *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 882 (9th Cir. 2014), *aff'd*,

2    557 U.S. 153 (2016) (quotation marks omitted). The key, outcome determinative

3    inquiry, is "whether the contractor 'exceeded his authority.'" *Salim III* at 1148

4    (quoting *Campbell-Ewald*, 577 U.S. at 167). Defendants, who engaged in illegal

5    activity well beyond the scope of their authority, in a torture program of their own

6    bizarre design, and in a capacity that was not traditionally protected, are entitled to

7    neither *Filarsky* nor *Yearsley* immunity. *See Filarsky v. Delia*, 566 U.S. 377 (2012),

8    *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940).

9
10
11
   ### 1. Torture and similar abuses can never be validly authorized, and Defendants abused Plaintiff outside the scope of any authority that would entitle them to Yearsley immunity

12    As this Court has already decided, Defendants designed and implemented an

13    experimental torture program, and, as such, are not entitled to Yearsley immunity.

14    *Salim III* at 1148. To enjoy Yearsley immunity, a contractor (1) must be acting under

15    authority validly conferred by the government, and (2) those actions must be within

16    the scope of the contract. Defendants have not and cannot meet either requirement.

17    The allegations here relate to torture and other serious human rights violations

18    that can never be lawful. See *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012).

19    Defendants argue that the authority to commit war crimes and torture was validly

20    conferred, because "using the interrogation techniques on suspected terrorists in

21    2001-03 was not unlawful at the time when done by the government." MTD 26. This

Plaintiff's Opposition to Motion to Dismiss
Page 14

1    argument relies on a Department of Justice memo authored in August 2002 (the

2    "Yoo/Bybee Memo"), finding that certain enhanced interrogation techniques, if used

3    under controlled circumstances, and based on representations by Defendants that

4    they did not intend to torture, could not be charged as torture in a criminal case.

5    The Yoo/Bybee Memo does not support Defendants' position. As a

6    fundamental principle of separation of powers, this Court, not the executive branch,

7    determines the legality of an action. *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804)

8    (naval captain was liable for illegally seizing a ship despite Presidential order that

9    he could do so). The memo used indefensible circular logic to make the

10   unremarkable point that if an interrogator did not intend to commit torture when

11   applying enhanced interrogation techniques, they could not be ***criminally*** liable; it

12   says nothing about civil liability. Compl. ¶ 32. And one of its authors testified that

13   the enhanced interrogation techniques as applied to Plaintiff by Defendants,

14   exceeded the memo's approval in terms of both frequency and severity. H. Comm.

15   on the Judiciary, 111th Cong. 113-115, 220-222 (May 26, 2010) (interview with Jay

16   Bybee, Fmr. Assistant Attorney General). Because the Complaint alleges acts of

17   torture and abuse that would be illegal for government employees, the government

18   could not validly authorize Defendants to take these acts.

19   Defendants also fail to meet the second prong of *Yearsley*. Within the Ninth

20   Circuit, *Yearsley* immunity is "limited to cases in which a contractor had no

Plaintiff's Opposition to Motion to Dismiss
Page 15

1   discretion in the design process and completely followed government

2   specifications." *Childs v. San Diego Fam. Hous. LLC*, 22 F.4th 1092, 1097 (9th Cir.

3   2022) (quoting *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732

4   (9th Cir. 2015)). As alleged in the Complaint, and recognized in the *Salim* Action,

5   Defendants designed the interrogation program, recklessly recommended

6   unauthorized techniques to the government, and implemented them on Defendant,

7   retaining full operational control over each day's interrogations, and doing so in a

8   manner that exceeded any authority. Compl. ¶¶ 1, 4, 8, 76, 84.

9       Defendants argue that *Salim*'s reliance on the "no discretion" language from

10  *Cabalace* confuses *Yearsley*'s requirements with *Boyle*. MTD 28-30. But the Ninth

11  Circuit has confirmed *Salim*'s application of the rule, *see Childs*, 22 F.4th at 1097,

12  and Defendants rely on authority from the other side of a circuit split. *See Posada v.*

13  *Cultural Care, Inc.*, 66 F.4th 348, 359 (1st Cir. 2023) (noting split). Defendants do

14  not deny their discretion in the operation of the interrogation program, only that this

15  discretion does not preclude *Yearsley* immunity. The Ninth Circuit has directly

16  rejected that argument.

17      ## 2. *Defendants violated clearly established rights and are not*
18      *entitled to* **Filarsky** *immunity*

19      Whatever the merits of so-called "*Filarsky* immunity" as a distinct doctrine

20  outside of the § 1983 context in which it arose, *see Gomez*, 768 F.3d at 881,

21  Defendants fail to meet its requirements. This is because *Filrasky* provided qualified

1    immunity to contractors performing governmental functions that traditionally

2    enjoyed qualified immunity, if the contractors did not violate clearly established

3    rights in order to avoid unwarranted timidity. 566 U.S. at 390.

4          The basic elements of *Filarsky* are not present here. As noted by this Court,

5    the right not to be subjected to torture and war crimes is well-established. *Salim III*

6    at 1148. This, alone, renders *Filarsky* inapplicable.

7          And the Ninth Circuit, like almost every other circuit to have considered this

8    issue, has rejected the extension of immunity to private psychologists or psychiatrists

9    acting as government consultants. *See, e.g.*, *Jensen v. Lane Cty.*, 222 F.3d 570, 580

10   (9th Cir. 2000) (rejecting qualified immunity for contract psychiatrist in absence of

11   "'firmly rooted' tradition" of immunity) (quoting *Richardson*, 521 U.S. at 404).

12         In fact, Defendants' contracts explicitly state that they will ***not*** fulfil a

13   governmental function, nor is there any basis on which to conclude that they were

14   filling a traditionally protected function. The Complaint relates to torture and other

15   human rights abuses, which cannot comprise any lawful government function at all.

16   This is unchanged by the fact that Defendants were private contractors providing

17   research and consulting services relating to interrogation. Defendants cite cases from

18   the Fifth Circuit, which, again, has split from the Ninth Circuit on immunity.

19   *Perniciaro v. Lea*, 901 F.3d 241, 251 (5th Cir. 2018) (noting circuit split).

20   Defendants' other cases, which involve expert opinions for courts, are inapposite.

1    Defendants charged the Government $1800 per day to design and implement an

2    experimental interrogation program, which served as a foundation for their receipt

3    of tens of millions in the following years. None of those things are consistent with

4    the types of customary government functions often outsourced to government

5    contractors that received *Filarsky* immunity.

6    **C. Defendants should be Collaterally Estopped from Relitigating**
7    **This Court's Previous Denials of Their MCA and Immunity**
8    **Arguments**

9    Nonmutual offensive collateral estoppel serves to conserve judicial resources,

10   prevent inconsistent decisions, and encourage reliance on adjudication by precluding

11   a party from relitigating issues that it previously lost. *See Montana v. United States*,

12   440 U.S. 147, 153 (1979). Its application is committed to the discretion of the trial

13   court and is warranted when "(1) [defendant] was afforded a full and fair opportunity

14   to litigate the issues in the prior actions; (2) the issues were actually litigated and

15   necessary to support the judgments; (3) the issues were decided against [defendant]

16   in final judgments; and (4) [defendant] was a party … in the prior proceedings."

17   *Resol. Tr. Corp. v. Keating*, 186 F.3d 1110, 1114 (9th Cir. 1999). These conditions

18   for application of estoppel are fully met in the instant case.

19   ***1. Defendants had a full and fair opportunity to litigate their MCA***
20   ***and immunity theories, and they lost***

21   Defendants moved to dismiss the *Salim* Action on immunity grounds,

22   devoting a total of 35 pages of briefing and almost 200 pages of exhibits across their

1  initial motion to dismiss and their summary judgment motion. *See Salim*, ECF Nos.

2  27, 29, 169, 200. They devoted a second full motion to their theory that the MCA

3  applies—another 199 pages of briefing and exhibits that were ultimately

4  unpersuasive. *See id.*, ECF Nos. 105, 106, 126.

5      The finding that Defendants were lead participants in what the court called

6  the "Program" was central to each of the well-reasoned opinions rejecting immunity.

7  *See Salim I* at 1133; *Salim III* at 1160. After reviewing the factual record extensively,

8  Judge Quackenbush concluded that Defendants "had a role in the design of the

9  Program, trained interrogators for the Program, and exercised some discretion in the

10 application of the Program." *Salim III* at 1150. The Court also rejected Defendants'

11 MCA arguments, because Defendants failed to meet the burden to prove that they

12 were "agents" of the U.S. *Salim II* at *14. The Court found it "telling the Defendants,

13 who wish to establish the nature of the legal relationship between themselves and

14 the Government, did not cite to the contracts in their Motion." *Id.* Here too,

15 Defendants here have not cited or submitted their contracts with the Government, or

16 any other information to establish the agency relationship—they are simply asking

17 the Court to reach a different conclusion on the same facts.

18
19  ### *2. The Court's rejections of Defendants' arguments were "final judgments" for estoppel purposes*

20 "A final judgment for purposes of collateral estoppel can be any prior

21 adjudication of an issue in another action that is determined to be sufficiently firm

1    to be accorded conclusive effect." *Luben Indus., Inc. v. United States*, 707 F.2d 1037,

2    1040 (9th Cir.1983) (citation omitted). The relevant (noncumulative) factors are that

3    "the parties were fully heard, that the court supported its decision with a reasoned

4    opinion, that the decision was subject to appeal or was in fact reviewed on appeal."

5    *Id.* (quotation and citation omitted). "To be 'final' for [issue preclusion] purposes, a

6    decision need not possess 'finality' in the sense of 28 U.S.C. § 1291." *Syverson v.*

7    *International Business Machines Corp.*, 472 F.3d 1072, 1079 (9th Cir. 2006); *see*

8    *also Sec. People, Inc. v. Medeco Sec. Locks, Inc*., 59 F.Supp.2d 1040, 1045 (N.D.

9    Cal. 1999) (16-page interlocutory order that preceded settlement was final judgment

10   because both parties were fully heard on the issues).

11        The court orders denying Defendants' MCA and immunity defenses met each

12   of these factors. The parties submitted briefs and exhibits and participated in oral

13   argument on these issues. *See Salim*, ECF Nos. 27-29, 105, 106, 120, 121, 169, 178,

14   190, 193, 194, 200, 203. This Court rejected the defenses in three well-reasoned

15   opinions, in a total of 71 pages. *See Salim I, II, III*. These opinions were subject to

16   appeal, because "[a]n order rejecting the defense of qualified immunity at *either* the

17   dismissal stage *or* the summary judgment stage is a 'final' judgment subject to

18   immediate appeal," *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996), as is a denial of

19   a motion to dismiss for lack of subject matter jurisdiction, *Terenkian v. Rep. of Iraq*,

1    694 F.3d 1122, 1131 (9th Cir. 2012). Thus, Judge Quackenbush's orders in the *Salim*

2    *Action* are "final" for purpose of preclusion**.**

### 3. *Resolution of the MCA issue in Plaintiff's § 1782 Action lends further weight to the case for collateral estoppel*

5    Beyond the *Salim* Action, in Plaintiff's § 1782 case filed against Defendants,

6    this Court again denied the applicability of the MCA, noting that Defendants'

7    contracts described them as independent contractors, and rejecting the attempt to

8    characterize themselves as agents of the U.S. *In re Zayn Al-Abidin Muhammad*

9    *Husayn*, No. 2:17-CV-0171, 2018 WL 11150135, at *3 (E.D. Wash. Feb. 21, 2018),

10   *rev'd and remanded sub nom*. *Husayn v. Mitchell*, 938 F.3d 1123 (9th Cir. 2019),

11   *rev'd and remanded sub nom*. *United States v. Zubaydah*, 595 U.S. 195 (2022), *aff'd*,

12   31 F.4th 1274 (9th Cir. 2022). While other aspects of that case were appealed

13   through the Supreme Court, Defendants **did not appeal the MCA** issue.

14   Defendants quote Justice Gorsuch's dissenting opinion in the Supreme

15   Court's resolution of Plaintiff's § 1782 case to support their position, MTD 11-12,

16   but no question of agency was before the Supreme Court, which was only evaluating

17   the Government's invocation of the State Secrets Privilege. Although Justice

18   Gorsuch ascribed some level of responsibility to the CIA (noting that Plaintiff was

19   subject to "torture at the hands of the CIA") his comments do not change the

20   substantive, fact-bound analysis the district court performed of whether Defendants

21   were agents under the common law of agency. *Zubaydah*, 595 U.S. at 238.

Plaintiff's Opposition to Motion to Dismiss
Page 21

1    Defendants' citations to Justice Gorsuch's dissent are no more than cherry-

2    picking snippets of language that do not address the legal issue of agency. Although

3    Justice Gorsuch offhandedly refers to Defendants as agents, he does not say anything

4    regarding their ability to bind the CIA. His central point was something he

5    emphasized repeatedly: that Defendants tortured Plaintiff when they "waterboarded"

6    him and kept him "awake for 126 consecutive hours," and that Plaintiff had a right

7    to learn more about the circumstances under which they did so. *Id*. at 241. And the

8    other Justices also stated that Defendants' "treatment [of Plaintiff] constituted

9    torture," and "he was tortured" by "contractors" who used "enhanced interrogation

10   techniques" including "more than 80 waterboardings" *Id*. at 200-01 (Breyer, J.); *Id*.

11   at 236-237 (Kagan, J., concurring in part). There is no reasonable way to read the

12   various opinions by the Supreme Court as anything other than dismay and disgust

13   with respect to Defendants' treatment of Plaintiff. A dissenting opinion does not

14   somehow accord immunity *sub rosa* through a stray word on an unrelated issue.

15   ## II. **Defendants' Conduct as Private Actors Violated Substantive Laws**
16   **Cognizable Under the ATS**

17   Defendants do not challenge that the Complaint adequately states a claim for

18   war crimes based on the allegations of torture, non-consensual scientific

19   experimentation, and arbitrary detention that Defendants inflicted on Plaintiff. See

20   MTD 34-40. They argue only that their conduct cannot also amount to standalone

21   violations of international human rights law. Defendants are wrong.

Plaintiff's Opposition to Motion to Dismiss
Page 22

## A. An Agency Relationship Between Defendants and the State is Not Required to Support the Claims Plaintiff Asserts

Defendants claim that Plaintiff must allege "state action" in order to prevail on his human rights law claims under the ATS, but they paint with too broad a brush when they further assert the requirement of an "agency relationship" between Defendants and the state (which would, in Defendants' manufactured "Catch-22," thereby preclude jurisdiction under the MCA). MTD 34-35. While it is true that private conduct without government involvement does not violate the substantive causes of action alleged here (other than war crimes), the type of government involvement required is far short of the agency relationship Defendants profess it to be. As described below, it suffices that the government acquiesced in the private party's conduct. The Complaint alleges sufficient facts to plausibly support that the government acquiesced in Defendants' misconduct, and no more is required.

### 1. Plaintiff may prevail on a torture claim where private defendants act with the acquiescence of the state

The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT")—to which the U.S. and 172 other countries are party—defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Art. 1(1), Dec. 10, 1984, 1465 U.N.T.S. 85 (emphasis added). When ratifying CAT, the U.S. expressed

1   its "understand[ing] that the term 'acquiescence' requires that the public official,

2   prior to the activity constituting torture, have awareness of such activity and

3   thereafter breach his legal responsibility to intervene to prevent such activity." U.S.

4   Instrument of Ratification to CAT, § II. (1)(d), Oct. 21, 1994, 1830 U.N.T.S. 321.

5   This is reflected in U.S. regulations implementing the Convention. See 8 CFR §

6   208.18(a)(1), (7).

7        Defendants do not dispute that the prohibition of torture constitutes a rule of

8   customary international law, and that, as such, a violation of the prohibition is

9   cognizable under the ATS. Thus, the plain terms of CAT—and the U.S.

10  understanding—reflect the international consensus that state action is not required

11  for conduct to constitute torture. It is enough that a state was aware of the conduct

12  and failed to prevent it.

13      The U.S. and other relevant authorities have reaffirmed this principle. For

14  example, the U.S. reiterated to the U.N. Human Rights Committee, "it is well-

15  **established in international law** that torture requires state action **or affirmative**

16  **acquiescence**." U.S. Observations on U.N. Human Rights Committee General

17  Comment 31 (Dec. 27, 2007), ¶ 16 (emphases added). It continued: "**Abuses**

18  **committed by private individuals** may constitute human rights violations in certain

19  instances, such as when an abuse is committed . . . with the acquiescence of the

20  state." Id. n.12 (citing Art1 of CAT) (emphasis added).

Plaintiff's Opposition to Motion to Dismiss
Page 24

1      In monitoring states' implementation of CAT, the U.N. Committee Against

2  Torture explains that a state "acquiesce[es]" in torture where state authorities "know

3  or have reasonable grounds to believe that acts of torture . . . are being committed

4  by non-State officials or private actors and they fail to exercise due diligence to

5  prevent [such conduct]." Comm. Against Torture, General Comment No. 2, U.N.

6  Doc. CAT/C/GC/2 (Jan. 24, 2008), ¶ 18. By acquiescing, the State "enables non-

7  State actors to **commit acts impermissible under the Convention**." *Id.* (emphasis

8  added). The Committee found that private actors committed "torture" in 1995 in

9  Yugoslavia by burning the victims' houses in the presence of police who failed to

10 intervene. *Hajrizi Dzemajl et al. v. Yugoslavia*, Communication No. 161/2000,

11 Comm. Against Torture, U.N. Doc. CAT/C/29/D/161/2000 (2002), ¶ 9.2. The

12 European Court of Human Rights ("ECtHR") applied this principle to the torture of

13 Plaintiff at a CIA black site in Poland from December 2002 to September 2003. It

14 found that Plaintiff was tortured by CIA contractors with Polish state acquiescence,

15 affirming that the prohibition of torture "requires States to take measures designed

16 to ensure that individuals within their jurisdiction are not subjected to torture or

17 inhuman or degrading treatment or punishment, **including such ill-treatment**

18 **administered by private individuals** . . . about which [state authorities] knew or

19 ought to have known." *Case of Husayn (Abu Zubaydah) v. Poland*, App. No.

20 7511/13, ¶ 502 (July 24, 2014) (citing three cases) (emphasis added).

1    The Ninth Circuit has made clear when applying CAT: "acquiescence does

2    not require actual control or an agency relationship." *Reyes-Reyes v. Ashcroft*, 384

3    F.3d 782, 788 (9th Cir. 2004) (citing *Zheng v. Ashcroft*, 332 F.3d 1186, 1196 (9th

4    Cir. 2004)); *Morales v. Gonzales*, 478 F.3d 972, 983 (9th Cir. 2007) ("Government

5    acquiescence is not restricted to . . . an agency relationship; it includes 'willful

6    acceptance' or 'willful blindness' on the part of government officials toward abuse

7    inflicted exclusively by private individuals."), *abrogated in different part*. Judges err

8    by requiring a plaintiff to show that a state official or agent inflicted the violence.

9    *Reyes-Reyes*, 384 F.3d at 787-88; *Morales*, 478 F.3d at 984 ("focus[] on direct

10   government involvement . . . with Morales' attackers" is wrong given testimony that

11   prison officers heard her cries of rape and did nothing); *Karki v. Holder*, 715 F.3d

12   792, 806-07 (10th Cir. 2013) (acquiescence demonstrated by "evidence that the

13   government is aware of and does not prevent the Maoists' frequent acts of torture").

14   Defendants try to portray Plaintiff as facing a Catch-22; it is one that

15   Defendants have tried to construct against the mandates of the law. Defendants did

16   not need to be "agents" of the U.S. Government for their abuses of Plaintiff to

17   support a claim of torture. It is enough that, as private individuals, they committed

18   their acts with the acquiescence of the U.S. Government. And this is exactly what

19   occurred, and what the Complaint alleges: CIA officials knew or should have known

20   of Defendants' torture of Plaintiff, but did not try to stop it. Compl. ¶¶ 77-78, 85, 89.

1    Defendants support their Catch-22 argument by citing cases that did not

2    address acquiescence, or found it not established on the facts. MTD 36. Their

3    primary case **omitted the language concerning acquiescence** from its selective

4    quotation of CAT. *Saleh v. Titan Corp.*, 580 F.3d 1, 15 (D.C. Cir. 2009) (misquoting

5    CAT as applying only to "acts by 'a public official or other person acting in an

6    official capacity'"). Defendants also quote *Kadic v. Karadzic*'s statement that courts

7    should look to "principles of agency law and to jurisprudence under 42 U.S.C.

8    § 1983." MTD 35 (quoting 70 F.3d 232, 245 (2d Cir. 2009)). However, *Kadic* made

9    that statement when interpreting the Torture Victims Protection Act, *id.* at 245, a

10   narrower statute not at issue here that does "[not] diminish" the scope of the ATS.

11   *Id.* at 241. In any case, *Kadic* acknowledged the acquiescence language in CAT, *id.*

12   at 243-44, and interpreted the state action requirement consistently with this

13   language, to include private parties "act[ing] together with state officials or with

14   significant state aid," *id.* at 245. Finally, Defendants quote *Aldana v. Del Monte*'s

15   reliance on *Kadic*. MTD 35 (citing 416 F.3d 1242, 1247 (11th Cir. 2005)). However,

16   in *Aldana*, the court suggested that plaintiffs would have had a torture claim had they

17   "allege[d] sufficient facts to warrant the inference that the National Police knew of

18   and purposefully turned a blind eye to the events," *i.e.* acquiescence. *Id.* at 1248.

19       The Court should reject Defendants' attempt to impose an onerous "state

20   action" requirement that the law specifically disclaims. Defendants' manufactured

1  "state action" requirement is also inconsistent with case law establishing that torture

2  can never be an official action but can only be taken under "color of law"—that is,

3  a "veneer of perceived authority." *Al-Quraishi*, 728 F.Supp.2d at 752. These courts

4  have ***allowed*** ATS torture claims to proceed, despite invocations of immunity. *See*

5  *id.* at 751-53; *In re Est. of Ferdinand Marcos Hum. Rts. Litig.*, 25 F.3d 1467, 1472

6  n.8 (9th Cir. 1994); *Al Shimari v. CACI Premier Tech., Inc.*, 263 F.Supp.3d 595,

7  597, 600-02 (E.D.Va. 2017). The same analysis applies here and provides further

8  support to reject the MCA and immunity arguments that Defendants advance. The

9  U.S. Government could not lawfully enter into an agency relationship with

10  Defendants that authorized their illegal conduct. To the extent that the specific

11  conduct at issue has been alleged (and indeed found by courts) to constitute torture,

12  it could not have been performed within the context of a protected agency

13  relationship, and thus no immunity or jurisdiction stripping doctrine would apply,

14  even under the MCA. Defendants at most acted under color of law—with the veneer

15  of official approval but not bona fide legality—and this does not make them agents

16  of the Government.

17             **2.  *Plaintiff may prevail on claims for arbitrary detention and non-***
18                  ***consensual    scientific    experimentation    where    private***
19                  ***defendants act with state acquiescence.***

20      The same is true for Plaintiff's remaining claims. As confirmed by the U.N.

21  and every regional human rights court to have considered it, a violation of

1   international human rights law can arise from private conduct that occurs with the

2   acquiescence of the state, including failure by the state to act with due diligence to

3   prevent it. *See* U.N. Human Rights Committee, General Comment 31, U.N. Doc.

4   CCPR/C/21/Rev.1/Add.13 (2004), ¶ 8; *Commission nationale des droits de*

5   *l'Homme et libertés v. Chad*, Communication 74/92, Afr. Comm'n H.P.R., ¶¶ 5, 20-

6   22 (1995); *Velásquez Rodriguez v. Honduras*, Judgment, Inter-Am. Ct. H.R. (ser. C)

7   No. 4, ¶¶ 173, 182 (July 29, 1988); *Osman v. United Kingdom*, ECtHR, App. No.

8   23452, ¶ 116 (Oct. 28, 1998).

9       This principle has been applied in the arbitrary detention context. For

10   example, the International Court of Justice found that the wrongful detention of U.S.

11   diplomatic staff in Tehran violated customary international law, even when initially

12   the Government of Iran merely "encouraged" and "fail[ed] . . . to oppose" it, without

13   conducting the hostage-taking itself. *United States Diplomatic and Consular Staff in*

14   *Tehran (U.S. v. Iran)*, Judgment, 1980 I.C.J. Rep. 3 ¶¶ 57-60, 91 (May 24); *see also*

15   *Velásquez*, Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 186; *Riera Blume v. Spain*, ECtHR,

16   App. No. 37680/97, ¶ 35 (1999) ("national authorities at all times acquiesced in the

17   applicants' loss of liberty."); *Medov v. Russia*, ECtHR, App. No. 25385/04, ¶¶ 123-

18   25 (2009). The principles prohibiting Iranian private citizens' indefinite detention of

19   Americans with official Iranian acquiescence also apply to American private

20   citizens' arbitrary detention of a foreign national with U.S. acquiescence.

Plaintiff's Opposition to Motion to Dismiss
Page 29

1    No more is required to state a claim for non-consensual experimentation. The

2    prohibition against non-consensual experimentation is a specific, universal, and

3    obligatory norm of international law. *Abdullahi v. Pfizer*, 562 F.3d 163, 174-88 (2d

4    Cir. 2009). It applies to "nonconsensual medical experimentation by any entity—

5    state actors, private actors, or state and private actors behaving in concert." *Pfizer*,

6    562 F.3d at 180. This prohibition is rarely tested in practice – unsurprising after the

7    unimaginable cruelties of the Nazi-era experimentation by Dr. Mengele and his ilk.

8    Nonetheless, Defendants have offered no moral justification or legal authority (and

9    there is none) to differ from the Second Circuit's cogent analysis and adopt a novel

10   'exception' here to the settled rule that private misconduct is actionable under

11   international human rights law when committed with the acquiescence of the state.

12   To contend for such a principle is itself morally abhorrent and legally baseless.

13   **B. Defendants Committed Nonconsensual Scientific**
14   **Experimentation as Recognized at International Law**

15   Defendants ask this Court to reject the Second Circuit's holding in *Pfizer* that

16   the prohibition against nonconsensual experimentation exists in customary

17   international law. MTD 37. The extremely comprehensive analysis in *Pfizer* speaks

18   for itself. 562 F.3d at 174-88. And there is even more evidence of the universality of

19   the prohibition that the Second Circuit did not consider. *See, e.g.*, Convention on the

20   Rights of Persons with Disabilities, Art. 15, Dec. 12, 2006, 2515 U.N.T.S. 3; Third

21   Geneva Convention on Prisoners of War, Art. 130, Aug. 12, 1949, 75 U.N.T.S. 135.

1    Defendants alternatively claim that nonconsensual scientific experimentation

2    does not violate international law unless it involves "pharmaceuticals and medical

3    experiments conducted for a separate purpose," as in *Pfizer*. MTD 37-38. The claim

4    is also morally repugnant and baseless. Defendants' argument would create an

5    exception for many of the Nazi-era experiments, which imposed horrific cruelty in

6    pseudoscientific settings and did not involve pharmaceuticals or applicable medical

7    research. *See, e.g.*, *United States v. Brandt (The Medical Case)*, International

8    Military Tribunal, Judgment, Aug. 20, 1947, pp. 175, 200-01, 211, 237 (indictment

9    for forcing detainees to endure high-altitudes and freezing temperatures); *United*

10   *States v. Milch*, 2 Trials of War Criminals Before the Nuernberg Military Tribunals

11   Under Control Council Law No. 10 (Apr. 16, 1947). The International Committee

12   of the Red Cross ("ICRC") explains that the prohibition includes "conduct the

13   primary purpose of which is to study the effects, at that time unknown, of a product

14   or situation (e.g. extreme cold or altitude) on the human body," *ICRC Commentary*

15   *on Geneva Convention (III)*, Art. 130, ¶ 5257 (2020), and "the practice of leaving a

16   person in complete isolation for a very long period of time." *ICRC Commentary on*

17   *Additional Protocol (I) to the Geneva Conventions*, p. 152, ¶ 463 (1987). The cruelty

18   of human experimentation, like the experimentation in this case, does not depend in

19   any way on whether pharmaceuticals are involved or is there some vague articulation

20   of a medical purpose and there is no factual or legal justification for such a limitation.

The Complaint plausibly alleges no less. Defendants subjected Plaintiff to a psychological experiment to gain knowledge and practical experience regarding how to "break" detainees, which they could then market to the U.S. to win valuable government contracts to provide further custody and interrogation services. They were psychologists and held themselves out to the CIA as such. Compl. ¶¶ 49, 53. Their contracts with the CIA were purportedly for "applied research." Compl. ¶¶ 51, 54, 72, 108. The purpose of their experiment was to induce a state of "learned helplessness" in Plaintiff through various interventions and test the effect of that state on a human detainee's resistance to interrogation. Compl. ¶ 40. The interventions included, *inter alia*, solitary confinement and cold temperatures, as in the historical examples above. Compl. ¶¶ 5, 59. Defendants gathered information from their interrogations of Plaintiff, which they used to contribute to generalizable knowledge about interrogation methods, in order to "break" future detainees. Compl. ¶ 93. This is not research to benefit the physical or mental health of anyone. Contrary to Defendants' suggestion (MTD 38), this yielded information that the SERE training program did not, since the latter taught how to *avoid* learned helplessness, not how to *induce* it and observe its effects. Compl. ¶ 28. It is apt that the CIA internally referred to Defendants' treatment of Plaintiff as "guinea pig research on human beings." Compl. ¶ 85. Its use of a dehumanizing metaphor on Plaintiff and others is no accident. Experts have also concluded that the broad definition of

1   "human subjects research" in U.S. law, 45 C.F.R. § 46.102(e), applies to

2   Defendants' treatment of Plaintiff. *See* PHYSICIANS FOR HUMAN RIGHTS,

3   NUREMBERG BETRAYED: HUMAN EXPERIMENTATION AND THE CIA TORTURE

4   PROGRAM 25 *et seq.* (June 2017).

5        The Court should reject Defendants' invitation to impose a novel limitation

6   based on the facts of *Pfizer* inconsistent with that case's reasoning. The prohibition

7   requires consent and bans experimentation on vulnerable populations such as

8   prisoners. Plaintiff gave no consent and was part of such a population. Plaintiff has

9   stated a claim for nonconsensual scientific experimentation.

10       **C. Defendants Are Responsible for Plaintiff's Arbitrary Detention**

11       The prohibition on arbitrary detention constitutes a norm of customary

12  international law. *See Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1349 (N.D. Ga.

13  2002) (citing Restatement (Third) of Foreign Relations Law, § 702 (1987)). It is

14  beyond dispute that aspects of Plaintiff's detention have been arbitrary as a matter

15  of customary international law, and Defendants do not argue otherwise. The U.N.

16  Working Group on Arbitrary Detention ("WGAD"), which reviews individual

17  complaints of arbitrary detention, has considered the circumstances of Plaintiff's

18  detention and concluded that he has been held arbitrarily. *Zayn al-Abidin*

19  *Muhammad Husayn (Abu Zubaydah) v. United States of America, et al.*, WGAD

20  Opinion No. 66/2022, U.N. Doc. A/HRC/2022/66, ¶¶ 101-18 (2022). WGAD made

1  a similar determination as early as 2006, the year Defendants last claim to have had

2  contact with Plaintiff (MTD 39). *Mr. Ibn al-Shaykh al-Libi and 25 other persons v.*

3  *United States of America*, WGAD Opinion No. 29/2006, U.N. Doc.

4  A/HRC/4/40/Add.1 at 103, ¶ 21 (2006). Defendants argue only that they were not

5  causally responsible for Plaintiff's arbitrary detention because they did not initially

6  detain him in 2002. MTD 39-40.

7       Any challenge to causation involves a fact-bound analysis best addressed at

8  trial, not on a dispositive motion where the Complaint plausibly alleges causation.

9  In any case, Defendants' lack of involvement in the initial capture of Plaintiff is

10  irrelevant—Plaintiff need not argue, and the Court need not find, that his initial

11  capture and detention was arbitrary. The Complaint alleges that Defendants were the

12  direct and proximate cause of **subsequent** arbitrary detentions, both short and long,

13  which states a claim under the ATS.

14       What makes a detention arbitrary is not only the circumstances of a detainee's

15  capture, but also the lack of legal basis for the continuation of the detention, as well

16  as the treatment of the detainee while in detention. *See Mehinovic*, 198 F.Supp.2d at

17  1349 (arbitrary detention is defined as detention "not pursuant to law," or otherwise

18  "incompatible with the principles of justice or with the dignity of the human person."

19  (citing Restatement (Third) of Foreign Relations Law, § 702 (1987)). Arbitrary

20  detention includes detention of a person "without notice of charges and failure to

1   bring that person to trial within a reasonable time." *Id.* Confinements of as little as

2   20 days to a month, in conjunction with torture, were considered prolonged and

3   arbitrary. *Doe v. Qui*, 349 F.Supp.2d 1258, 1325-26 (N.D. Cal. 2004). Significantly

4   shorter detention periods also have been deemed arbitrary. *See Eastman Kodak v.*

5   *Kavlin*, 978 F.Supp. 1078, 1094 (S.D.Fla.1997) (8-10 day detention). Plaintiff has

6   been detained for some **twenty-two years** without charge, the first four years of

7   which were used by Defendants to break him.

8   Domestic law determines questions of causality. *Doe I v. Nestle USA, Inc.*,

9   766 F.3d 1013, 1022 (9th Cir. 2014). In Washington State, proximate cause is a

10  "cause which, in a direct sequence, unbroken by any superseding cause, produces

11  the injury complained of and without which such injury would not have happened."

12  *Berry v. King County*, 19 Wash.App.2d 583, 588 (Wash. App. 2021) (cleaned up);

13  *see also Pacheco v. United States*, 21 F.4th 1183, 1188 (9th Cir. 2022) (same).

14  The Complaint adequately alleges that Defendants were a direct and

15  proximate cause of Plaintiff's arbitrary detention in several respects. **First**, they

16  physically and personally detained him in various stress positions, confinement

17  boxes, and on a waterboarding table over the course of 83 waterboarding sessions.

18  Compl. ¶¶ 16, 28, 90, 141. Could they really have thought that after forty, fifty, sixty,

19  seventy, eighty episodes of near-death torture there would suddenly be a

20  breakthrough in their "research;" or did it become sadistic frustration? The six to

Plaintiff's Opposition to Motion to Dismiss
Page 35

eight weeks that Defendants kept Plaintiff tied to a chair, and the 295 hours (more than 12 days) they confined him in a coffin-sized box also, constitute unlawful detention in violation of customary international law. Compl. ¶¶ 59, 90. Moreover, during the period following the FBI's interrogation of Plaintiff in April 2002, Defendants falsely overpromised on Plaintiff's continuing value as an intelligence source; this led to his continued, incommunicado captivity in a black site well after he could have been "regularized" at Guantanamo or elsewhere, with traditional prisoner of war rights of access and some limited legal process. Instead, Plaintiff remained in Defendants' custody after his initial capture and interrogation in order for Defendants to conduct their illegal, cruel experiments on him; this is not a sufficient legal basis for his continued detention.

**Second**, Defendants physically and personally subjected Plaintiff to torture and cruel, inhuman, and degrading treatment. Compl. ¶¶ 56-65, 78-90. This contributed to the unlawfulness and continuation of his detention. After 22 years detained, there is no case brought against him and likely never will be. Yet his torture has left the government apparently unwilling to release him for fear that somehow he may have been radicalized and poses a continuing threat these many years later, or—much more likely—that he would further publicize details of his treatment to the detriment of the CIA's bureaucratic interests in further revelations of human rights violations. Moreover, Defendants' roles in raising expectations concerning

1   Plaintiff's connections to terrorist groups, and the purported "confessions" they

2   extracted from him, have created political risk for any country to accept him out of

3   Guantanamo, further contributing to his continued arbitrary detention.

4       And if their intent is in question, Defendant Mitchell removed all doubt when,

5   on July 15, 2002, he urged that Plaintiff "remain in isolation and incommunicado for

6   the remainder of his life." Compl. ¶ 98. Defendants attempt to downplay this

7   recommendation of a life sentence, by misquoting the Complaint as conceding that

8   Plaintiff "would have been detained regardless" of this statement. MTD 40 (citing

9   Compl. ¶ 98). The Complaint actually alleges that while Plaintiff would have been

10  ***initially*** detained regardless of Defendants, "his ongoing, interminable detention

11  without charge is intentional and due, in significant part, to [Defendants]." Compl.

12  ¶ 98. The corollary to using torture as a purported experiment was burying its victim

13  alive and forever so the conduct could remain a secret.

14      These allegations state numerous unbroken chains of causation precipitated

15  by Defendants alone, and sufficiently state a claim for arbitrary detention.

16  **III.   The Political Question Doctrine Has No Applicability Here Because**
17         **the Complaint Implicates Unauthorized Conduct of CIA Contractors,**
18         **Not Any Government Action**

19      As this Court has found twice already, the facts and claims presented here are

20  readily justiciable under the test applied in this Circuit. *See Salim I* at 1129-30; *Salim*

21  *III* at 1146-47. Defendants tacitly concede this, asking the Court to rely instead on a

1   factually distinct out-of-circuit test from *Taylor v. Kellogg Brown & Root Servs.,*

2   *Inc.*, 658 F.3d 402, 411 (4th Cir. 2011). Even if it applied to this case, which it does

3   not, *Taylor* would not support dismissal.

4       In the Ninth Circuit courts weigh political question challenges through the six-

5   factor analytical framework provided by the Supreme Court in *Baker v. Carr*, 369

6   U.S. 186, 211 (1962). Supporting facts must be "prominent on the surface," *id.* at

7   217, to satisfy this "narrow exception" to justiciability, *Zivotofsky v. Clinton*, 132

8   S.Ct. 1421, 1427-28 (2012).

9       Here, analysis of these factors does not support Defendants' position. There

10  is no "textually demonstrable constitutional commitment of the issue to a coordinate

11  political department," *Baker*, 658 F.3d at 217, because, as observed by this Court,

12  there are a host of cases in which courts have heard torture claims. *Salim I* at 1129-

13  30 (collecting cases). There is no lack of a "judicially discoverable and manageable

14  standard for resolving" ATS claims, because the law of nations provides the

15  standard. *See id.* at 1128. This case does not ask the Court to make a policy

16  determination or rely on a political decision; the Complaint plainly alleges that

17  Defendants' individual conduct exceeded the scope of their authority; the allegations

18  do not directly implicate a decision of the U.S. or the conduct of its agents.

19      Deciding this case would not put in question the judiciary's respect for the

20  other branches of government. To date, every branch has described Defendants' acts

Plaintiff's Opposition to Motion to Dismiss
Page 38

1    as torture. *See, e.g. Report of the Senate Select Committee on Intelligence Study of*

2    *the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No.

3    113-288, at 19, 33 (Dec. 9, 2014); *Zubaydah*, 595 U.S. at 200; Press Conference by

4    the President, Office of the Press Secretary, Aug. 1, 2014 ("[W]e tortured some

5    folks."). Unlike Defendants' inapposite caselaw addressing the executive's decision

6    to deploy troops and mine harbors during war (MTD 14), here the Court is not asked

7    to question the wisdom of the executive's military decisions, but the legality of the

8    conduct of two independent contractors who devised a torture plan and exceeded

9    their authority in executing that plan on Plaintiff.

10        *Baker* remains good law, and courts in the Ninth Circuit have applied it for 60

11    years. *E.g.*, *Center for Bio. Diversity v. Mattis*, 868 F.3d 803, 821-26 (9th Cir. 2007).

12    There is no reason to reach out for a different test. Moreover, as exemplified by all

13    of Defendants' cases, *Taylor* is inapposite as it concerns claims against military

14    contractors closely controlled by the military, not CIA contractors off on a cruel

15    detour of their own devising. No court has ever ruled that a CIA contractor is akin

16    to a military contractor, because the CIA is a civilian intelligence agency.

17    Defendants' invitation to adopt an out-of-circuit test and extend it to novel facts

18    should be rejected.

19        Defendants would fare no better under *Taylor*. Here, there was no military

20    control, *Taylor*, 658 F.3d at 411, and the CIA is not a stand-in for the military on

1    questions of national defense. Too, the Complaint alleges that Defendants exceeded

2    their authority, acting ***outside*** any government control. *See* Compl. ¶¶ 1, 4, 27-28,

3    33, 40-41, 51, 55-62, 65-72, 74-75, 78-90. This removes the possibility of

4    intertwinement between national defense decisions and Defendants' conduct.

5    While asking this Court to adopt a Fourth Circuit test, Defendants seek to

6    dodge how the Fourth Circuit applied that test in the context of an analogous ATS-

7    torture case. In *Al Shimari*, detainees at the Abu Ghraib prison in Iraq filed ATS

8    claims against the military contractors who deployed unauthorized interrogation

9    techniques. 840 F.3d at 152. Applying *Taylor*, the Fourth Circuit held there was no

10   political question because the conduct was unlawful. *Id*. at 156-58. "[W]hen a

11   contractor has engaged in unlawful conduct, irrespective of the nature of control

12   exercised by the military, the contractor cannot claim protection under the political

13   question doctrine." *Id*. at 157. Mitchell and Jessen unlawfully tortured Abu

14   Zubaydah and cannot escape the consequences of their conduct under the political

15   question doctrine. The result would be the same in the Fourth Circuit.

16                                    **<u>CONCLUSION</u>**

17   For the above reasons, this Court should deny Defendants' motion to dismiss.

18

Dated:      January 5, 2024

Respectfully submitted,

FINER WINN
By: /s/ Jeffry K. Finer
Jeffry K. Finer, Esq.
2850 East Rockhurst Lane, Suite 356
Spokane, WA 99223
(509) 981-8960

LEWIS BAACH KAUFMANN
MIDDLEMISS PLLC
By: /s/ Solomon B. Shinerock
Solomon B. Shinerock (*pro hac vice*)
10 Grand Central, 155 East 44th Street,
25th Floor
New York, New York 10017
(212) 826-7001

Eric L. Lewis (*pro hac vice*)
David Short (*pro hac vice*)
Alexander S. Bedrosyan (*pro hac vice*)
1050 K Street, NW
Suite 400
Washington, DC 20001

*Counsel for Plaintiff*

Plaintiff's Opposition to Motion to Dismiss
Page 41

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

James B. King, WSBA #8723. (jking@ecl-law.com)
Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Ste. 250
Spokane, WA 99201
(509)455-5200
(509)455-3632 facsimile

James Smith (*Pro Hac Vice*)
Brian Paszamant (*Pro Hac Vice*)
Ann Querns (*Pro Hac Vice*)
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Phone: (215) 569-5791

*Counsel for Defendants*

**LEWIS BAACH**
**KAUFMANN MIDDLEMISS PLLC**

By: /s/ Solomon B. Shinerock
Solomon B. Shinerock
10 Grand Central
155 East 44th Street, 25th Floor
New York, New York 10017
(212) 826-7001

Plaintiff's Opposition to Motion to Dismiss
Page 42

1

2

3

4

**EVANS, CRAVEN & LACKIE, P.S.**
James B. King, WSBA #8723
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

5

6

7

8

9

**BLANK ROME LLP**
James T. Smith (admitted *pro hac vice*)
Brian S. Paszamant (admitted *pro hac vice*)
Ann E. Querns (admitted *pro hac vice*)
One Logan Square, 130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5500; fax (215) 832-5674

10

11

Attorneys for Defendants
James Mitchell and John "Bruce" Jessen

12

13

14

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| ZAYN AL-ABIDIN MUHAMMAD HUSAYN also known as ABU ZUBAYDAH,<br><br>Plaintiff,<br><br>v.<br><br>JAMES MITCHELL and JOHN "BRUCE" JESSEN,<br><br>Defendants. | Case No.: 2:23-cv-00270<br><br>**DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FRCP 12(b)(1) AND 12(b)(6)**<br><br>Hearing Date, Oral Argument Requested, February 15, 2024, at 11:00 am |

# **TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ...................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ...................... 2

III. LEGAL STANDARD .................................................................. 5

IV. THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(b)(1) ........ 6

    A. The Military Commissions Act Divests the Court of Jurisdiction ........... 6

        1. Plaintiff Has Been Determined by the U.S. To Be "Properly Detained as An Enemy Combatant." ........................................ 7

        2. Defendants Were Agents of the United States .............................. 8

    B. The Political Question Doctrine Also Divests the Court of Jurisdiction ......................................................................... 13

        1. This Court Should Adopt the Two-Part Taylor Test for Evaluating Political Questions Involving Defense Contractors and Determine That Plaintiff's Claims Raise Nonjusticiable Political Questions .............................. 14

            (a) The CIA Exercised Actual and Plenary Control Over the Interrogation of Plaintiff. ............................ 15

            (b) National Defense Interests Were Closely Intertwined with Military Decisions Governing Defendants' Alleged Conduct. .............................................. 16

            (c) Defendants' Conduct Was Not Unlawful ................... 19

        2. Al Shimari and Salim Are Not Controlling ................................. 21

V. THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(b)(6) ...... 23

    A. Defendants Are Entitled to Derivative Sovereign Immunity ................. 23

        1. Defendants Are Entitled to *Yearsley*-Based Immunity ................. 24

            (a) The Authority Granted Was "Validly Conferred." ............. 24

            (b) Defendants Did Not Exceed the Scope of Their Authority .......................................................... 27

            (c) *Yearsley* Immunity Is Not Limited to Situations Where the Contractor Had "No Discretion" in the Design Process and Completely Followed Government Specifications. ..................................... 28

    B. Defendants are Entitled to *Filarsky*-Based Immunity ...................... 30

         1. Immunity for the Government Function Being Delegated to Defendants Is Historically Grounded in the Common Law ............ 31

i

2.    Defendants Did Not Violate Well-Established Prohibitions of Conduct Involving the Treatment of Enemy Combatants ......... 34

C.    Plaintiff Has Not Sufficiently Alleged ATS Claims ................................ 34

1.    Plaintiff Cannot Allege That Defendants Engaged in the Requisite State Action Required for Counts I, II, and IV ............. 34

2.    Plaintiff Also Has Not Alleged That Defendants Violated The "Law of Nations" for Purposes of Counts II and IV ............. 36

     (a)    Non-consensual Medical Experimentation Cannot Support an ATS claim, and Plaintiff Has Not Alleged Non-Consensual Medical Experimentation. ...................... 37

     (b)    Plaintiff Has Not Alleged Defendants Arbitrarily Detained Him ........................................................................ 39

VI.    CONCLUSION .................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullahi v. Pfizer, Inc.*,
   562 F.3d 163 (2d Cir. 2009) ........................................................... 35, 37, 38

*Ackerson v. Bean Dredging LLC*,
   589 F.3d 196 (5th Cir. 2009) ...................................................................... 24

*ACLU v. DOD*,
   2017 U.S. Dist. LEXIS 159108 (S.D.N.Y. Sep. 27, 2017) .......................... 5

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
   790 F.3d 641 (6th Cir. 2015) ...................................................................... 24

*Agredano v. U.S. Customs Serv.*,
   223 F. App'x 558 (9th Cir. 2007) ............................................................... 24

*Aktepe v. USA*,
   105 F.3d 1404 (11th Cir. 1997) ................................................................. 17

*Al Shimari v. CACI Premier Tech. Inc.*,
   840 F.3d 147 (4th Cir. 2016) ................................................ 19, 21, 22, 23

*Al-Zahrani v. Rodriguez*,
   669 F.3d 315 (D.C. Cir. 2012) ..................................................................... 8

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
   416 F.3d 1242 (11th Cir. 2005) ................................................................. 35

*Alfaro-Huitron v. Cervantes Agribusiness*,
   982 F.3d 1242 (10th Cir. 2020) ................................................................... 9

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011) ................................................................... 28

*In re Am. Boiler Works*,
   220 F.2d 319 (3d Cir. 1955) ...................................................................... 25

*In re: Application of Zayn Al-Abidin Muhammad Husayn.*
   No. 17-cv-171-JLQ (E.D. Wash.).................................................................. 4

*Assoc. Gen. Contractors v. Metro. Water Dist.,*
   159 F.3d 1178 (9th Cir. 1998) ................................................................... 6

*Assoc. of Am. Med. Coll. v. U.S.,*
   217 F.3d 770 (9th Cir. 2000) ..................................................................... 6

*Bader v. State,*
   43 Wn. App. 223, 716 P.2d 925 (1986).................................................. 32

*Baker v. Carr,*
   369 U.S. 186 (1962)........................................................................... 13, 15

*Barr v. Matteo,*
   360 U.S. 564 (1959).................................................................................. 24

*Bartell v. Lohiser,*
   215 F.3d 550 (6th Cir. 2000) ............................................................. 28, 34

*Bednarski v. Potestivo & Assocs., P.C.,*
   2017 U.S. Dist. LEXIS 32522 (N.D. Ill. Mar. 7, 2017) ......................... 27

*Bishop v. Karney,*
   408 F. App'x 846 (5th Cir. 2011)............................................................ 32

*Boyle v. United Tech. Corp.,*
   487 U.S. 500 (1988)..............................................................23, 28, 29, 30

*Braswell v. Shoreline Fire Dep't,*
   2012 U.S. Dist. LEXIS 71308 (W.D. Wash. May 22, 2012) ............. 33, 34

*Brosseau v. Haugen,*
   543 U.S. 194 (2004).................................................................................. 34

*Brown v. DirecTV, LLC,*
   562 F. Supp. 3d 590 (C.D. Cal. 2021)........................................... 9, 10, 12

*Butters v. Vance Int'l, Inc.,*
   225 F.3d 462 (4th Cir. 2000) ............................................................. 24, 31

*Cabalce v. Thomas E. Blanchard & Assocs.,*
   797 F.3d 720 (9th Cir. 2015) ............................................................. 29, 30

*Cabalce v. VSE Corp.,*
   922 F. Supp. 2d 1113 (D. Haw. 2013)..................................................... 28

iv

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016).................................................................24, 28, 31

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*,
    572 F.3d 1271 (11th Cir. 2009) ......................................................15, 17, 18

*Chesney v. TVA*,
    782 F. Supp. 2d 570 (E.D. Tenn. 2011) ...........................................28, 29

*Cooper v. Tokyo Elec. Power Co. Inc.*,
    860 F.3d 1193 (9th Cir. 2017) ....................................................................14

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) .......................................................................................24

*Corrie v. Caterpillar, Inc.*,
    503 F.3d 974 (9th Cir. 2007) .........................................................13, , 17

*Cunningham v. Gen'l Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) .......................................................................26

*DaCosta v. Laird*,
    471 F.2d 1146 (2d Cir. 1973) .......................................................................14

*Doe I v. Cisco Sys., Inc.*,
    73 F.4th 700 (9th Cir. July 7, 2023) ..........................................................40

*Doe v. Qi*,
    349 F.Supp.2d 1258 (N.D. Ca. 2004) ........................................................39

*Elsmore v. Cty. of Riverside*,
    2016 U.S. Dist. LEXIS 62564 (C.D. Cal. Mar. 31, 2016) ......................28

*Filarsky v. Delia*,
    566 U.S. 377 (2012).................................................23, 24, 30, 31, 33

*Flores v. S. Peru Copper Corp.*,
    414 F.3d 233 (2d Cir. 2003) .......................................................................37

*Ford v. Anderson Cty.*,
    2022 U.S. Dist. LEXIS 81821 (E.D. Tex. May 5, 2022) ........................33

*Garcia v. Chapman*,
    911 F. Supp. 2d 1222 (S.D. Fla. 2012)....................................................35

*Hamdi v. Rumsfeld*,
   542 U.S. 507 (2004) .................................................................. 23

*In re Hanford Nuclear Rsrv. Litig.*,
   534 F.3d 986 (9th Cir. 2008) ................................................... 29

*Harris v. Kellogg Brown & Root Servs., Inc.*,
   724 F.3d 458 (3d Cir. 2013) ................................... 14, 15, 18

*Henderson v. United Student Aid Funds, Inc.*,
   918 F.3d 1068 (9th Cir. 2019) ................................................... 9

*Ibrahim v. Titan Corp.*,
   391 F. Supp. 2d 10 (D.D.C. 2005) .......................................... 35

*Janko v. Gates*,
   741 F.3d 136 (D.C. Cir. 2014) .................................................. 8

*Jawad v. Gates*,
   832 F.3d 364 (D.C. Cir. 2016) .................................................. 8

*Jensen v. Lane County*,
   222 F.3d 570 (9th Cir. 2000) ........................................... 33, 34

*Johnson v. Eisentrager*,
   339 U.S. 763 (1950) ................................................................. 14

*Kadic v. Karadzic*,
   74 F.3d 377 (2d Cir. 1996) ............................................ 35, 36

*In re: KBR, Inc.*,
   893 F.3d 241 (4th Cir. 2018) ..........................................*passim*

*In re KBR, Inc., Burn Pit Litigation.*,
   744 F.3d 326 (4th Cir. 2014) ......................................... 24, 27

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................... 6

*Kokkonen v. Guardian Life Ins. Co.*,
   511 U.S. 375 (1994) ................................................................... 6

*Koohi v. U.S.*,
   976 F.2d 1328 (9th Cir. 1992) ................................................. 23

*Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs.*,
    853 F.3d 173 (5th Cir. 2017) ....................................................................... 24

*Lane v. Halliburton*,
    529 F.3d 548 (5th Cir. 2008) ............................................................ 14, 15, 18

*Lebron v. Rumsfeld*,
    670 F.3d 540 (4th Cir. 2012) ...................................................................... 25

*Leitgeb v. Sark Wire Corp.–GA*,
    2022 WL 18777380 (N.D. Ga. Sept. 21, 2022) ....................................... 39

*Liu Bo Shan v. China Constr. Bank Corp.*,
    2011 WL 1681995 (2d Cir. May 5, 2011) .................................................. 39

*Estate of Lockett ex rel. Lockett v. Fallin*,
    841 F.3d 1098 (10th Cir. 2016) ................................................................. 33

*Mangold v. Analytic Servs., Inc.*,
    77 F.3d 1442 (4th Cir. 1996) ..................................................................... 24

*Margitan v. Spokane Cnty.*,
    2023 U.S. Dist. LEXIS 13748 (E.D. Wash. Jan. 26, 2023) ...................... 6

*Martinez v. City of Los Angeles*,
    141 F.3d 1373 (9th Cir. 1998) ................................................................... 39

*McAdory v. M.N.S. & Assocs., LLC*,
    2021 WL 2321634 (D. Or. June 7, 2021) ............................................ 10, 12

*McKay v. Rockwell Int'l Corp.*,
    704 F.2d 444 (9th Cir. 1983) ..................................................................... 31

*McMahon v. Presidential Airways, Inc.*,
    502 F.3d 1331 (11th Cir. 2007) ........................................................ 14, 15, 18

*Morales v. Brown*,
    2015 WL 6167451 (E.D. Cal. Oct. 20, 2015) ........................................... 38

*Myers v. U.S.*,
    323 F.2d 583 (9th Cir. 1963) ..................................................................... 24

*Nicholes v. Jano*,
    2020 WL 2615529 (M.D. Fla. May 22, 2020) ........................................... 11

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"*
   2016 U.S. Dist. LEXIS 101175 (E.D. La. Aug. 2, 2016) ........................................ 25

*In re Oil Spill by the Oil Rig "Deepwater Horizon,"*
   2016 U.S. Dist. LEXIS 18248 (E.D. La. Feb. 16, 2016) ........................... 25, 27, 28

*Padilla v. Yoo,*
   678 F.3d 748 (9th Cir. 2012) .............................................................*passim*

*Perniciaro v. Lea,*
   901 F.3d 241 (5th Cir. 2018) ............................................................ 32, 33

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
   582 F.3d 244 (2d Cir. 2009) ................................................................ 35

*Rasul v. Bush,*
   542 U.S. 466 (2004) ......................................................................... 23

*Reddy v. Karr,*
   102 Wn. App. 742, 9 P.3d 927 (2000) ...................................................... 32

*Richardson v. McKnight,*
   521 U.S. 399 (1997) ......................................................................... 34

*Safe Air for Everyone v. Meyer,*
   373 F.3d 1035, (9th Cir. 2004) ............................................................... 6

*Saldana v. Occidental Petroleum Corp.,*
   774 F.3d 544 (9th Cir. 2014) ........................................................... 13, 17

*Saleh v. Titan Corp.,*
   580 F.3d 1 (D.C. Cir. 2009) ......................................................... 30, 31, 36

*Salim v. Mitchell,*
   183 F. Supp. 3d 1121 (E.D. Wash. 2016) .............................................. 28, 30

*Salim v. Mitchell,*
   268 F. Supp.3d 1132, 1146 (E.D. Wash. 2017) ....................................... 22, 23

*Salim v Mitchell,*
   2017 WL 390270, (E.D. Wash. Jan. 27, 2017) ........................................... 12

Sanchez-Espinoza v. Reagan,
   770 F.2d 202 (D.C. Cir. 1985) ............................................................. 35

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ................................................................. 36, 37, 39

*Suhail Najim Abdullah Al Shimari v. CACI Premier Tech., Inc.*,
    300 F.Supp.3d 758 (E.D. Va. 2018) .................................................. 21, 22

*Taylor Energy Co., LLC v. Luttrell*,
    3 F.4th 172 (5th Cir. 2021) .............................................................. 25, 26

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
    658 F.3d 402 (4th Cir. 2011) ......................................................... *passim*

*U.S. v. Cox*,
    836 F. Supp. 1189 (D. Md. 1993) ............................................................ 11

*U.S. v. Milovanovic*,
    678 F.3d 713 (9th Cir 2012) ..................................................................... 9

*U.S. v. Mitchell*,
    445 U.S. 535 (1980) ............................................................................... 23

*U.S. v. Zubaydah*,
    595 U.S. 195 (2022) ...................................................................... *passim*

*Von Staich v. Atwood*,
    2011 U.S. Dist. LEXIS 83705 (C.D. Cal. Feb. 22, 2011) ...................... 32

*Watson v. Weeks*,
    436 F.3d 1152 (9th Cir. 2006) ................................................................. 6

*Westfall v. Erwin*,
    484 U.S. 292 (1988) ............................................................................... 23

*Williams v. PillPack LLC*,
    644 F. Supp. 3d 845 (W.D. Wash. 2022) ..................................... 10, 11, 12

*Winter v. NRDC, Inc.*
    555 U.S. 7 (2008) ................................................................................... 25

*Yearsley v. W.A. Ross Constr. Co.*,
    309 U.S. 18 (1940) ........................................................................ *passim*

*Young v. County of Hawaii*,
    947 F. Supp. 2d 1087 (D. Haw. 2013) ............................................. 32, 33

139114.00603/133644505v.1

**Statutes**

18 U.S.C. § 2511 (2)(c) ............................................................................. 11

28 U.S.C. § 1350 ........................................................................................ 4

28 U.S.C. § 1782 ........................................................................................ 5

28 U.S.C. § 2241(e)(2) – Military Commissions Act ........................ 1, 6, 7, 8

42 U.S.C. § 1983 ...................................................................................... 35

42 U.S.C. § 2000dd .................................................................................. 20

50 U.S.C. §§ 1541-1548 ........................................................................... 25

50 U.S.C. §§ 3035, 3036(c), (d)(1)-(4) (2005) ......................................... 25

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat.
    224 (2001) ......................................................................................... 25

War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973) ............ 25

RCW 71.05.120 ....................................................................................... 32

**Other Authorities**

152 Cong. Rec. H7,947-48 (Sept. 29, 2006) (statement of Rep.
    Sensenbrenner) ................................................................................... 8

U.S. Dep't of Justice, Office of Public Affairs, Press Release No. 09-356,
    *available at* https://www.usDOJ.gov/opa/pr/2009/April/09-ag-
    356.html .......................................................................................... 27

RESTATEMENT (THIRD) OF AGENCY (2006) .................................................9

Rule 12(b)(1) ........................................................................................ 5, 6

Rule 12(b)(6) ...................................................................................... 6, 23

S. Rep. No. 288, 113th Cong., 2d Sess. (2014) ("SSCI Report") ................. 5

U.S. CONST. art II § 2, cl. 1 ..................................................................... 13

## I.    INTRODUCTION

Six months after September 11, 2001, when Al Qaeda orchestrated the deadliest terrorist attack on U.S. soil, killing more than 3,000 people, a joint force of U.S. and Pakistani agents captured Plaintiff Abu Zubaydah ("Plaintiff"). During initial interrogations, Plaintiff provided significant details about an attack that Al Qaeda was planning and identified the mastermind behind 9/11. Desperate to ensure Plaintiff was not withholding any additional information, the U.S. Central Intelligence Agency ("CIA") took over Plaintiff's interrogation and asked Defendants to propose interrogation techniques that could potentially be used on Plaintiff. Defendants, who had spent years serving as psychologists for the U.S.'s SERE training program that trained U.S. forces how to resist interrogation techniques if captured, answered the CIA's call. Defendants proposed interrogation techniques, based upon their SERE experience, that the CIA could consider using when interrogating Plaintiff. The CIA then sought and got approval from the U.S. Department of Justice ("DOJ") to use some of the proposed techniques. At the CIA's request and under the CIA's control, Defendants then interrogated Plaintiff at a CIA black site using the approved techniques while CIA staff observed and until CIA Headquarters permitted them to stop. Plaintiff now claims Defendants should be personally liable for his interrogation simply because Defendants were contractors of the CIA rather than CIA employees. Plaintiff brings claims under the Alien Tort Statute alleging that Defendants tortured him, subjected him to non-consensual medical experimentation, committed war crimes, and arbitrarily detained him. But Plaintiff's claims cannot proceed.

First, this Court does not have jurisdiction. In passing the Military Commissions Act, 28 U.S.C. § 2241(e)(2), Congress clearly and specifically divested all courts of jurisdiction to hear any non-habeas claims brought by enemy combatants (like Plaintiff) against agents of the U.S. (like Defendants) relating to any aspect of their detention or treatment. Second, the political question doctrine mandates that this Court refrain from exercising jurisdiction because the CIA's decision to direct Defendants to use enhanced

1    interrogation techniques on Plaintiff was inextricably intertwined with national defense
2    interests, as the CIA desperately tried to avoid additional attacks by Al Qaeda and
3    believed Plaintiff knew more about Al Qaeda's plans than he had shared. To adjudicate
4    Plaintiff's claims will require the Court to pass judgment on the decisions the CIA made
5    in trying to protect the American people in the wake of September 11. Such decisions
6    are properly left to the Government's executive branch and are not justiciable.

7         Third, Plaintiff has failed to state a claim on which relief can be granted because
8    Defendants are immune. The CIA specifically asked Defendants to interrogate Plaintiff
9    using enhanced interrogation techniques. Through application of derivative sovereign
10   immunity, Defendants are thus entitled to the same immunity protections as those CIA
11   employees who made the request of Defendants and observed the directed interrogation.
12   Had Defendants been CIA employees, Plaintiff would not be advancing these claims,
13   as evidenced by Plaintiff's failure to name any CIA officials or employees alongside
14   Defendants. Finally, Plaintiff has failed to sufficiently allege that Defendants (1)
15   conducted medical experimentation on him, or (2) are responsible for the U.S. choosing
16   to continue his detention at the U.S. military base in Guantanamo Bay.

17        In the end, this case should be dismissed.

18   **II.    FACTUAL AND PROCEDURAL BACKGROUND**

19        Plaintiff was captured on March 28, 2002, during a raid in Faisalabad Province,
20   Pakistan. Compl. ¶ 42.[1]  At the time, U.S. intelligence "believed [Plaintiff] had
21   connections to high-profile jihadists, including within Al Qaeda," he "was the 'number
22   three' man in Al Qaeda, and that he had authored the Manchester Manual," "an Al
23   Qaeda-generated document that included purported strategies to resist interrogation that
24   British anti-terrorism police recovered in a May 2000 raid on a suspected Al Qaeda safe
25   house in Manchester, England." *Id.* ¶¶ 16, 35, 44.

26

27

28   [1] Defendants accept as true the Complaint's allegations for purposes of this Motion.

DEFENDANTS' MOTION TO DISMISS
Page 2
139114.00603/133644505v.1

These beliefs by the U.S. intelligence community were not unfounded, as Plaintiff admits shortly after his capture, he provided "valuable information regarding a planned attack," including "details such as the sources he had received money from, where the money was going, the individuals involved, and logistical and operational details." *Id.* ¶ 45. Indeed, Plaintiff knew so much about the planned attack that with the information Plaintiff provided, the CIA was able to confirm the intelligence and thwart the attack. *Id.* Plaintiff also knew more about Al Qaeda's September 11, 2001, attack than any other person the U.S. had ever interrogated, as Plaintiff "identified Khalid Shaykh Mohammad as 'Mokhtar'—the mastermind behind the September 11 attacks"—a fact Plaintiff admits had "never been previously confirmed." *Id.* ¶ 47.

Because Plaintiff provided detailed information about terrorist activities, the CIA took over his interrogation and transferred him to a CIA black site. *Id.* ¶¶ 57-58. At this time, the CIA was "keenly focused on its new mandate: to hold and interrogate people suspected of terrorist associations in order to gather intelligence and help avoid a 'second wave' of attacks." *Id.* ¶ 30. The CIA was trying to "regain footing after the intelligence failures apparent in the wake of the September 11 attacks," and was "under immense pressure to produce actionable intelligence." *Id.* ¶¶ 4, 30. Indeed, the Vice President specifically urged the CIA to "use any means at our disposal." *Id.* ¶ 30. In this environment, Plaintiff became the CIA's first "high-value detainee." *Id.* ¶ 4.

Because of the intense pressure the CIA was under, it sought out Defendants and asked them to "think big," and propose interrogation techniques that the CIA could use on Plaintiff. *Id.* ¶ 67. Defendants had, for years, served as psychologists at the SERE training school at Fairchild Air Force Base where U.S. forces were trained on how to withstand certain interrogation techniques including slapping, shaking, stress positions, isolation, forced nudity, body cavity searches, sleep deprivation, exposure to extreme heat or cold, confinement in cramped spaces, dietary manipulation, and waterboarding. *Id.* ¶ 21. Defendants, building upon their experience at SERE, "*proposed*" twelve potential enhanced interrogation techniques to the CIA similar to those utilized at

1  SERE. *Id.* ¶ 70 (emphasis added). The CIA then brought Defendants' proposal to DOJ's
2  Office of Legal Counsel ("OLC")—seeking "legal clearance for the *proposed*
3  techniques." *Id.* ¶ 73 (emphasis added).

4       After proposing the interrogation techniques, Defendants had no interaction with
5  Plaintiff until after August 1, 2002—when the DOJ's OLC issued legal memoranda that
6  concluded "the techniques did not cause the kind of pain associated with 'serious
7  physical injury,' would not give rise to criminal liability," and "would not violate the
8  federal statute criminalizing torture." *Id.* ¶¶ 76-77. Critically, the DOJ approved only
9  10 of the 12 techniques proposed by Defendants. *Id.* ¶ 78. And only after the DOJ's
10  approval did Defendants begin interrogating Plaintiff, while the CIA observed. *Id.* ¶¶
11  79, 80, 82. Defendants had to send CIA Headquarters a summary of Plaintiff's
12  interrogation at the end of each day and maintain data concerning the specific
13  techniques used. *Id.* ¶ 85. Plaintiff's interrogation ended on August 20, 2002, after
14  which Plaintiff provided still more actionable intelligence about three Al Qaeda
15  suspects. *Id.* ¶ 90, 94. Thereafter, and without any involvement from Defendants, the
16  CIA transferred Plaintiff to various black sites until September 2006, when the U.S.
17  transferred Plaintiff to the U.S. base in Guantanamo Bay where he remains detained.
18  *Id.* ¶¶ 95, 97. Critically, Plaintiff does not allege that he has had any interactions with
19  Defendants since 2006. *Id.* On March 27, 2007, a Combatant Status Review Tribunal
20  of the Department of Defense determined that Plaintiff "meets the criteria for
21  designation as an Enemy Combatant." *In re: Application of Zayn Al-Abidin Muhammad*
22  *Husayn.* No. 17-cv-171-JLQ (E.D. Wash.), ECF No. 34-1, Decl. of Steven W. Dalbey,
23  attached hereto as Appendix A.

24       Plaintiff advances claims for torture, non-consensual medical experimentation,
25  war crimes, and arbitrary detention pursuant to the Alien Tort Statute ("ATS"), 28
26  U.S.C. § 1350.  The ATS provides jurisdiction over "any civil action by an alien for a
27  tort only, committed in violation of the law of nations or a treaty of the United States."
28  Plaintiff has not named any employee of the CIA or U.S. Government as a defendant.

1
2
3
4
5
6
7
8

Notably, this is not the first time Plaintiff has been before this Court. In 2017, he filed an *ex parte* 28 U.S.C. § 1782 motion seeking to compel Defendants to testify in connection with Polish litigation regarding Plaintiff's treatment at a CIA black site ("1782 Litigation"). *U.S. v. Zubaydah*, 595 U.S. 195, 198-99 (2022). The Government intervened and moved to quash, asserting the state secrets privilege, and claiming the disclosure of the information sought would harm national security—specifically, the actual location of a CIA black site. *Id.* at 199. This Court held the state secrets privilege applied and dismissed the action. *Id.* at 203.

9
10
11
12
13
14
15
16
17
18

The Ninth Circuit then affirmed in part and reversed in part, finding information that was already publicly known (like the location of the black site) was not protected by the state secrets privilege. *Id.* at 204. The Supreme Court reversed, holding the privilege applied because the CIA never "officially" disclosed the location of any CIA black site and Defendants' "confirmation (or denial) . . . would be tantamount to a disclosure from the CIA itself." *Id.* at 210-11. Moreover, the Supreme Court found the CIA sufficiently established such official disclosure could reasonably be expected to significantly harm national security interests. *Id.* The Supreme Court's opinion cites the S. Rep. No. 288, 113th Cong., 2d Sess. (2014) ("SSCI Report") to support factual statements about Plaintiff's interrogation, which Plaintiff also cites in his Complaint.

19
20
21
22
23
24
25

So too have Defendants faced similar claims arising under the ATS in this Court. In 2015, three foreign nationals, who had allegedly been subjected to enhanced interrogation techniques at CIA black sites, asserted similar claims to those Plaintiff brings here. *Salim v. Mitchell*, No. 15-cv-00286-JLQ (E.D. Wash.) (the "*Salim* Case"). In *Salim*, the plaintiffs had very little or no direct interactions with Defendants and the case settled in 2017 before trial. *ACLU v. DOD*, 2017 U.S. Dist. LEXIS 159108, at *6 n.2 (S.D.N.Y. Sep. 27, 2017) (citation omitted).

26

## III. LEGAL STANDARD

27
28

Rule 12(b)(1) provides for dismissal for "lack of subject matter jurisdiction." FED. R. CIV. P. 12(b)(1). "'A Rule 12(b)(1) jurisdictional attack may be facial or

1   factual.'" *Margitan v. Spokane Cnty.*, 2023 U.S. Dist. LEXIS 13748, *5 (E.D. Wash.

2   Jan. 26, 2023) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.

3   2004)). "The Court's review of a facial attack is limited to the allegations in the

4   complaint whereas [it] need not presume the truthfulness of the plaintiff's allegations'

5   in a factual attack and can consider evidence outside the complaint.'" *Id.*; *Assoc. of Am.*

6   *Med. Coll. v. U.S.*, 217 F.3d 770, 778 (9th Cir. 2000). Plaintiff has the burden of proving

7   jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

8       Rule 12(b)(6), in turn, provides for dismissal of an action for "failure to state a

9   claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). For a 12(b)(6) motion,

10  "all well-pleaded allegations of material fact [are accepted as true] and construe[d] in

11  the light most favorable to the non-moving party." *Padilla v. Yoo*, 678 F.3d 748, 757

12  (9th Cir. 2012). "[C]onclusory allegations of law and unwarranted inferences" are

13  insufficient. *Assoc. Gen. Contractors v. Metro. Water Dist.*, 159 F.3d 1178, 1181 (9th

14  Cir. 1998). A complaint must state "evidentiary facts which, if true, will prove [the

15  claim]," *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), otherwise it

16  will be dismissed. *Watson v. Weeks*, 436 F.3d 1152, 1157 (9th Cir. 2006).

17  **IV.**     **THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(B)(1).**

18      **A.**     **The Military Commissions Act Divests the Court of Jurisdiction.**

19      The Military Commissions Act ("MCA") deprives a court of jurisdiction over

20  non-habeas, detention-related claims where the alien plaintiff was determined to have

21  been properly detained by the U.S. as an enemy combatant. It provides, in relevant part:

22          Except as provided in paragraphs (2) and (3) of section 1005(e) of the
Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice,

23          or judge shall have jurisdiction to hear or consider any other action

24          against the United States or its agents relating to any aspect of the
detention, transfer, treatment, trial, or conditions of confinement of an

25          alien who is or was detained by the United States and has been

26          determined by the United States to have been properly detained as an
enemy combatant or is awaiting such determination.

27  28 U.S.C. § 2241(e)(2).

28

The Ninth Circuit in *Hamad v. Gates*, explained that a court lacks jurisdiction under Section 2241(e)(2) when the following five elements are satisfied:

> (1) the action is against the 'United States or its agents'; (2) the action relates to 'any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States'; (3) the action relates to an alien who was 'determined by the United States to have been properly detained as an enemy combatant' or an alien awaiting such a determination; (4) the action is an action 'other' than an application for a writ of habeas corpus, which is covered in § 2241(e)(1); and (5) the action does not qualify for an exception under § 1005(e)(2) or (3) of the Detainee Treatment Act of 2005 (DTA), which provide the D.C. Circuit jurisdiction over a narrow class of challenges by enemy combatants, *see* Detainee Treatment Act of 2005, Pub.L. No. 109–148, div. A, title X, § 1005(e), 119 Stat. 2680, 2740–44.

732 F.3d 990, 995 (9th Cir. 2013). Here, all five elements are met, and this Court therefore lacks jurisdiction to preside over Plaintiff's claims.

The second, fourth, and fifth elements are clearly satisfied. The second is met because this action unquestionably relates to "any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States." Compl. ¶¶ 15-16, 122-44. The fourth is met because this is an action under the ATS and not an application for a writ of habeas corpus. Compl. ¶¶ 10, 114-44. And the fifth is met because this case does not qualify for an exception under section 1005(e)(2) or (3) of the Detainee Treatment Act of 2005, as those exceptions apply only to the D.C. Circuit's ability to review the validity of any final decision of a Combatant Status Review Tribunal ("CSRT") that an alien is properly detained as an enemy combatant, *i.e.*, an item not at issue here. *Hamad*, 732 F.3d at 997.

The first and third elements are also satisfied.

1. Plaintiff Has Been Determined by the U.S. To Be "Properly Detained as An Enemy Combatant."

The third *Hamad* element—*i.e.*, whether Plaintiff was "determined by the United States to have been properly detained as an enemy combatant"—is easily met, as

demonstrated by the Declaration of Steven W. Dalbey and the associated CIA Memorandum filed by the U.S. in November 2017 in the 1782 Litigation before this Court. *See* Appendix A. The CIA Memorandum states that the CSRT determined Plaintiff "meets the criteria for designation as an Enemy Combatant"; the Designed Civilian Office (DCO) approved the CSRT's decision. *Id.* Such a determination by CSRT satisfies element three. *See Hamad*, 732 F.3d at 995 ("Hamad's action satisfied the third requirement, because there is no dispute that a CSRT determined that Hamad was properly detained as an enemy combatant."); *Jawad v. Gates*, 832 F.3d 364, 368 (D.C. Cir. 2016) ("Jawad concedes that a CSRT found that he was an 'enemy combatant.' We have held that such a finding by a CSRT fully satisfies the section 7(a) requirement that an alien be determined by the United States to have been properly detained as an enemy combatant."); *Al-Zahrani v. Rodriguez,* 669 F.3d 315, 317 (D.C. Cir. 2012) (MCA deprived court of jurisdiction where a CSRT determined the plaintiffs were enemy combatants); *Janko v. Gates*, 741 F.3d 136, 144 (D.C. Cir. 2014) (same).

## 2. Defendants Were Agents of the United States.

The first element of Section 2241(e)(2) is also met—this is an action against "agents" of the U.S. A review of the MCA's legislative history demonstrates that Congress understood this provision would apply to government employees *and contractors alike*; it passed this legislation specifically to protect individuals, like Defendants, who interrogated enemy combatants:

> [T]here is one issue that really has not come up in this debate, and that is the immunity that is given in this bill to the people who are interrogating the enemy combatants. We need to pass this bill so that interrogations can start up again because without the immunity, anybody who is hired by the United States Government to try to find out whom they are planning on blowing up next would be subject to a lawsuit that would be filed by some attorney that would claim that he was representing the public interest. This is a protection bill for the interrogators. It is something that is needed, and that is another reason why it ought to pass.

152 Cong. Rec. H7,947-48 (Sept. 29, 2006) (statement of Rep. Sensenbrenner).

1    While the MCA does not specifically define "agent," the Restatement (Third) of

2    Agency explains, "[a]gency is the fiduciary relationship that arises when one person (a

3    'principal') manifests assent to another person (an 'agent') that the agent shall act on

4    the principal's behalf and subject to the principal's control, and the agent manifests

5    assent or otherwise consents so to act." RESTATEMENT (THIRD) OF AGENCY § 1.01

6    (2006). The essential element that establishes an agency relationship is that "*the agent*

7    *consent to act on the principal's behalf, as well as subject to the principal's control*."

8    *Id.* § 1.01 at cmt. g (emphasis added). The principal has a right to control the agent's

9    actions. *Id.* § 1.01, cmt. f. But such "control may concern only the overall mission, not

10   operational details." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1253

11   (10th Cir. 2020).

12   Critically, Defendants' label as "independent contractors" does not foreclose

13   their agency status. RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. c (explaining "the

14   common term 'independent contractor' is equivocal in meaning and confusing in usage

15   because some termed independent contractors are agents"); *Henderson v. United*

16   *Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019) (holding independent

17   contractor status does not preclude a finding of agency status). Indeed, the Restatement

18   on Agency is clear that how the parties label their relationship is not dispositive of

19   whether an agency relationship exists. RESTATEMENT (THIRD) OF AGENCY § 1.02;

20   *Henderson*, 918 F.3d at 1073. Rather, the Court must decide whether an agency

21   relationship exists "based on an assessment of the facts of the relationship and not based

22   on how the parties define their relationship." *Id.* § 1.02; *see U.S. v. Milovanovic*, 678

23   F.3d 713, 725 (9th Cir 2012). In the end, "[t]he hallmark of an agency relationship, in

24   contrast with a mere contractual relationship to provide a service, is 'the power to give

25   interim instructions.'" *Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590, 608-09 (C.D. Cal.

26   2021) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01, cmt. f.).

27   Here, the Complaint concedes Defendants were agents of the CIA because they

28   consented to act on the CIA's behalf in interrogating Plaintiff and were subject to the

1    CIA's control. For instance, Plaintiff claims that at the CIA's request, Defendants

2    "proposed" twelve "enhanced interrogation techniques" to be used by the CIA or on the

3    CIA's behalf. *Id.* ¶¶ 67, 70. And because Defendants were subject to the CIA's control,

4    none of the proposed techniques were utilized until *after* it obtained legal clearance

5    from the DOJ for the techniques to be applied to suspected terrorists; this took nearly a

6    month. *Id.* ¶¶ 73, 76-77. Two of the techniques were ultimately not authorized. *Id.* ¶ 78.

7         The Complaint alleges more. After the CIA authorized Defendants to utilize 10

8    of the proposed interrogation techniques, Plaintiff admits the interrogation was done

9    under the ultimate control of the CIA, with the CIA maintaining the power to give

10   interim instruction. Plaintiff's interrogation also occurred at a black site controlled by

11   the CIA, *id.* ¶ 58, and Defendants were accompanied by CIA personnel who monitored

12   the interrogations. *See id.* ¶ 79 (Defendants were "accompanied by security personnel"),

13   *id.* ¶¶ 80, 82 (a CIA team, a fellow SERE instructor and CIA guards were present during

14   the interrogation). Plaintiff even admits the CIA medical team overrode an early

15   interrogation suggestion by Dr. Mitchell. Compl. ¶ 62. Further, Defendants were

16   required to send CIA Headquarters a summary of Plaintiff's interrogation at the end of

17   each day and maintain data concerning the specific techniques used. *Id.* ¶ 85. These

18   allegations alone are sufficient to establish an agency relationship. *Brown*, 562 F. Supp.

19   3d at 608-09 (finding independent contract was an agent where principal had to pre-

20   approve script before use, principal visited sites to monitor performance, and agent had

21   to regularly submit data and documentation to agent); *McAdory v. M.N.S. & Assocs.,*

22   *LLC*, 2021 WL 2321634, at *8 (D. Or. June 7, 2021) (finding independent contractor

23   was an agent because principal "retained the right to control [agent] to the degree

24   necessary to establish a principal-agent relationship" through means such as directing

25   the agent to stop actions and reserving the right to audit actions); *Williams v. PillPack*

26   *LLC*, 644 F. Supp. 3d 845, 852 (W.D. Wash. 2022) (finding independent contractor

27   could be an agent where principal participated in the approval of the script used by agent

28   on calls and agent made changes to services based upon feedback from principal).

DEFENDANTS' MOTION TO DISMISS
Page 10

But this is not all. Rather, Plaintiff further concedes the agency relationship by repeatedly alleging that Defendants "acted under color of law," Compl. ¶¶ 117, 124, and acting "under color of law" has been equated to acting as an agent in various statutory contexts. *See Nicholes v. Jano*, 2020 WL 2615529, *5 (M.D. Fla. May 22, 2020) ("under color of law" in the context of 42 U.S.C. § 1983 "means that the defendant must have acted as an agent of a government"); *U.S. v. Cox*, 836 F. Supp. 1189, 1197 n.9 (D. Md. 1993) ("acting under color of law," in the context of 18 U.S.C. § 2511 (2)(c), equates to "acting as a government agent").

Additionally, the agency relationship between Defendants and the CIA is further born out in the Supreme Court's discussion in the 1782 Litigation of Defendant's role in Plaintiff's interrogation. *See 1782 Litigation*, 595 U.S. at 238 (Gorsuch, J., dissenting). There, Justice Gorsuch noted "Zubaydah seeks information about his torture *at the hands of the CIA*." *Id.* (emphasis added). Justice Gorsuch explains—citing exclusively to the SSCI Report—that Defendants sought to end the interrogation six days into applying the interrogation techniques on Plaintiff:

> Mitchell and Jessen concluded that it was "'highly unlikely' that Zubaydah possessed the information they were seeking," and they sought to end the interrogations. It seems their assessment may have been correct. . . . At the time, however, CIA headquarters was not yet persuaded by Mitchell's and Jessen's report. *It instructed the pair to continue their work. Following these directions*, Mitchell and Jessen carried on for two more weeks until *their superiors finally concluded* that Zubaydah "did not possess any new terrorist threat information."

*Id.* (citing and quoting the SSCI Report). Further, the SSCI Report, on which Plaintiff extensively relies, demonstrates Defendants acted under the control of the CIA; received interim instruction from the CIA; and that it was the CIA that determined when to end the interrogation—factors that support existence of an agency relationship. *Id.*

That an agency relationship existed between Defendants and the CIA is also consistent with the Supreme Court's holding in the 1782 Litigation, which held Defendants' "confirmation (or denial) of the information Zubaydah seeks would be

tantamount to a disclosure from the CIA itself." 595 U.S. at 211. In other words, the Supreme Court concluded that because Defendants were acting on behalf of the CIA to such a degree, Defendants' testimony was equivalent to that of the CIA. *Id.* And Defendants remain subject to the control of the CIA, such that they are still not permitted to disclose the information Plaintiff sought in that case. *Id.* at 210-11. Indeed, Justice Gorsuch, in his dissent, recognized Defendants were "executive agents." *Id.* at 261 (Gorsuch, J., dissenting).

In *Salim*, this Court declined to apply the MCA to Defendants because, based upon the limited record before the Court for that specific motion to dismiss, Defendants had not established an "agency relationship," or that the plaintiffs were "enemy combatants." *Salim v Mitchell*, 2017 WL 390270, at *7 (E.D. Wash. Jan. 27, 2017). That ruling, however, is not controlling or even instructive here, where the allegations in the Complaint differ from those in *Salim* in that Defendants had limited or no interactions with the *Salim* plaintiffs. Conversely, here, the CIA and Defendants' agency relationship is evident because the CIA observed and provided feedback during Defendants' interrogation of Plaintiff. Additionally, the *Salim* Court did not have the benefit of the Supreme Court's findings regarding Defendants' role in Plaintiff's interrogation or Justice Gorsuch's summary of the SCCI Report that evidences that Defendants were ordered to continue Plaintiff's interrogation even when they wanted to stop. Nor did the *Salim* Court have the benefit of recent caselaw that explains when an independent contractor qualifies as an agent. *See Brown*, 562 F. Supp. 3d at 608-09; *Williams*, 644 F. Supp. 3d at 852; *McAdory*, 2021 WL 2321634, at *8.

In sum, the Complaint evidences that Defendants were "agents" of the CIA, and thus, all elements of the MCA are met.[2] As such, this Court lacks jurisdiction.

---

[2] To the extent the Court determines an agency relationship has not yet been established, it should allow the parties to engage in jurisdictional discovery on the issue to avoid the case moving forward on the merits when subject matter jurisdiction may be lacking.

**B.**     **The Political Question Doctrine Also Divests the Court of Jurisdiction.**

The Supreme Court has long recognized an exception to the federal courts' duty to decide cases—known as the political question doctrine—which prevent courts from deciding issues assigned to the executive or legislative branches. *Baker v. Carr*, 369 U.S. 186 (1962). Against this backdrop, *Baker*, *id*. at 217, opined "[p]rominent on the surface of any case held to involve a political question is":

    (1)    'a textually demonstrable constitutional commitment of the issue to a coordinate political department';

    (2)    'a lack of judicially discoverable and manageable standard for resolving it';

    (3)    'the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion';

    (4)    'the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government';

    (5)    'an unusual need for unquestioning adherence to a political decision already made'; or

    (6)    'the potentially of embarrassment from multifarious pronouncement by various departments on one question.'

Using the *Baker* factors as a guide, courts must conduct a "*discriminating* case-by-case analysis … to determine whether a political question is so inextricably tied to a case as to divest the court of jurisdiction." *Saldana v. Occidental Petroleum Corp*., 774 F.3d 544, 551 (9th Cir. 2014) (emphasis added) (citations omitted).

Governing precedent recognizes that although not every case that "touches foreign relations lies beyond judicial cognizance, *Baker*, 369 U.S. at 211, "the foreign relations of our government is committed by the Constitution to the executive and legislative [branches] … and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Corrie v. Caterpillar, Inc*., 503 F.3d 974, 982 (9th Cir. 2007) (citation omitted). The Constitution expressly assigns war and foreign policy decisions to the Executive and Legislative Branches. U.S. CONST. art II § 2, cl. 1; art. I, § 1, cls. 12-14; art. II, § 2. And the "strategy and tactics

DEFENDANTS' MOTION TO DISMISS
Page 13
139114.00603/133644505v.1

employed on the battlefield are clearly not subject to judicial review." *Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008) (citation omitted); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (President's decision to deploy troops in a foreign land nonjusticiable); *DaCosta v. Laird*, 471 F.2d 1146, 1153-57 (2d Cir. 1973) (decision to mine another country's harbors during war nonjusticiable).

Claims are textually committed to another branch of government when they "will require reexamination of" a decision made by a coordinate branch of government that is "insulated from judicial review." *McMahon v. Presidential Airways, Inc*., 502 F.3d 1331, 1359-60 (11th Cir. 2007). And, importantly, "even when the face of a complaint does not ask the court to review a political question, issues 'that are textually committed to the executive sometimes lie just beneath the surface of the case.'" *Cooper v. Tokyo Elec. Power Co. Inc*., 860 F.3d 1193, 1212 (9th Cir. 2017) (citing *Harris v. Kellogg Brown & Root Servs., Inc*., 724 F.3d 458, 465 (3d Cir. 2013)).

    1.   <u>This Court Should Adopt the Two-Part Taylor Test for Evaluating Political Questions Involving Defense Contractors and Determine That Plaintiff's Claims Raise Nonjusticiable Political Questions.</u>

"Given the unprecedented levels at which today's military relies on contractors to support its mission, [courts have] recognized that a military contractor acting under military orders can also invoke the political question doctrine as a shield under certain circumstances." *In re: KBR, Inc*., 893 F.3d 241, 259 (4th Cir. 2018) (citing *Taylor v. Kellogg Brown & Root Servs., Inc*., 658 F.3d 402, 411 (4th Cir. 2011)). And while the Ninth Circuit has not had a chance to opine on the matter, this Court should take this opportunity to follow those circuits that have adopted the Fourth Circuit's *Taylor* test as applied to governmental defense contractors. The Third, Fifth and Eleventh Circuits have developed a similar test to *Taylor* related to defense contractors under which "a determination must first be made whether the case requires evaluation of a military decision. If so, those military decisions must be of the type that are unreviewable

because they are textually committed to the executive." *Harris*, 724 F.3d at 466 (citing *Lane*, 529 F.3d at 565; *McMahon*, 502 F.3d at 1359-60).

Under *Taylor*, courts have distilled the *Baker* factors to two primary questions when asked to invoke the political question doctrine on behalf of a military contractor: whether "(1) the military exercised direct control over the contractor, or (2) 'national defense interests were closely intertwined with the military's decision regarding [the contractor's] conduct.'" *In re: KBR, Inc*., 893 F.3d at 260 (citing *Taylor*, 658 F.3d at 411). An affirmative answer to *either* inquiry renders the case nonjusticiable. *Id*.

(a)    *The CIA Exercised Actual and Plenary Control Over the Interrogation of Plaintiff.*

Under the first prong of the *Taylor* test, a case against a military contractor will be dismissed as a nonjusticiable political question if the miliary exercised "actual" and "plenary" control over the contractor. *In re: KBR Inc*., 893 F.3d at 260. To establish actual control, the government or military must have exercised more than mere "[f]ormal command authority;" it entails "actual control of day-to-day interrogation operations." *In re: KBR Inc*., 893 F.3d at 261 (citation omitted). Plenary control involves "whether the military clearly chose how to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." *Id*. at 260.(citation omitted); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009) (finding plenary control when "military judgments governed the planning and execution of virtually every aspect" of the contractor's activities). Here, the Complaint establishes the CIA's actual and plenary control over Defendants.

As explained in Section IV.A.2., the CIA exercised actual control over Defendants. The Complaint alleges that Defendants reported to the CIA and the CIA had direct and consistent control over Plaintiff's interrogation. In fact, Plaintiff admits the government and military were heavily involved from the very beginning: U.S. forces captured Plaintiff on March 28, 2002, and he was then immediately interrogated by

1    agents from the FBI. Compl. ¶ 16. There was then a "CIA takeover" of Plaintiff's

2    interrogation, as the CIA had to assemble "an interrogation team" to face a "life-

3    threatening short fuse situation." *Id*. ¶¶ 49, 57. At multiple points, the Complaint refers

4    to Defendants' plan as a "proposal" requiring CIA "approv[al]" and "accept[ance]"

5    before it was used. *Id*. ¶¶ 1, 4, 27, 33, 41, 66, 70. Plaintiff concedes Defendants' use of

6    enhanced interrogation techniques during Plaintiff's interrogation was undertaken at the

7    request of, and pursuant to, the direct supervision of the CIA and did not begin until

8    approved by the DOJ. *Id*. ¶¶ 16, 32, 33, 41, 49, 57, 70, 73, 76, 77, 85, 140.

9        Additionally, the Complaint alleges the CIA had plenary control over Defendants

10   because it determined how Defendants would interrogate Plaintiff. In this respect, the

11   CIA asked Defendants to "provide real-time recommendations" and deliver

12   "summar[ies] of the da[ily] interrogation." *Id*. ¶¶ 49, 85. The CIA observed Plaintiff's

13   interrogation and the CIA even required Defendants to continue utilizing the enhanced

14   interrogation techniques after Defendants sought to end the interrogation because

15   Defendants thought it highly unlikely Plaintiff possessed the information the U.S. was

16   seeking. *1782 Litigation*, 595 U.S. at 238 (Gorsuch, J., dissenting). In fact, the

17   interrogation did not end until CIA headquarters was satisfied that Plaintiff did not

18   possess any new terrorist threat information. *Id*. Finally, after Plaintiff's interrogation,

19   the CIA maintained control over Plaintiff's transfer via a number of different CIA black

20   sites and ultimately to the U.S. military base in Guantanamo Bay. Compl. ¶¶ 95, 97.

21       Because the CIA's actual and plenary control is evident on the face of the

22   Complaint, this Court lacks the necessary jurisdiction to hear this case. *See In re: KBR,*

23   *Inc*., 893 F. 3d at 259-60 (citing *Taylor*, 658 F.3d at 411).

24               (b)    *National Defense Interests Were Closely Intertwined with*
                        *Military Decisions Governing Defendants' Alleged Conduct.*
25
26       Under *Taylor*'s second prong, the court must consider whether "national defense

27   interests were closely intertwined with the military decisions regarding [the

28   contractor's] conduct." *In re: KBR, Inc*., 893 F.3d at 260 (citation omitted). Indeed,

courts "lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Carmichael*, 572 F.3d at 1290 (citation omitted). In such cases, "it is completely evident that the suit would require [the court] to review many basic questions traditionally entrusted to the military, and [there are] no judicially manageable standards for adjudication of the issues." *Id.* at 1291. And a court cannot adjudicate a claim that would require the judiciary to question "actual, sensitive judgments made by the military." *Taylor*, 658 F.3d at 411. Here, Plaintiff seeks to involve this Court in issues which are "inherently entangled" with political decisions—whereby a favorable judgment will "necessarily conflict with and denounce our government's official actions," *Saldana*, 774 F.3d at 554-55, and/or require this Court to render a policy determination akin to making a judicial pronouncement as to the "necessity of simulating actual battle conditions." *Aktepe v. USA*, 105 F.3d 1400, 1404 (11th Cir. 1997). This Court simply cannot find for Plaintiff "without implicitly questioning, and even condemning," U.S. policy on the war against Al Qaeda. *Corrie*, 503 F.3d at 984.

The requisite intertwinement is present on the face of the Complaint. Plaintiff's claims cannot be adjudicated "without inquiring into or passing judgment" on political decisions, the sensitivity of which is evident from Plaintiff's allegations. *Saldana*, 744 F.3d at 555. Plaintiff admits that when he was first captured, U.S. intelligence "believed [he was] Al Qaeda's third in command"; and that "he had authored the Manchester Manual[,]" Compl. ¶¶ 16, 44, "an Al Qaeda-generated document that included purported strategies to resist interrogation that British anti-terrorism police recovered in a May 2000 raid on a suspected Al Qaeda safe house in Manchester, England." *Id.* ¶ 35. Plaintiff further admits that after his capture, he provided "valuable information regarding a planned attack," including significant financial, logistical, and operational details about the planned attack that allowed the CIA to confirm the intelligence and thwart the attack. *Id.* ¶ 45. Moreover, Plaintiff provided the U.S. with "vital intelligence that had never been previously confirmed" in that he identified Khalid Shaykh

1  Mohammad as "Mokhtar"—the mastermind behind the September 11 attacks. *Id.* ¶ 47.

2  It was in these circumstances—after Plaintiff admitted to knowing of a planned attack

3  against the U.S. and knowing the identity of the man who planned September 11—that

4  the CIA encouraged Defendants to "think big" when proposing methods to use in

5  interrogating Plaintiff. *Id.* ¶ 67. This same context propelled the CIA's decision to seek

6  the DOJ's approval to use the proposed techniques. *Id.* ¶¶ 73, 76, 77.

7  Plaintiff acknowledges that when the CIA chose to utilize enhanced interrogation

8  techniques on him, it was attempting to "regain footing after the intelligence failures

9  apparent in the wake of the September 11 attacks," and was "under immense pressure

10  to produce actionable intelligence" to "help avoid a second wave of attacks." *Id.* ¶¶ 4,

11  30. Thus, the actions Plaintiff complains of here—the application of enhanced

12  interrogation techniques on him—is inextricably intertwined with the CIA's actions and

13  judgments in response to the threat posed by Al Qaeda. *Id.* ¶¶ 16, 32, 33, 41, 49, 57, 70,

14  73, 76, 77, 85, 140.

15  As in *Carmichael* and *Taylor*, adjudicating the instant claims would require this

16  Court to deploy hindsight to determine whether a military policy was correct. *See* 572

17  F.3d 1271; 658 F.3d 402. Plaintiff concedes that at the outset of the "War on Terror,"

18  the government and CIA were required to make "sensitive judgments" as to the best

19  course forward to prevent a "second wave of attacks" even considering the "significant

20  harm to important national interest[s]" these decisions might have posed and that the

21  decisions may "erode[] the mutual deterrence that existed before September 11."

22  Compl. ¶¶ 6, 30; *Taylor*, 658 F.3d at 411. It is exactly these sorts of decisions that are

23  "textually committed to the executive." *Harris*, 724 F.3d at 466 (citing *Lane*, 529 F.3d

24  at 560; *McMahon*, 502 F.3d at 1359-60). Because both prongs of the *Taylor* test are

25  satisfied, the political question doctrine applies to bar jurisdiction. *In re: KBR, Inc.*, 893

26  F. 3d at 259-60; *Taylor*, 658 F.3d at 411.

27

28

1

(c)    *Defendants' Conduct Was Not Unlawful.*

2

The Fourth Circuit applied the *Taylor* test in a similar, yet distinguishable,

3

circumstance involving an ATS claim against a government contractor. *See Al Shimari*

4

*v. CACI Premier Tech. Inc.* ("*Al Shimari IV*"), 840 F.3d 147 (4th Cir. 2016). In *Al*

5

*Shimari IV*, the Fourth Circuit had previously instructed the lower court to apply the

6

*Taylor* test and conduct discovery pursuant to its two prongs. It then evaluated the

7

resulting factual record—while also noting that the contractor must be engaged in "a

8

lawful action under actual control of the military"—because "the military cannot

9

lawfully exercise its authority by directing a contractor to engage in unlawful activity."

10

*In re: KBR*, 893 F.3d at 261 (citing *Al Shimari IV*, 840 F.3d at 157).

11

Here, Plaintiff cannot demonstrate that Defendants' conduct was "unlawful" at

12

the time it occurred in light of the Ninth Circuit's decision in *Padilla*, 678 F.3d at 763.

13

Padilla was an individual who, like Plaintiff, was designated an enemy combatant by

14

the U.S. Government because he was "closely associated with [A]l Qaeda," possessed

15

intelligence that "would aid U.S. efforts to prevent attacks by [A]l Qaeda on the United

16

States," and "represented a continuing, present and grave danger to the national security

17

of the United States." *Id.* at 751. Padilla complained about his detention conditions and

18

brought suit against John Yoo, former Deputy Assistant Attorney General at the Office

19

of Legal Counsel, who Padilla claimed "set in motion" Padilla's illegal interrogation

20

and detention by "issuing legal memoranda designed to evade legal restraints on those

21

policies and immunize those who implemented them." *Id.* at 752. The memoranda at

22

issue in *Padilla* included those cited by Plaintiff in his Complaint, memoranda that

23

concluded that enhanced interrogation techniques would not violate the federal statue

24

criminalizing torture. *Id.*; Compl. ¶¶ 76-77. The Ninth Circuit found that Yoo was not

25

liable to Padilla for two reasons. First, Yoo had qualified immunity because at the time

26

he acted, the law was not sufficiently clear as to the rights of enemy combatants such

27

that every reasonable official would have understood that what he was doing violated

28

1    the plaintiff's rights. *Id.* at 750. Second, the Ninth Circuit held it was not clearly

2    established in 2001-03 that the treatment Padilla allegedly received was torture. *Id.*

3         The Ninth Circuit explained that in 2001-03, there was general agreement that

4    torture meant the intentional infliction of severe pain or suffering, whether physical or

5    mental. *Id. at* 763. On the other hand, the Ninth Circuit found that the meaning of

6    "severe pain or suffering" was less clear at that time because there was "considerable

7    debate, both in and out of government, over the definition of torture as applied to

8    specific interrogation techniques." *Id*. at 768. As a result, the Ninth Circuit could not

9    "say that any reasonable official in 2001-03 would have known that the specific

10   interrogation techniques allegedly employed against Padilla, however appalling,

11   necessarily amounted to torture." *Id. at* 767-68.

12        Applying *Padilla's* reasoning here, Defendants' alleged conduct in interrogating

13   Plaintiff at the CIA's direction was not unlawful. At the request of the CIA, Defendants

14   proposed potential interrogation techniques based upon techniques that had been

15   employed at SERE. Compl. ¶ 28. Critically, Defendants did not apply any of the

16   techniques until after the DOJ—through Yoo—issued legal memoranda in August 2002

17   that indicated the proposed techniques did not constitute torture. Compl. ¶¶ 76-77.

18   Indeed, the DOJ's memoranda laid at the heart of the "debate" that the *Padilla* Court

19   found existed at the time, finding "the techniques did not cause the kind of pain

20   associated with 'serious physical injury,' and that the techniques would not give rise to

21   criminal liability,". . . [nor] "prolonged mental harm', and that they would not violate

22   the federal statute criminalizing torture." Compl. ¶¶ 77; *see also* 42 U.S.C. § 2000dd.

23   And for his part, Plaintiff acknowledges the intent of the program was to "prevent

24   imminent, significant physical harm to persons," and that the CIA made "every effort

25   possible to ensure the subject [was] not permanently physically or mentally harmed."

26   Compl. ¶¶ 31, 73. If Yoo, a lawyer for the OLC, could not have known that the enhanced

27   interrogation techniques addressed in the memoranda he authored for the DOJ

28   amounted to torture and were thus unlawful, how could Defendants have known that—

1   particularly when they were provided with Yoo's memoranda concluding otherwise?

2   *See Padilla*, 678 F.3d at 767-68. Thus, in light of Yoo's memoranda, Defendants'

3   alleged conduct *at a minimum* falls within the "grey area" of non-justiciable conduct

4   per the political question doctrine. *Al Shimari IV*, 840 F.3d at 159-60. As Defendants'

5   conduct was not unlawful, the political question doctrine applies to bar Plaintiff's

6   claims.

7                    2.      <u>*Al Shimari* and *Salim* Are Not Controlling.</u>

8          Plaintiff may point to *Al Shimari*[3] or *Salim* to claim that the political question

9   doctrine does not apply here—neither case controls.

10         In *Al Shimari*, following the invasion of Iraq in 2003, the U.S. took control of

11  Abu Ghraib prison, to detain criminals and other enemies of the provisional

12  government, for purposes of interrogation and intelligence gathering. *See* 840 F.3d at

13  151-52. Due to a shortage of military interrogators, the U.S. contracted with CACI to

14  provide additional interrogation services. *Id.* at 152. The CACI personnel deployed

15  many unauthorized interrogation techniques including forced masturbation and sexual

16  arousal; inserting fingers into detainees' rectums; the use of dogs and inflicting dog

17  bites; dragging detainees by a rope tied around their necks; and repeated electric shocks.

18  *Suhail Najim Abdullah Al Shimari v. CACI Premier Tech., Inc.*, 300 F.Supp.3d 758,

19  765-71 (E.D. Va. 2018). The detainees brought ATS claims for torture, cruel inhuman,

20  or degrading treatment, and war crimes. *Id.* at 763. Ultimately, the District Court found

21  the case justiciable because the conduct was unlawful, as it rose "to the level of torture."

22         While Plaintiff's claims and those in *Al Shimari* both arise from the interrogation

23  of U.S. detainees, the similarities end there. The conduct in *Al Shimari* was found to be

24  unlawful because "what began as 'nakedness and humiliation, stress and physical

25

26  ─────────────────
    [3] *Al Shimari* has been the subject of extensive litigation, reaching the 4th Circuit on five

27  separate occasions. When referencing "*Al Shimari*" Defendants are generally referring

28  to the litigation as a whole and will cite to the relevant decisions for specific findings.

DEFENDANTS' MOTION TO DISMISS
Page 21

1   training (exercise)' devolved into 'sexual and physical assaults by a small group of

2   morally corrupt and unsupervised soldiers and civilians.'" *Id.* at 764. Indeed, the

3   conduct was the basis of numerous criminal proceedings where individuals were

4   punished under military law by court martial, some even receiving significant terms of

5   imprisonment. *Al Shimari IV*, 840 F.3d at 153. Nothing of the sort is alleged here. *See*

6   *generally* Compl. To the contrary, Yoo was specifically held to have qualified immunity

7   such that he could not be held civilly liable for his role in drafting the memoranda that

8   specifically approved Defendants' interrogations. *See Padilla*, 678 F.3d at 767-68. And

9   Plaintiff does not allege that any of those individuals who observed Plaintiff's

10  interrogation have been prosecuted.  *See generally* Compl. Additionally, the conduct at

11  issue in *Al Shimari* did not occur during the infancy of the War on Terror, but at the end

12  of 2003 into 2004—*i.e.*, a period beyond when *Padilla* found there existed a "debate"

13  as to whether certain interrogation techniques constituted torture. *Al Shimari*, 300 F.

14  Supp. 3d at 763; *Padilla*, 678 F.3d at 763-64.

15      *Al Shimari* explained that "instances in which the lawfulness of such conduct was

16  not settled at the time the conduct occurred, and the conduct occurred under the actual

17  control of the military or involved sensitive military judgment, that conduct will not be

18  subject to judicial review." *Al Shimari IV*, 840 F.3d at 160 (citation omitted). As

19  explained above, the instant matter is one such instance because "[t]he absence of clear

20  norms of international law or applicable criminal law regarding the lawfulness of a

21  particular mode of treatment will render that 'grey area' conduct non-justiciable under

22  the political question doctrine [because] …the conduct was committed under the actual

23  control of the military [and/or] implicated sensitive military judgments. *Id*.

24      *Salim* similarly does not establish that Plaintiff's claims are justiciable. In *Salim*,

25  this Court declined to invoke the political question doctrine on the basis that "[o]ther

26  courts have adjudicated cases touching the same, or similar, subject matter." *Salim v.*

27  *Mitchell,* 268 F. Supp.3d 1132, 1146 (E.D. Wash. 2017). In so ruling, *Salim* did not

28  accept or reject the *Taylor* test, but simply noted it existed. *Id.* This Court should now

DEFENDANTS' MOTION TO DISMISS

Page 22

accept the *Taylor* test because years have passed since *Salim's* ruling, during which the *Taylor* test has gained further support as courts have recognized the U.S. military continues to rely upon contractors at unprecedented levels. *See In re: KBR, Inc*., 893 F. 3d at 259. Additionally, this Court should decline to follow *Salim* because the cases relied upon therein do not indicate that the subject matter before the Court—Plaintiff's interrogation by Defendants—is justiciable. *See Salim*, 268 F.Supp.3d at 1146. Most of those cases deal with different factual circumstances. *See Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (pertaining to an American Citizen's right to challenge his status as an enemy combatant to contest his indefinite detention); *Rasul v. Bush*, 542 U.S. 466, 505 n.6 (2004) (Scalia, J., dissenting) (pertaining to the legality of the detention of foreign nationals at Guantanamo Bay Naval Base. In dissent, Justice Scalia noted, "[t]he ATS, while invoked below, was repudiated as a basis for jurisdiction by all petitioners, either in their petition for certiorari, in their briefing before this Court, or at oral argument"); *Koohi v. U.S*., 976 F.2d 1328, (9th Cir. 1992) (finding plaintiffs' claims against the U.S. government and its contractors for downing a civilian aircraft to be preempted by the combatant activities exception to the FTCA). The sole case cited in *Salim* that concerns the evaluation of interrogation techniques is *Padilla*, in which no party raised the political question doctrine. Moreover, as discussed above, *Padilla* supports finding a lack of jurisdiction under the political question doctrine because it establishes Defendants' conduct was not unlawful and that the CIA was making sensitive military decisions when the law was unsettled based upon the advice from DOJ. 678 F.3d at 750.

## V.  THIS CASE SHOULD BE DISMISSED BASED UPON RULE 12(B)(6).

### A.  Defendants Are Entitled to Derivative Sovereign Immunity.

A sovereign is immune absent an immunity waiver and consent to suit. *U.S. v. Mitchell*, 445 U.S. 535, 538 (1980). Government employees and contractors performing government work likewise may be immune from suit based upon *derivative* sovereign immunity. *See Filarsky v. Delia*, 566 U.S. 377 (2012); *Westfall v. Erwin*, 484 U.S. 292 (1988); *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988); *Barr v. Matteo*, 360 U.S. 564

(1959); *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940). Such immunity arises where, as here, "the government has directed a contractor to do the very thing that is the subject of the claim." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001). Here, Defendants followed the government's valid instructions (*Yearsley*), and would be immune were they government employees performing the same job function (*Filarsky*).

### 1.  Defendants Are Entitled to *Yearsley*-Based Immunity.

The Supreme Court has repeatedly recognized government contractors share the U.S.'s immunity when they act: (1) pursuant to authority "validly conferred" by the government; and (2) within the scope of their contracts. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673 (2016) (citing *Yearsley*, 309 U.S. at 21); *see also Agredano v. U.S. Customs Serv.*, 223 F. App'x 558, 559 (9th Cir. 2007) (company contracting with the U.S. cannot be liable for third-party injuries arising from the contract's execution where company did not breach contract's terms) (citing *Myers v. U.S.*, 323 F.2d 580, 583 (9th Cir. 1963)); *In re KBR, Inc., Burn Pit Litigation*, 744 F.3d 326, 345 (4th Cir. 2014); *Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Servs.*, 853 F.3d 173, 185 (5th Cir. 2017) ("contractor may not be liable for harm resulting from its strict execution of a constitutionally authorized government order."). Extending immunity to contractors avoids "imped[ing] the significant governmental interest in the completion of its work." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000); *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1447-48 (4th Cir. 1996) ("it is a small step to protect [a government] function when delegated to private contractors"); *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 204 (5th Cir. 2009); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 646 (6th Cir. 2015). Defendants did not exceed the scope of the authority that was "validly conferred" by the U.S. government for national security purposes.

### (a)  *The Authority Granted Was "Validly Conferred."*

"After al Qaeda killed over three thousand people in its September 11, 2001, attacks on the United States, Congress empowered the President to use his warmaking authority to defeat this terrorist threat to our nation." *Lebron v. Rumsfeld*, 670 F.3d 540,

544 (4th Cir. 2012) (citing Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)). To that end, "[i]n an effort to extract . . . information [about the September 11 attacks and potential future assaults], the CIA hired two contractors, James Mitchell and John Jessen, *and authorized them* to employ what it called 'enhanced interrogation techniques.'" *1782 Litigation*, 595 U.S. at 986 (Gorsuch, J., dissenting) (emphasis added). It is this valid delegation of authority[4] from Congress; to the President; to the CIA; to Defendants that shields Defendants where the government "directed and led" the interrogation of Plaintiff. *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 2016 U.S. Dist. LEXIS 18248, at *32 (E.D. La. Feb. 16, 2016) (contractors were "immunized under the [Clean Water Act] for any damages resulting from their actions or omissions … so long as they adhered to, and acted within the scope of, the federal government's directives."); *In re Oil Spill by the Oil Rig "Deepwater Horizon,"* 2016 U.S. Dist. LEXIS 101175, at *36 (E.D. La. Aug. 2, 2016) (same). Notably, *Yearsley* immunity also applies where, as here, contractors designed certain "procedures," or implemented their own "plans," which the government then "authorized." *See, e.g., Taylor Energy Co., LLC v. Luttrell*, 3 F.4th 172, 176 (5th Cir. 2021) (*Yeasley* immunity applied where "[t]he Government directed [the contractor] to come up with [a] site assessment procedure for the Rapid Response Solution containment project," and "authorized [the contractor's] plan, the design of the response system, and the installation of the system.").

---

[4] War Powers Resolution, Pub. L. No. 93-148, 87 Stat. 555 (1973), *codified at* 50 U.S.C. §§ 1541-1548; *Winter v. NRDC, Inc.* 555 U.S. 7, 24, 26 (2008) (President has authority to delegate national security matters to the CIA); National Security Act of 1947, *as amended*, 50 U.S.C. §§ 3035, 3036(c), (d)(1)-(4) (2005). The CIA had authority to contract with Defendants to perform such services. Exec. Order 12333, 46 Fed. Reg. 59941, 59951 § 2.7 (Dec. 4, 1981), *amended by*, Exec. Order 13470, 73 Fed. Reg. 45325, 45339 (July 30, 2008); *In re Am. Boiler Works*, 220 F.2d 319, 321 (3d Cir. 1955).

1   Importantly, under *Yearsley*, the legality of a given action is recognized as

2   distinct from the "authority to act" under government instruction.[5] 39 U.S. at 19 (focus

3   was on whether the work done was "under the direction of" the Secretary of War and

4   "supervision" of the Chief of Engineers). Here, the government's "authority" to assign

5   Defendants the task of recommending interrogation techniques—and then employing

6   said techniques on Plaintiff in the name of national security to prevent future attacks—

7   is well-documented.  And to the extent Plaintiff asserts that the government somehow

8   lacked the "authority to act" because the conduct was allegedly "torture," Compl. ¶ 31,

9   this argument fails.  Critically,  as explained in Section IV.B.1.c. *infra*, contrary to

10  Plaintiff's claims, using the interrogation techniques on suspected terrorists in 2001-03

11  was *not* unlawful at the time when done by the government. Compl. ¶¶ 2, 5, 16, 42, 90

12  (Plaintiff was captured March 28, 2002, and the "interrogation period" ended August

13  20, 2002); *id.* ¶ 67 (Defendants' techniques gained support of officials at CTC); *id.* ¶ 73

14  (CIA sends memo to DOJ attorney Yoo seeking "legal clearance for the proposed

15  techniques"); *id.* ¶¶ 76-78 (detailing OLC memos finding interrogation techniques

16  would not give rise to criminal liability). The U.S.'s immunity thus extends to

17  Defendants "regardless of the wisdom of [the CIA's] judgments" since, at the time,

18  "there was considerable debate, both in an out of government, over the definition of

19  torture as applied to specific interrogation techniques"—even if that debate was later

20  settled. *Padilla*, 678 F.3d at 764-69. As Attorney General Eric Holder explained in an

21

---

22  [5] As the Fourth Circuit explained, "[t]he question is not whether [the conduct alleged]

23  violated the law, but rather whether Congress had the authority to assign [the contractor]

24  to complete that task. The purpose of *Yearsley* immunity is to prevent a government

25  contractor from facing liability for an alleged violation of law, and thus, *it cannot be*

26  *that an alleged violation of law* per se *precludes* Yearsley *immunity*." *See, e.g.,*

27  *Cunningham v. Gen'l Dynamics Info. Tech., Inc.*, 888 F.3d 640, 648 (4th Cir. 2018)

28  (citing *Yearsley*, 309 U.S. at 20) (emphasis added).

April 16, 2009, press release, "[i]t would be unfair to prosecute dedicated men and women working to protect America for conduct that was sanctioned in advance by the Justice Department." U.S. Dep't of Justice, Office of Public Affairs, Press Release No. 09-356, *available at* https://www.usDOJ.gov/opa/pr/2009/April/09-ag-356.html (last visited Nov. 6, 2023); *see also Bednarski v. Potestivo & Assocs., P.C.*, 2017 U.S. Dist. LEXIS 32522, at *3-4 (N.D. Ill. Mar. 7, 2017) ("*Yearsley* teaches that, where the sovereign has agreed to accept responsibility for the actions of a contractor that has acted within the scope of its authority, the proper defendant is the United States[.]").

(b)     *Defendants Did Not Exceed the Scope of Their Authority.*

Plaintiff concedes Defendants "signed a contract with the CIA" in December 2001. Compl. ¶ 36. This contract was extended on April 1, 2002, for Defendants to "provide real-time recommendations to overcome Abu Zubaydah's resistance to interrogation," *id.* ¶ 49; Mitchell also signed another contract around April 3, 2002, to provide "psychological consultation to CTC in debriefing and interrogation operations for Quick Response Tasking." *Id.* ¶ 50. Jessen signed a contract to perform "applied research" in or around May 2002. *Id.* ¶ 54. And Plaintiff admits these "contracts . . . specified the experimental, research-oriented aspects of their roles." *Id.* ¶ 72. Additionally, Defendants signed new contracts on June 13, 2003, to "coach newly hired psychologist" and to "rewrite training materials." *Id.* ¶ 106. Notably, Plaintiff does *not* allege Defendants ever breached any such contract(s).

In assessing conformance with a contract, a court may look to its "appended task orders, and any laws and regulations that the contract incorporates." *In re KBR, Inc., Burn Pit Litigation*, 744 F.3d at 345. Importantly, here, there is no allegation Defendants "exceed[ed] or disobey[ed] the authority conferred" by the CIA. *In re Oil Spill*, 2016 U.S. Dist. LEXIS 18248, at *32-33.[6] And, as detailed above, not only did the CIA

---

[6] Further, Jessen is independently immune for any conduct while employed by the Department of Defense. Compl. ¶¶ 19, 54.

determine who would be detained at a black site, *id.* ¶ 58, it also possessed "ultimate authority" to "determine which, if any, of Defendants' recommendations and advice to follow or implement." *Chesney v. TVA*, 782 F. Supp. 2d 570, 586 (E.D. Tenn. 2011); *Gomez*, 136 S. Ct. at 673 n.7 (Court "disagree[d]" with Ninth Circuit's "narrow" reading of *Yearsley*, noting "[c]ritical in *Yearsley* was the … contractor's performance *in compliance with all federal directions*.") (emphasis added); *Elsmore v. Cty. of Riverside*, 2016 U.S. Dist. LEXIS 62564, at *9 n.3 (C.D. Cal. Mar. 31, 2016); *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (granting immunity where state agency closely supervised private agency, including appointing caseworker to monitor and approve foster-care plans); *see also Ali v. Rumsfeld*, 649 F.3d 762, 765 (D.C. Cir. 2011) (granting immunity where conduct involved detaining and interrogating enemy aliens).

(c)     *Yearsley Immunity Is Not Limited to Situations Where the Contractor Had "No Discretion" in the Design Process and Completely Followed Government Specifications.*

Lastly, it is worth noting *Salim*'s observation that *Yearsley* immunity is "limited to cases in which a contractor 'had no discretion* in the design process and completely followed government specifications.'" *Salim v. Mitchell*, 183 F. Supp. 3d 1121, 1131 (E.D. Wash. Apr. 28, 2016) (citing *Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720 (9th Cir. 2015)) (emphasis added). This observation wrongly conflates "derivative sovereign immunity" under *Yearsley*, with the "distinct" "government contractor defense" test established in *Boyle*. *Cabalce v. VSE Corp.*, 922 F. Supp. 2d 1113, 1125 (D. Haw. 2013). In *Boyle*, the Supreme Court built upon *Yearsley* and held that government contractors involved in the design of military equipment should not be liable for state law claims where their design conformed to "reasonably precise" government specifications. 487 U.S. at 512. And while *Yearsley* and *Boyle* both "address the same federal interest of a contractor's performance of a government contract, . . . the context in which the immunities apply is different." *Chesney*, 782 F. Supp. 2d at 581-82 (citations omitted).

In *Cabalce*, a private contractor signed a contract with the U.S. Department of the Treasury to store and destroy fireworks that had been seized by the federal government. 797 F.3d at 723.  Following a deadly explosion involving the seized fireworks, the contractors each sought to oppose remand and remain in federal court based on the presence of two "colorable federal defenses"—*i.e.,* the "government contactor defense" under *Boyle*, and "derivative sovereign immunity" under *Yearsley*.

After observing the "government contractor defense" is "only available to contractors who design and manufacture military equipment," *id.* at 731, *Cabalce* turned to "derivative sovereign immunity."  It was at this point the Ninth Circuit opined that "*Yearsley* is limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications,'" *id.* at 732, relying on its prior decision in *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008) as support.  But *In re Hanford* was instead focused on whether the federal statute governing nuclear accidents, the Price-Anderson Act, preempted the "government contractor defense" under *Boyle*.  534 F.3d at 1001.  In holding the "government contractor defense" was inapplicable, *In re Hanford* mentioned *Yearsley* only in passing—describing *Yearsley* as the "origin" of *Boyle*'s "government contractor defense."  *Id.*  Further compounding this confusion, *In re Hanford* relied on Justice Brennan's *dissent* in *Boyle* for the proposition that "[n]othing in *Yearsley* extended immunity to military contractors exercising a discretionary governmental function." *Id.* (citing *Boyle*, 487 U.S. at 524-25 (Brennan, J., dissenting)). Courts have observed "[e]xplicit language" in *Boyle* indicates the limited nature of this defense. *Chesney*, 782 F. Supp. 2d at 582 (citing *Boyle*, 487 U.S. at 505 n.1 (noting "Justice Brennan's dissent misreads our discussion," and observing the issue of immunity for government contractors was "not before us")). Based on this muddled history, *Cabalce* held the contractors were *not* immune, as the "record does not reflect that [the contractors] 'had no discretion' in devising the destruction plan for the fireworks," and instead, "designed the destruction plan without government control or supervision." 797 F.3d at 732.

It is this confused *dicta* from *Cabalce*—which traces its roots back to *Boyle*, not *Yearsley*—that the *Salim* Court seized upon to deny "derivative sovereign immunity" to Defendants on the basis they purportedly had "discretion" in the design/implementation of the interrogation plan applied to Plaintiff. 183 F. Supp. 3d at 1131. This was error. Here, Defendants do *not* rely on *Boyle*'s "government contractor defense." Nor does *Yearsley* (or its properly interpreted progeny) contain a contractor "discretion" component. Indeed, the term "discretion" does not appear anywhere in *Yearsley*. Defendants are thus entitled to *Yearsley*-based derivative sovereign immunity.

## B. Defendants are Entitled to *Filarsky*-Based Immunity.

The Supreme Court has held government contractors should not be left "holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Filarsky*, 566 U.S. at 391. Plaintiff proposes that Defendants suffer precisely this fate. But, if the government's *own lawyers* were held immune from liability, *Padilla*, 678 F.3d at 768, contractors like Defendants should likewise not be liable for engaging in "the same activity" as CIA medical staff officers, guards, site managers, operational psychologists, analysts, and the numerous other members of the team specifically tasked with interrogating Plaintiff.

Relatedly, the Supreme Court has observed important "policy reasons" behind granting *Filarsky* immunity include ensuring "talented individuals" with "specialized knowledge or expertise" are willing to accept public engagements. 132 S. Ct. at 1665-66. Thus, this immunity serves at least two vital purposes. First, it protects the government's own sovereign immunity; otherwise, private individuals incurring liabilities during contract performance would pass those costs onto the government, directly or indirectly. *Saleh v. Titan Corp.*, 580 F.3d 1, 8 (D.C. Cir. 2009), *cert. denied*, 564 U.S. 1037 (2011); *Boyle*, 487 U.S. at 511-12. Second, it ensures private contractors remain willing to perform essential tasks, rather than declining for fear of being held liable for doing the government's work. *Filarsky*, 132 S. Ct. at 1665-66.

*Filarsky* did *not* establish a bright-line test to determine when a government contractor is entitled to immunity; rather, it "considered" if the contractor's immunity claim was: (1) "historically grounded in common law"; or (2) did not "violate[e]" "clearly established rights." *Gomez*, 136 S. Ct. at 673. Defendants satisfy both prongs.

### 1.  Immunity for the Government Function Being Delegated to Defendants Is Historically Grounded in the Common Law.

The proper focus under *Filarsky*'s first prong is on the government "function" being delegated—not the position or title. 566 U.S. at 382-92; *see also Butters*, 225 F.3d at 466. What mattered in *Filarsky* was not that the defendant was a private attorney; it was that he was performing an investigatory function for the local government. 566 U.S. at 392. Likewise, what matters here is not that Defendants are psychologists; it is that they were performing national security support and law enforcement "functions" for the U.S. alongside government employees. In such situations, contractors have consistently been deemed to be immune. *Saleh*, 580 F.3d at 2 (private contractors providing interpretation/interrogation services to the U.S. in Iraq immune); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448-49 (9th Cir. 1983).

Here, the CIA recruited and retained Defendants to propose interrogation techniques for potential use on Plaintiff, and to then apply those techniques following CIA and DOJ approval. Defendants were thus "agents," Compl. ¶¶ 58, 62, 67, 70, 73, 76-77, 78-79, 85, acting as an "arm" of the government in interrogating Plaintiff—a suspected terrorist who had recently provided detailed information about a planned attack by Al Qaeda, as well as the identity of the man who planned the September 11 attacks—at a CIA black site. For this reason alone, *Filarsky* mandates Defendants be treated like the "CIA team," government psychologists, "interrogators," "security personnel," and "medical team" who *also* participated in the interrogation—all of whom are immune. Compl. ¶¶ 62-63, 79, 80, 89, 94. And this is true whether Defendants performed the "function" of a government psychologist *or* an interrogator. *Id.* ¶ 69 (Defendants acted as "both interrogator *and* psychologist") (emphasis in original).

Indeed, courts have repeatedly found private psychologists who, like Defendants, worked "alongside government employees" to be immune.[7] *Perniciaro v. Lea*, 901 F.3d 241, 252 (5th Cir. 2018) ("general principles of immunity at common law" in 1871 supported the right of two privately employed psychiatrists to assert qualified immunity where they "work[ed] in a public institution and alongside government employees . . . [and] their public counterparts would be entitled to assert qualified immunity."); *Bishop v. Karney*, 408 F. App'x 846, 848-49 (5th Cir. 2011) (licensed psychiatrist who worked for the Texas Department of Criminal Justice under a personal services contract with the Texas Tech University Health Sciences Center entitled to qualified immunity).

Alternatively, when contractors are enlisted to work in "close collaboration" with, and under the supervision of, law enforcement, this too has resulted in immunity. *Young v. County of Hawaii*, 947 F. Supp. 2d 1087, 1108-09 (D. Haw. 2013) (noting the "close collaboration" between the humane society S.P.C.A. ("HIHS") and the Hawaii County Police Department ("HCPD"), and the "HCPD's power to review HIHS procedures," merited the conclusion that "officers of HIHS are private actors enlisted by the police department to exercise police powers to discharge special public duties"

---

[7] Psychologists performing similar reporting/advising "function[s]" were immune under the common law. Indeed, Washington courts have consistently recognized that "[w]hen psychiatrists or mental health providers are appointed by the court and render an advisory opinion … on a criminal defendant's mental condition, they are acting as an arm of the court and are protected from suit by absolute judicial immunity." *Bader v. State*, 43 Wn. App. 223, 226, 716 P.2d 925 (1986) (citations omitted); *Reddy v. Karr*, 102 Wn. App. 742, 748-50, 9 P.3d 927 (2000). Washington law also offers qualified immunity for mental health professionals involved in involuntary commitments. RCW 71.05.120; *see also Von Staich v. Atwood*, 2011 U.S. Dist. LEXIS 83705, at *8 (C.D. Cal. Feb. 22, 2011) ("Ninth Circuit has held that a court-appointed psychologist has quasi-judicial immunity [for] preparing and submitting medical reports[.]").

1  such that "the private actors also enjoy the same protections afforded to law

2  enforcement officers."), *aff'd*, 578 F. App'x 728, 730 (9th Cir. 2014); *see also Braswell*

3  *v. Shoreline Fire Dep't*, 2012 U.S. Dist. LEXIS 71308, at *17-18 (W.D. Wash. May 22,

4  2012) (granting immunity to medical director for firefighter department performing

5  "supervisory services" where "traditional justifications for according qualified

6  immunity to government officials apply equally to Dr. Somers . . . as they would if [he]

7  were a government employee."); *Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d

8  1098 (10th Cir. 2016) (extending immunity against allegations of "torture and deliberate

9  indifference" for privately employed physician providing services, including

10  administering drugs for prisoner executions, at state penitentiary), *cert. denied*, 582 U.S.

11  950, 137 S. Ct. 2298 (2017); *Ford v. Anderson Cty.*, 2022 U.S. Dist. LEXIS 81821, at

12  *48-49 (E.D. Tex. May 5, 2022) (physician hired by county to perform medical services

13  at the jail for $1,500 per month immune). Either way, *Filarsky* immunity applies here.[8]

14

15

16

17

18

---

19  [8] Notably, the Fifth Circuit has criticized the Ninth Circuit's decision in *Jensen v. Lane*

20  *County*, 222 F.3d 570 (9th Cir. 2000), to deny immunity to private contractors based on

21  a narrow reading of the need for historical immunity at common law. *Perniciaro*, 901

22  F.3d at 252 n.9. Observing that *Jensen* did not have the benefit of the Supreme Court's

23  *Filarsky* decision, the Fifth Circuit opined that "where the defendant at issue worked in

24  a governmental entity and alongside government employees, the relevant historical

25  question asks whether someone bearing that relationship to the state would have had

26  immunity at common law, not whether immunity was accorded to purely private

27  persons performing some governmental function." *Id.* Under this broad "focus"

28  Defendants qualify for *Filarsky* immunity based on their "relationship" to the CIA.

### 2. Defendants Did Not Violate Well-Established Prohibitions of Conduct Involving the Treatment of Enemy Combatants.

As to *Filarsky's* second prong, Defendants did not "violate well-established prohibitions." *See* Sec. IV.B.1.(c) *supra* and Sec. V.C. *infra*. This is especially true *in 2001-03*, and as applied to enemy combatants like Plaintiff. Compl. ¶¶ 67, 73, 76-78, 90; *Padilla*, 678 F.3d at 768; *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (observing "reasonableness is judged against the backdrop of the law at the time of the conduct"; accordingly, the "inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.") (quotation marks omitted).

Finally, the CIA's "close official supervision" of Defendants further distinguishes this case from those that have opted to deny immunity. Compl. ¶¶ 59-60, 62, 66-67, 70; *cf. Richardson v. McKnight*, 521 U.S. 399, 413 (1997) (case did "not involve a private individual briefly associated with a government body, service as an adjunct to government in an essential governmental activity, *or acting under close official supervision*.") (emphasis added); *Bartell*, 215 F.3d at 557. So too does the "direct" nature of Defendants' CIA contract(s) weigh in favor of immunity and implicate the above sensitive "policy reasons" therefor. Compl. ¶¶ 49-50 (conceding the "CIA contacted Mitchell" to request "recommendations" for Plaintiff; Mitchell was the "only candidate considered"; and signed a contact directly with the CIA); *Braswell*, 2012 U.S. Dist. LEXIS 71308, at *14-18 (distinguishing *Jensen*, 222 F.3d at 570, and noting the private contract in *Jensen* was "qualitatively different" where it was with a group of psychiatrists, rather than "directly with the government entity" to "carry out responsibilities delegated by [the program director] pursuant to a state statute"; "market factors" and "privatization" arguments supporting immunity applied).

### C. Plaintiff Has Not Sufficiently Alleged ATS Claims.

### 1. Plaintiff Cannot Allege That Defendants Engaged in the Requisite State Action Required for Counts I, II, and IV.

Plaintiff brings four counts for violation of the ATS, alleging torture (Count I), non-consensual medical experimentation (Count II), war crimes (Count III), and

1    arbitrary detention (Count IV).  For each of these claims, Plaintiff must allege he (1) is

2    an alien; (2) claiming damages for a tort; (3) resulting from a violation of the law of

3    nations or of a treaty of the United States. *Presbyterian Church of Sudan v. Talisman*

4    *Energy, Inc.*, 582 F.3d 244, 255 (2d Cir. 2009). Additionally, for Count I (torture)

5    Plaintiff must also allege Defendants engaged in official action. *Id.*; *see also Sanchez-*

6    *Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) ("the basis for jurisdiction [for

7    an ATS claim] requires action authorized by the sovereign as opposed to private

8    wrongdoing"). This is because only "state-sponsored torture" is actionable under the

9    ATS. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir.

10   2005).  Similarly, Plaintiff must allege state action for purposes of his claims based

11   upon non-consensual human medical experimentation (Count II) and arbitrary detention

12   (Count IV). *See Abdullahi v. Pfizer*, *Inc.*,562 F.3d 163, 188 (2d Cir. 2009); *Garcia v.*

13   *Chapman*, 911 F. Supp. 2d 1222, 1235 (S.D. Fla. 2012)

14        "In construing this state action requirement, [courts] look 'to the principles of

15   agency law and to jurisprudence under 42 U.S.C. § 1983.'" *Aldana*, 416 F.3d at 1247,

16   quoting *Kadic v. Karadzic,* 70 F.3d 232, 245 (2d Cir. 1995). As established above,

17   Plaintiff has alleged that an agency relationship existed between the CIA and

18   Defendants. *See supra*, Sec. IV. A. Plaintiff has thus alleged the requisite state action to

19   support Counts I, III, and IV. But that agency relationship simultaneously divests the

20   Court of jurisdiction to hear this case, pursuant to the MCA. *Id.*

21        On the other hand, if Plaintiff disavows the agency relationship between the CIA

22   and Defendants, Plaintiff cannot meet the ATS's state action requirement and Counts I,

23   III, and IV fail. In short, Plaintiff cannot have it both ways—by alleging that conduct is

24   state action for one purpose but private action for another purpose. He cannot claim

25   Defendants were not acting on behalf of the CIA and under its control for purposes of

26   avoiding application of the MCA, while simultaneously claiming that the alleged

27   torture, non-consensual medical experimentation, and arbitrary detention were "state-

28   sponsored." *See Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 14 n.3 (D.D.C. 2005)

("plaintiffs cannot allege that conduct is state action for jurisdictional purposes but private action for sovereign immunity purposes"); *Saleh*, 580 F.3d 1, 15 ("appellants are caught between Scylla and Charybdis: they cannot artfully allege that the contractors acted under color of law for [ATS] jurisdictional purposes while maintaining that their action was private when the issue is sovereign immunity."). As such, Plaintiff's claims must be dismissed either because (1) Defendants were agents of the CIA and the Court therefore lacks subject matter jurisdiction to address these claims; or (2) Plaintiff has not established the conduct at issue was state sponsored, rendering these claims outside the ATS. In either scenario, Plaintiff's claims fail.

### 2. Plaintiff Also Has Not Alleged That Defendants Violated The "Law of Nations" for Purposes of Counts II and IV.

"Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations"—a prerequisite to potential ATS liability. *Id.* Indeed, when the ATS was first enacted in 1789, Congress contemplated it would give rise to causes of action only for piracy, infringement on the rights of ambassadors, and violation of safe conducts. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004). And though conduct that constitutes a violation of the "law of nations" has been extended to include additional torts, ATS jurisdiction still does *not* apply "for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar" when the law was enacted in 1789. *Id.* at 732. Moreover, while the "judicial power" to recognize actionable international norms may still be exercised, it must be "subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 729. And even when an international norm supports ATS jurisdiction, plaintiffs must still allege facts that do more than state a "colorable violation of the law of nations." *Kadic v. Karadzic*, 74 F.3d 377 (2d Cir. 1996). Here, Plaintiff has not sufficiently alleged that Defendants engaged in non-consensual medical experimentation (Count II) or arbitrary detention (Count IV).

(a)    *Non-consensual Medical Experimentation Cannot Support an ATS claim, and Plaintiff Has Not Alleged Non-Consensual Medical Experimentation.*

Only one circuit has substantively evaluated whether the prohibition against non-consensual human medical experimentation is "a norm that is specific, universal, and obligatory," and thus, can give rise to an ATS claim. *Pfizer*, 562 F.3d 163, 175-188. Defendants respectfully submit *Pfizer*'s reasoning was flawed for three reasons. First, it is not *specific*, in that the parameters of non-consensual human medical experimentation are not defined. Second, it is not a sufficiently *universal* norm abided by nations out of a sense of mutual concern because non-consensual human medical experimentation does not "threaten[] serious consequences in international affairs" in the same manner as the three offenses originally contemplated by the ATS (*i.e.*, piracy, rights of ambassadors, and safe conduct). *Cf. Sosa*, 542 U.S. at 715 (assault against an ambassador "impinged upon the sovereignty of the foreign nation and if not adequately addressed could rise to an issue of war"). And third, it is not *obligatory* as the prohibition is not enshrined in international treaties or custom. *See, e.g.*, *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 250 (2d Cir. 2003) ("In determining whether a particular rule is a part of customary international law—*i.e.*, whether States universally abide by, or accede to, that rule out of a sense of legal obligation and mutual concern— courts must look to concrete evidence of the customs and practices of States."). Indeed, the sources of law *Pfizer* relied upon are "incapable of carrying the weight" needed to support a conclusion that non-consensual medical experimentation is universal and obligatory. 562 F.3d at 202 (Wesley, J., dissenting). Thus, non-consensual human medical experimentation cannot support an ATS claim, and Count II must fail.

However, even if this Court were willing to follow *Pfizer*, Plaintiff's ATS claim for non-consensual medical experimentation fails because *Pfizer* narrowly dealt with obvious medical experiments involving the testing of pharmaceuticals. The actions in *Pfizer* included the requisite characteristics of a medical experiment which are not

present here, including: variable and control groups, a comprehensive research headquarters and test protocol, and a separate purpose for *Pfizer* to use the results of the experiment to gain FDA approval for use of the drug on children in the U.S. 562 F.3d at 169-170. Given this was the conduct at issue, in finding a valid ATS claim, *Pfizer* relied on domestic and international laws specifically applicable to pharmaceuticals and medical experiments conducted for a separate purpose. *Id* at 178. The same laws cannot be relied upon here, where there was no medical experiment or pharmaceutical product involved. To find Plaintiff's allegations state a claim for non-consensual medical experimentation in violation of the "law of nations" would greatly and improperly expand the ATS.

To be sure, Plaintiff has not alleged Defendants engaged in a medical experiment involving pharmaceuticals. The Complaint does not mention a pharmaceutical product. It also does not allege that a "medical experiment" like that which was done in *Pfizer* occurred. Rather, here, Plaintiff attempts to claim that the alleged interrogation program was an "experiment" because the underlying theories were untested interrogation methods. Compl. ¶¶ 2, 3, 5. This, however, is contradicted by Plaintiff's concessions that the interrogation program was based on the SERE training program, with which Defendants had years of experience. *Id.* ¶¶, 27, 60, 73. Plaintiff also refer to the interrogation program as an opportunity for Defendants to test their hypothesis, continually refining the methodologies in order to produce actionable intelligence. *Id.* ¶ 5. This is far removed from what took place in *Pfizer*, where the defendant's medical experimentation involved controlled groups of patients receiving different drugs, a test protocol, and a research headquarters. 562 F.3d at 169-70. Simply put, Plaintiff cannot allege Defendants engaged in non-consensual human medical experimentation because the purported conduct is not, nor can it be, characterized as either "experimentation" or "medical" in nature. Tellingly, other courts have been hesitant to find a claim for non-consensual medical experimentation without clear evidence that an actual medical experimentation occurred. *See Morales v. Brown*, 2015 WL 6167451, at *8 (E.D. Cal.

Oct. 20, 2015) (dismissing plaintiff's claim that building prisons in location known to have highly toxic levels of Valley Fever spores was tantamount to conducting non-consensual medical experiments on inmates); *Leitgeb v. Sark Wire Corp.–GA*, 2022 WL 18777380, at *9 (N.D. Ga. Sept. 21, 2022) (rejecting claim that a COVID-19 vaccine mandate constituted non-consensual medical experimentation because the vaccine was based upon "poor research"). Because Plaintiff has not alleged non-consensual medical experimentation, Count II should be dismissed.

(b) *Plaintiff Has Not Alleged Defendants Arbitrarily Detained Him.*

Prolonged arbitrary detention in violation of international law can give rise to an ATS claim in some circumstances. *Sosa*, 542 U.S. at 735-736; *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1384 (9th Cir. 1998); *Doe v. Qi*, 349 F.Supp.2d 1258, 1325 (N.D. Ca. 2004). But, Plaintiff has not alleged such circumstances with respect to Defendants. In particular, Plaintiff claims Defendants "were a direct and proximate cause of, contributed to, and aided and abetted [Plaintiff's] detention in an official detention facility." Compl. ¶ 139. Yet, Plaintiff admits that he was captured by U.S./Pakistani joint forces and flown to Thailand and interrogated by the FBI with no involvement from Defendants. *Id.* ¶ 16. And he admits that even before Defendants were retained for any work regarding interrogations, the "CIA was keenly focused on its new mandate: to hold and interrogate people suspected of terrorist associations to gather intelligence and help avoid a 'second wave' of attacks." *Id.* ¶ 30. Even more critically, Plaintiff does not allege that Defendants have had any contact with him since September 2006 when the U.S. decided to transfer Plaintiff to the U.S. base at Guantanamo Bay. *Id.* ¶ 97. Thus, Defendants cannot be held directly liable for the CIA's decision to capture and detain Plaintiff. *Liu Bo Shan v. China Constr. Bank Corp.*, 2011 WL 1681995 (2d Cir. May 5, 2011) (allegations that a bank called the police on plaintiff and manufactured evidence to induce the plaintiff's arrest insufficient to support a

1   reasonable inference of direct liability for arbitrary detention committed by Chinese
2   government police, not the bank).

3          Defendants similarly did not aid and abet Plaintiff's detention. To establish aiding
4   and abetting, Plaintiff must show Defendants acted "with knowledge that the
5   defendant's action will assist in the commission of a crime or with awareness of a
6   'substantial likelihood that the defendant's actions would assist the commission of a
7   crime.'" *Doe I v. Cisco Sys., Inc.,* 73 F.4th 700, 734 (9th Cir. 2023). Plaintiff has not
8   alleged Defendants had requisite knowledge their actions would result in Plaintiff's
9   alleged arbitrary detention where Plaintiff was detained before any involvement by
10  Defendants. Nor does Plaintiff allege Defendants had any role in the U.S.'s decision to
11  continue his detention. To try to bridge the gap, Plaintiff alleges only that Defendants
12  "request[ed] and recommend[ed]" he "remain in isolation and incommunicado for the
13  remainder of his life." Compl. ¶ 142. This statement alone plainly does not indicate
14  Defendants assisted in Plaintiff's alleged arbitrary detention whereby Plaintiff fails to
15  connect that alleged singular statement in 2002 to the ongoing decision by the U.S.—
16  more than twenty years later—to detain Plaintiff or the decision on how to prosecute
17  Plaintiff. Indeed, Plaintiff includes no allegations that Defendants have had anything to
18  do with his detention after September 2006 when the U.S. transferred Plaintiff to
19  Guantanamo Bay—a decision that was obviously made without any input from
20  Defendants. And most critically, Plaintiff admits that he "would have been detained
21  regardless" of whether Defendants made that statement. Compl. ¶ 98. Because Plaintiff
22  has not alleged Defendants arbitrarily detained him or that Defendants aided and abetted
23  in any arbitrary detention by the U.S. Government, Count IV should be dismissed.

24  **VI.  CONCLUSION**

25         Based on the foregoing, Defendants respectfully request the Court grant
26  Defendants' Motion to Dismiss and dismiss this action in its entirety with prejudice.

27

28

DATED this 13th day of November, 2023.

**EVANS, CRAVEN & LACKIE, P.S.**

By s/ James B. King, WSBA #8723

James B. King, WSBA #8723
Attorneys for Defendants
Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Ste. 250
Spokane, WA 99201
(509) 455-5200
(509) 455-3632 facsimile
jking@ecl-law.com

**BLANK ROME LLP**

By:  /s James Smith

James Smith (*Pro Hac Vice*)
Brian Paszamant (*Pro Hac Vice*)
Ann Querns (*Pro Hac Vice*)
Attorneys for Defendants
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Phone:      (215) 569-5791

*Counsel for Defendants*

DEFENDANTS' MOTION TO DISMISS
Page 41
139114.00603/133644505v.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Jeffry K. Finer, Esquire (Jeffry@FinerWinn.com)
Finer Winn
2850 East Rockhurst Lane, Suite 356
Spokane, WA 99223
(509) 981-8960
*Counsel for Plaintiff*

Solomon B. Shinerock, Esquire (Solomon.Shinerock@lbkmlaw.com)
Adam Kaufmann, Esquire (Adam.Kaufmann@lbkmlaw.com)
Elizabeth M. Velez, Esquire (Elizabeth.Velez@lbkmlaw.com)
Anika Conrad, Esquire (Annika.Conrad@lbkmlaw.com)
Lewis Baach Kaufmann Middlemiss PLLC
The Chrysler Bldg, 405 Lexington Avenue, 64th Floor
New York, NY 10174
(212) 826-7001
Eric L. Lewis, Esquire (Eric.Lewis@lbkmlaw.com)
David Short, Esquire (David.Short@lbkmlaw.com)
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Avenue NW, Suite 1000
Washington, DC 20005

*Counsel for Plaintiff*

**EVANS, CRAVEN & LACKIE, P.S.**

By s/ James B. King, WSBA #8723_

James B. King, WSBA #8723
Attorneys for Defendants
Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Ste. 250
Spokane, WA 99201
(509) 455-5200
(509) 455-3632 facsimile

DEFENDANTS' MOTION TO DISMISS
Page 42
139114.00603/133644505v.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

jking@ecl-law.com

**BLANK ROME LLP**

By:  /s James Smith

James Smith (*Pro Hac Vice*)
Brian Paszamant (*Pro Hac Vice*)
Ann Querns (*Pro Hac Vice*)
Attorneys for Defendants
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Phone:       (215) 569-5791

*Counsel for Defendants*

# APPENDIX A

Case: 24-1468, 08/02/2024, DktEntry: 33.1, Page 142 of 144
Case 2:23-cv-00270-TOR    ECF No. 27-1    filed 11/13/23    PageID.222    Page 2 of 4
Case 2:17-cv-00171-JLQ    ECF No. 34-1    filed 11/13/17    PageID.1063    Page 2 of 4

1
2
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

3
4
5
6
7
8
9
10
11

IN RE APPLICATION OF ZAYN AL-
ABIDIN MUHAMMAD HUSAYN
(ABU ZUBAYDAH) and JOSEPH
MARGULIES

No. 17-CV-171-JLQ

DECLARATION OF STEVEN W.
DALBEY

12    Pursuant to 28 U.S.C. § 1746, I, Steven W. Dalbey, declare as follows:

13    1.    I am the Director for the Office of Detainee Policy in the U.S. Department

14    of Defense ("DoD").  I have worked in the Office of Detainee Policy since October

15    2007.  I am responsible for developing policy recommendations and coordinating policy

16    guidance relating to individuals captured or detained by DoD.

17    2.    Attached hereto as Exhibit 1 is a true and correct copy of an unclassified

18    version of the DoD Action Memorandum dated July 3, 2007, initialed by then-Deputy

19    Secretary of Defense Gordon England on July 13, 2007, approving the decision of the

20    Combatant Status Review Tribunal that Abu Zubaydah meets the criteria for

21    designation as an Enemy Combatant.

22

23    I declare under penalty of perjury that the foregoing is true and correct.

24

25    Executed on: November 9    , 2007

26                                    STEVEN W. DALBEY

27

28

DECLARATION OF STEVEN W. DALBEY - 1
PAGE 045

Case: 24-1468, 08/02/2024, DktEntry: 33.1, Page 143 of 144
Case 2:23-cv-00270-TOR   ECF No. 27-1   filed 11/13/23   PageID.223   Page 3 of 4
Case 2:17-cv-00171-JLQ   ECF No. 34-1   filed 11/13/17   PageID.1064   Page 3 of 4

# EXHIBIT 1

Case: 24-1468, 08/02/2024, DktEntry: 33.1, Page 144 of 144
Case 2:23-cv-00270-TOR ECF No. 27-1 filed 11/13/23 PageID.224 Page 4 of 4
Case 2:17-cv-00171-JLQ ECF No. 34-1 filed 11/13/17 PageID.1065 Page 4 of 4

UNCLASSIFIED//FOR PUBLIC RELEASE



**Department of Defense**
Office for the Administrative Review
of the Detention of Enemy Combatants (OARDEC)
at U.S. Naval Base Guantanamo Bay, Cuba
1010 Defense Pentagon, Washington, D.C. 20301-1010

SECRET//NOFORN

**ACTION MEMO**

3 July 2007

FOR: Designated Civilian Official (DCO)

FROM: Convening Authority, Combatant Status Review Tribunal

SUBJECT: FINAL REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL ICO
ZAYN AL ABIDIN MUHAMMAD HUSAYN (ABU ZUBAYDAH), ISN
US9GZ-010016DP (GAZA STRIP)

- The Combatant Status Review Tribunal (CSRT) for Detainee ISN 10016 was completed on
27 March 2007. The Tribunal determined that this detainee meets the criteria for designation
as an Enemy Combatant.

RECOMMENDATION: That the DCO, as the final review authority, approve the CSRT
decision by initialing:

Approve the decision of the Combatant Status Review Tribunal _____ 7-13

Return the Record of Proceedings to the Tribunal for further proceedings _____

ATTACHMENTS:
TAB A Legal Sufficiency Review
TAB B Tribunal President's Report of Proceeding

Prepared by: Frank Sweigart. Convening Authority. ███████