**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ZAYN AL-ABIDIN MUHAMMAD HUSAYN, also known as Abu Zubaydah, | No. 24-1468 |
| | D.C. No. 2:23-cv-00270-TOR |
| *Plaintiff - Appellant*, | |
| v. | |
| JAMES MITCHELL; JOHN JESSEN, also known as Bruce Jessen, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued and Submitted February 11, 2025
San Francisco, California

Filed June 30, 2025

Before: John B. Owens, Lawrence VanDyke, and Anthony
D. Johnstone, Circuit Judges.

Opinion by Judge Johnstone

# SUMMARY[*]

## Military Commissions Act

Affirming the district court's dismissal of an action brought under the Alien Tort Statute by Zayn Al-Abidin Muhammad Husayn, known as Abu Zubaydah, the panel held that the Military Commissions Act, 28 U.S.C. § 2241(e)(2), deprived the district court of jurisdiction.

Zubaydah, whom the United States mistakenly believed was an Al Qaeda leader, sought damages under the Alien Tort Statute for injuries he suffered during his detention and interrogations at a secret prison or "black site" run by the Central Intelligence Agency.

The Military Commissions Act denies federal courts jurisdiction over certain actions relating to the detention and treatment of enemy combatants by the United States and its agents. It was undisputed that Zubaydah's claims related to his detention and treatment by defendants and that he had been designated an enemy combatant. The panel held that Zubaydah's complaint also established that the defendant contractors were agents of the United States for his claims because the United States authorized, controlled, and ratified defendants' treatment of Zubaydah. Therefore, the Military Commissions Act denied the district court jurisdiction over this case.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Solomon B. Shinerock (argued), Lewis Baach Kaufmann Middlemiss PLLC, New York, New York; Alexander Bedrosyan, Eric L. Lewis, and David A. Short, Lewis Baach Kaufmann Middlemiss PLLC, Washington, D.C.; Jeffry K. Finer, Finer Winn, Spokane, Washington; for Plaintiff-Appellant.

Brian S. Paszamant (argued), Jeffrey N. Rosenthal, James T. Smith, and Ann E. Querns, Blank Rome LLP, Philadelphia, Pennsylvania; Arash Beral, Blank Rome LLP, Los Angeles, California; James B. King, Evans Craven & Lackie PS, Spokane, Washington; for Defendants-Appellees.

Luke P. Ihnen and Molly Kincaid, Assistant Federal Public Defenders, Federal Defender Services of Eastern Tennessee Inc., Capital Habeas Unit, Knoxville, Tennessee, for Amicus Curiae Abu Faraj Al-Libi.

## OPINION

JOHNSTONE, Circuit Judge:

Plaintiff Zayn Al-Abidin Muhammad Husayn, known as Abu Zubaydah, was captured in Pakistan in March 2002. At the time, United States intelligence officials suspected Zubaydah was a leader of Al Qaeda, the terrorist network that killed nearly 3,000 people in the attacks of September 11, 2001. Zubaydah was transferred to a secret prison or "black site" run by the Central Intelligence Agency ("CIA") where, he alleges, he endured an experimental program of so-called "enhanced interrogation techniques" that amounted to torture. Defendants James Mitchell and John Jessen, United States citizens and psychologists, contracted with the CIA to design that program. They subjected Zubaydah to these enhanced interrogation techniques over seventeen days. Later, Zubaydah was transferred to the U.S. detention facility at Guantanamo Bay Naval Base, where in 2007 he was designated as an enemy combatant. He is still detained there today.

Zubaydah sued Defendants under the Alien Tort Statute seeking damages for the injuries he suffered during his detention and interrogations. 28 U.S.C. § 1350. He alleges that Defendants committed torture and other violations of customary international law and various international agreements and declarations. The district court granted Defendants' motion to dismiss for several reasons, including that the court lacked jurisdiction under the Military Commissions Act ("MCA") of 2006. 28 U.S.C. § 2241(e)(2).

Congress, through the MCA, denied federal courts jurisdiction over certain actions relating to the detention and

treatment of enemy combatants by the United States and its agents. It is undisputed that Zubaydah's claims relate to his detention and treatment by Defendants and that he has been designated an enemy combatant. We hold that the complaint also establishes that Defendants were agents of the United States for Zubaydah's claims. Therefore, the MCA denied the district court jurisdiction over this case. We affirm the district court's dismissal.

## I. Zubaydah's allegations of inhumane treatment by Defendants.

Congress, the President, and the Supreme Court have already addressed Zubaydah's treatment and Defendants' development and use of enhanced interrogation techniques. *See, e.g.*, *Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program*, S. Rep. No. 113-288, 40 (Dec. 9, 2014); *Press Conference by the President,* Office of the Press Secretary (Aug. 1, 2014) https://obamawhitehouse.archives.gov/the-press-office/2014/08/01/press-conference-president [https://perma.cc/3DLX-PR9A]; *United States v. Zubaydah,* 595 U.S. 195, 200 (2022). Whether Defendants tortured Zubaydah is not at issue. The only question we must answer is whether Congress put Zubaydah's action against Defendants beyond the jurisdiction of the district court because they acted as agents of the United States.

We review de novo whether Zubaydah's complaint invokes federal jurisdiction. *See DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (reviewing a dismissal under Rule 12(b)(1) and 12(b)(6)). We deny Zubaydah's motion for judicial notice of documents publicly filed in *Salim v. Mitchell*, No. CV-15-

6          HUSAYN V. MITCHELL

0286 (E.D. Wash.). Because Defendants bring a jurisdictional challenge solely on the basis of Zubaydah's complaint, we do not look beyond the complaint to determine the district court's jurisdiction. We take as true the facts Zubaydah alleges in his complaint and construe them in the light most favorable to him. *See DaVinci Aircraft*, 926 F.3d at 1122.

Defendants trained service members in the military's Survival, Evasion, Resistance, and Escape ("SERE") program. At SERE, Mitchell "developed and supervised a course involving mock torture in a pretend prisoner-of-war camp." Jessen worked as the chief psychologist for the department that oversaw the SERE training programs. Through "simulated scenarios in a controlled and constructive manner," service members learned to "build resistance to the extreme stresses of capture." SERE mock interrogations presented serious psychological and physical risks. So the program implemented safeguards including strict time limits and careful psychological monitoring to prevent students from developing "learned helplessness," a state of total submission.

After the attacks of September 11, 2001, intelligence officials across the Government scrambled to investigate who was responsible and how to prevent feared imminent attacks. To those ends, the CIA reconsidered whether torture was necessary "to prevent imminent, significant, physical harm . . ., where there is no other available means." The agency contracted with Defendants to prepare a report that drew on their work at SERE and "proposed countermeasures to defeat" resistance by captured "Al Qaeda operatives."

Then, in March 2002, a joint United States-Pakastani force captured Zubaydah, whom the United States

mistakenly believed was an Al Qaeda leader. United States intelligence officials transferred Zubaydah to Thailand. For the first two weeks of his detention, Federal Bureau of Investigation ("FBI") agents interrogated Zubaydah. Meanwhile, the CIA began assembling its own team to interrogate Zubaydah. It asked Mitchell to "provide real-time recommendations to overcome Abu Zubaydah's resistance to interrogation." Mitchell accepted the request and negotiated an "independent contract with the CIA to provide psychological consultation . . . in debriefing and interrogation operations."

Mitchell left for Thailand. On arrival, he recommended the transfer of Zubaydah from a medical facility to a CIA-operated black site. Zubaydah alleges that, at Mitchell's direction, the interrogation team held him naked, in "an all-white room that was lit 24 hours a day," and kept him awake shackled to a chair. At one point, after Mitchell allegedly deprived Zubaydah of sleep for seventy-six hours, CIA medical staff intervened to allow Zubaydah to sleep. Otherwise, the CIA team treated Zubaydah as Mitchell directed.

A month of interrogations under these conditions elicited the same information that Zubaydah had provided the FBI. But Mitchell wanted to use even more aggressive techniques to try to preempt an attack on the United States. So he returned to the United States and enlisted Jessen, who signed an independent contract with the CIA. Defendants approached the CIA with a new program of "enhanced interrogation techniques" to overcome Zubaydah's purported resistance. As they detailed in a memorandum to the CIA, Defendants proposed the following techniques: (1) attention grasp; (2) walling; (3) facial hold; (4) facial or insult slap; (5) cramped confinement; (6) wall standing;

(7) stress positions; (8) sleep deprivation; (9) waterboarding; (10) diapers; (11) insects; and (12) mock burial. Although Defendants likened these techniques to those used in SERE training, they intended to accomplish what SERE tried to prevent: a state of "learned helplessness" wherein Zubaydah would become unable to resist an interrogator's requests. Defendants signed new contracts with the CIA to engage in "applied research" domestically and abroad. In July 2002, Mitchell returned to the black site in Thailand with Jessen.

Still, the CIA raised concerns that these enhanced interrogation techniques could cross the line into torture—a federal crime, then and now. 18 U.S.C. § 2340A. Federal law defines torture as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1); *see also id.* at § 2340(2) (defining "mental pain or suffering" as "prolonged mental harm"). Given these concerns, the CIA sent a memo to the Department of Justice ("DOJ") requesting "legal clearance."

The DOJ issued two memos on Defendants' proposed enhanced interrogation techniques. In the first, the DOJ opined that, under 18 U.S.C. §§ 2340-2340A, to be federally prosecuted for torture, "an interrogator must cause 'longer-term mental harm' or 'intense pain or suffering of the kind that is equivalent to the pain that would be associated with serious physical injury so severe that death, organ failure, or permanent damage resulting in a loss of significant body functions will likely result.'" In the second, the DOJ opined, based on Defendants' assurances about the proposed techniques, that the following techniques would not meet its

interpretation of torture: "(1) attention grasp; (2) walling; (3) facial hold; (4) facial or insult slap; (5) cramped confinement; (6) insects; (7) wall standing; (8) stress positions; (9) sleep deprivation; and (10) waterboarding." Thus, according to the memos, use of the ten techniques would not give rise to criminal liability under 18 U.S.C. § 2340A. The DOJ did not address two of Defendants' proposed techniques: forced diapering and mock burials. After the DOJ issued its memos, Defendants began their interrogations of Zubaydah.

For seventeen days, from August 4 to August 20, 2002, Defendants used their enhanced interrogation techniques on Zubaydah. But, he alleges, the intensity and repetition of Defendants' techniques went beyond anything resembling the SERE training or the descriptions in the DOJ memos. According to Zubaydah, Defendants "slammed [him] against a concrete wall." They waterboarded Zubaydah 83 times, once until he stopped breathing and had to be resuscitated. They also threatened Zubaydah, telling him that unless he gave them information, "he would leave the facility in [a] coffin-like box." And they confined him in such a box for hours at a time, totaling 266 hours over the seventeen-day period, which Zubaydah alleges "amounted to mock execution and mock burial." Although Defendants proposed "mock burial" to the CIA, the DOJ memo did not address the potential criminal liability of either mock burials or mock executions.

After their interrogations, Defendants updated the CIA on their treatment of Zubaydah. Defendants would "sen[d] CIA Headquarters a clinical, sterilized summary of the day's interrogation, and maintained data and records concerning the techniques used." CIA personnel also observed at least some of the interrogations and expressed concerns about

Defendants' treatment of Zubaydah. Still, following
Defendants' interrogations of Zubaydah, the CIA extended
their contracts. All told, from 2002 to 2009, the CIA paid
Defendants more than $80 million for work that followed
from their interrogations of Zubaydah.

Defendants left Zubaydah permanently scarred,
physically and mentally, according to the complaint.
Zubaydah was then transferred between various black sites
for four more years. In September 2006, he arrived at
Guantanamo Bay, where he remains. And though he does
not plead it, Zubaydah does not dispute that in 2007 the
United States determined that he was detained as an enemy
combatant.

Zubaydah sued Defendants in federal district court.
Defendants moved to dismiss the complaint under Rules
12(b)(1) and 12(b)(6). The district court granted Defendants'
motion to dismiss for several reasons, including that the
court lacked jurisdiction under the MCA. 28 U.S.C.
§ 2241(e)(2).

## II. In the MCA, Congress limited courts' jurisdiction to hear claims brought by enemy combatants.

The MCA denies jurisdiction over cases "relating to any
aspect of the detention, transfer, treatment, trial, or
conditions of confinement" by or for an enemy combatant
"against the United States or its agents." 28 U.S.C.
§ 2241(e)(2). The MCA was not the first statute denying
jurisdiction over claims brought by noncitizens detained
following the terrorist attacks of September 11, 2001. The
matter of jurisdiction, or lack thereof, emerges from an
extended legal dialogue between Congress, the President,
and the Supreme Court. This dialogue shapes our

understanding of the law that we apply to Zubaydah's claims.

Days after September 11, Congress authorized the President to use "all necessary and appropriate force against those . . . persons he determines planned, authorized, committed, or aided the terrorist attacks." Authorization for Use of Military Force, Pub. L. No. 107–40, 115 Stat. 224 (2001). Under that law, the President asserted the authority to detain and try by military commission individuals suspected to be members of Al Qaeda or otherwise participating in acts of international terrorism. Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57833, 57834 (Nov. 13, 2001). The Supreme Court confirmed this power. *Hamdi v. Rumsfeld,* 542 U.S. 507, 518 (2004) (plurality opinion); *id.* at 589 (Thomas, J., dissenting). The President also ordered that individuals so detained be "treated humanely." Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. at 57834. And the Court held that those individuals retained the right to challenge their detention at Guantanamo Bay under the general habeas corpus statute, 28 U.S.C. § 2241. *Rasul v. Bush*, 542 U.S. 466, 484 (2004); *see* Pub. L. No. 89-590, 80 Stat. 811 (1966) (current version at 28 U.S.C. § 2241).

Congress responded with the Detainee Treatment Act of 2005 ("DTA"). Pub. L. No. 109–148, §§ 1001–06, 119 Stat. 2680, 2739–44 (2005). The DTA amended § 2241 to deny jurisdiction over actions by or for noncitizens detained at Guantanamo Bay (1) applying for a writ of habeas corpus, or (2) bringing "any other action against the United States or its agents" relating to their detention. § 1005(e)(2), 119 Stat. at 2742 (current version at 42 U.S.C. § 2241(e)(2)). The DTA also provided that "[n]o individual in the custody or

under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment." § 1003(a), 119 Stat. at 2739 (current version at 42 U.S.C. § 2000dd(a)). But it contained a good-faith defense, allowing "an officer, employee, member of the Armed Forces, or other agent of the United States Government" to avoid civil or criminal liability for the "detention and interrogation of aliens" if the defendant "did not know," and "a person of ordinary sense and understanding would not know," that "the practices were unlawful." § 1004(a), 119 Stat. at 2740 (current version at 42 U.S.C. § 2000dd-1(a)). The Supreme Court held that the DTA did not apply to pending cases, so the DTA did not deny a court jurisdiction to hear those detainee-brought cases pending before it. *Hamdan v. Rumsfeld*, 548 U.S. 557, 576–78 (2006).

Congress amended § 2241 again, enacting the MCA to clarify that the denial of jurisdiction applied to pending cases. *See* Pub. L. No. 109-366, §§ 1–10, 120 Stat. 2600, 2600–37 (2006). The MCA provides for limited review of enemy-combatant status determinations by the Court of Appeals for the D.C. Circuit. 28 U.S.C. § 2241(e)(1), (2). Otherwise, like the DTA, it denies jurisdiction over two categories of lawsuits brought by or for a noncitizen "who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination." *Id*. First, the MCA denies jurisdiction to review habeas corpus applications. *Id.* § 2241(e)(1). Second, the MCA provides, with exceptions not applicable here:

> [N]o court, justice, or judge shall have jurisdiction to hear or consider *any other action against the United States or its agents*

> relating to any aspect of the detention,
> transfer, treatment, trial, or conditions of
> confinement of an alien who is or was
> detained by the United States and has been
> determined by the United States to have been
> properly detained as an enemy combatant or
> is awaiting such determination.

*Id.* § 2241(e)(2) (emphasis added). The Supreme Court held,
in *Boumediene v. Bush*, that the denial of habeas corpus
jurisdiction by § 2241(e)(1) violated the Suspension Clause
of Article I. 553 U.S. 723, 792 (2008); U.S. Const. art. I, § 9,
cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not
be suspended, unless when in Cases of Rebellion or Invasion
the public Safety may require it."). Distinguishing
*Boumediene*, we held that § 2241(e)(2) remains
constitutional as applied to damages claims under the Alien
Tort Statute arising from a plaintiff's detention at
Guantanamo Bay as an enemy combatant. *Hamad v. Gates*,
732 F.3d 990, 1003–06 (9th Cir. 2013).

   In this appeal, we consider whether the MCA deprived
the district court of jurisdiction to hear this case. It is
uncontested that Zubaydah's suit "relat[es] to any aspect of
[his] detention . . . treatment . . . or conditions of
confinement" by the United States, 28 U.S.C. § 2241(e)(2),
and that Zubaydah has been determined to be an enemy
combatant. So if Defendants were "agents" of the United
States, the district court lacked jurisdiction over this case.
*See id.* To answer that question, we first examine the MCA's
text and the context of its enactment. Because the undefined
term "agent" is best read to incorporate the common law of
agency, we then consider whether the CIA's course of

14          HUSAYN v. MITCHELL

dealing with Defendants gave rise to an agency relationship. We conclude that it did.

### A. The MCA incorporates the common-law meaning of "agents."

We begin with the text. The MCA does not define "agents," but it is undisputed that "agents" under the MCA includes at least officers and employees of the United States. We and other circuit courts of appeals have concluded as much. *See Hamad*, 732 F.3d at 993 (former Secretary of Defense, United States military officials, and civilian officials); *Al-Nashiri v. MacDonald*, 741 F.3d 1002, 1008 (9th Cir. 2013) (U.S. military official); *Ameur v. Gates*, 759 F.3d 317, 320 (4th Cir. 2014) (former Secretary of Defense and federal employees); *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (current and former federal officials and employees).

Here, however, Defendants' contracts with the CIA specify that they were "independent contractors," not officers or employees. And "[u]nlike employees, independent contractors are not ordinarily agents." *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010). Zubaydah argues that if Congress had intended for the MCA to extend to independent contractors, "it would have done so by including those terms, as it has done in other statutes." True, Congress distinguished agents from contractors in statutes other than the MCA. *See, e.g.*, 28 U.S.C. § 1494 (granting jurisdiction over accounts of "any officer or agent of, or contractor with, the United States"); 31 U.S.C. § 3729(b)(2) (False Claims Act applies to claims "presented to an officer, employee, or agent of the United States" or "a contractor, grantee, or other recipient"); 30 U.S.C. § 1716 (defining covered "person" as "any agent or employee of the United

States and any independent contractor"). In a different case, a district court drew a similar distinction in concluding that these Defendants, as contractors, were not agents under the MCA. *See Salim v. Mitchell*, No. CV-15-0286, 2017 WL 390270, at \*3 (E.D. Wash. Jan. 27, 2017). Yet the MCA and its preceding enactments contain several contextual clues that "agent" means more than an officer or employee of the United States government.

As discussed above, the MCA amended the DTA. And the DTA, like the MCA, denied jurisdiction over cases brought by enemy combatants "against the United States or its agents." § 1005, 119 Stat. at 2742. The MCA also incorporates the DTA's good-faith defense and clarifies that the defense applies to war-crime prosecutions arising since September 11, 2001. *See* § 8(b), 120 Stat. at 2636. Recall that this good faith provision applies to "an officer, employee, member of the Armed Forces, or other agent of the United States Government." 42 U.S.C. § 2000dd-1(a). The MCA itself also separately denies jurisdiction over actions invoking the Geneva Conventions "to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party." § 5, 120 Stat. at 2631.

We presume that Congress used terms consistently in the MCA, so "agent" must mean something beyond just officers and employees of the United States. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 113 (2001) ("Our cases express a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." (quoting *Pa. Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 562 (1990))); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("A word or phrase is presumed to bear the same

meaning throughout a text . . . ."). Zubaydah points to nothing in the MCA's text that rebuts this presumption, so we take the term "agent" to include contractors as well as officers and employees.

Even if the MCA applies to contractors generally, however, Zubaydah argues that Defendants are "non-agent contractors." Because the MCA's text does not distinguish between contractors who are agents of the United States and those who are not, we turn to the "age-old principle . . . that words undefined in a statute are to be interpreted and applied according to the common-law meanings" to discern the MCA's meaning of "agent." *See* Scalia & Garner, *supra* at 320. This is because "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981). Thus, we infer that Congress incorporated the settled common-law meaning of "agents" into the MCA.

### B. Defendants were "agents" of the United States.

At common law, "[w]hether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship" and how the parties define their relationship "is not dispositive." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019), *as amended on denial of reh'g and reh'g en banc* (May 6, 2019). While "independent contractors are not ordinarily agents," *Bonds*, 608 F.3d at 505, courts still may find an agency relationship, *see United States v. Milovanovic*, 678 F.3d 713, 725 (9th Cir. 2012).

To determine whether an agency relationship exists for purposes of defining federal law, we look to the Restatement

(Third) of Agency, which restated the common law of agency the year that Congress enacted the MCA and remains the most current articulation of the common law of agency. *See, e.g.*, *Smith v. Wade*, 461 U.S. 30, 34, 39–45 (1983) (applying the common law from the year of a statute's enactment); *id.* at 56–57, 65–68 (Rehnquist, J., dissenting) (same); *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1053–54 (9th Cir. 2017) (applying the most current articulation of the common law). An agency relationship arises when a principal agrees with an agent "that the agent shall act [1] on the principal's behalf and [2] subject to the principal's control." Restatement (Third) of Agency § 1.01 (A.L.I. 2006); *Mavrix Photographs*, 873 F.3d at 1054. Alternatively, even when a principal and alleged agent do not reach such an agreement before the alleged agent acts, a principal can ratify an agency relationship by "affirm[ing] a prior act done by another." Restatement (Third) of Agency § 4.01 (1) (A.L.I. 2006). We look to both parties' contracts and their conduct to find an agency relationship. *See id.* § 1.02; *Henderson*, 918 F.3d at 1073–74.

Here, because of the alleged contracts between the CIA and Defendants, and their conduct in the course of performing those contracts, Defendants acted as agents of the United States. First, the CIA and Defendants agreed that Defendants would interrogate Zubaydah on the CIA's behalf. Second, the CIA and Defendants agreed that their interrogations were subject to the CIA's control. And third, to the extent any part of Defendants' interrogations exceeded the agreed scope of the agency relationship, Defendants purported to act on behalf of the CIA, and the CIA ratified those acts through its conduct.

### 1. The CIA authorized Defendants to act on its behalf and Defendants agreed to do so.

First, an agent must hold authority to act on the principal's behalf. Restatement (Third) of Agency § 1.01 (A.L.I. 2006).

The complaint alleges several contracts and other communications between the CIA and Defendants that establish the CIA's authorization for Defendants to interrogate Zubaydah. Right after Zubaydah's capture, the CIA "contacted Mitchell with a request that he 'provide real-time recommendations to overcome Abu Zubaydah's resistance to interrogation.'" Two days later, Mitchell negotiated and signed an independent contract with the CIA for "applied research" and "psychological consultation . . . in debriefing and interrogation operations." Around this time, when Mitchell sought Jessen's consultation on the interrogation work, Jessen also signed a contract with the CIA for "applied research." And after Defendants proposed the enhanced interrogation techniques to be used on Zubaydah, the CIA signed them to "new, lucrative contracts" that specified their roles in interrogations abroad as "specified, time-limited research projects."

The CIA then sought "legal clearance" from the DOJ for Defendants' "proposed techniques." Consistent with Defendants' roles as agents of the CIA for the interrogations, the DOJ responded to the CIA's request by identifying the two Defendants as the "new interrogation specialist" and "the [SERE] training psychologist." And as the interrogations proceeded, Defendants "would point to . . . [that] DOJ memo, claiming . . . it authorized" their use of the enhanced interrogation techniques. *See Penthouse*

*Int'l, Ltd. v. Barnes*, 792 F.2d 943, 947–48 (9th Cir. 1986) (finding authority based on representations in internal memoranda).

Taken together, these allegations show that the CIA authorized Defendants to interrogate Zubaydah. *See Mavrix Photographs*, 873 F.3d at 1054 (examining a principal's communications with the alleged agent to determine whether the alleged agent had authority); *Jones v. Royal Admin. Servs., Inc*., 887 F.3d 443, 449 (9th Cir. 2018) (examining a contract to determine whether the alleged agent had authority). They also show that Defendants agreed to interrogate Zubaydah on the CIA's behalf, then did so. Restatement (Third) of Agency § 2.01 cmt. c. (A.L.I. 2006) ("An agent's actions establish the agent's consent to act on the principal's behalf, as does any separate manifestation of assent by the agent.").

### 2. The CIA could control Defendants and Defendants agreed to the CIA's control.

Second, a principal must have the "right to control the agent's actions." *Id.* § 1.01 cmt. *f*.; *see Bonds*, 608 F.3d at 505. The control need not be total. Agency may arise even when "the principal lacks the right to control the full range of the agent's activities." Restatement (Third) of Agency § 1.01 cmt. c (A.L.I. 2006).

The complaint alleges that the CIA could control Defendants and Defendants agreed to the CIA's control. The CIA controlled Zubaydah's detention. It operated the black site where Defendants interrogated Zubaydah. And Defendants agreed to that control. For example, before beginning their interrogations, they requested that the CIA provide "reasonable assurances" that Zubaydah "remain in isolation and incommunicado for the remainder of his life"

"in light of the planned psychological pressure techniques to be implemented." The CIA knew of Defendants' treatment of Zubaydah, expressed concerns about it, and once intervened to stop Mitchell's interrogation. So even when the CIA did not always exert control over Defendants' interrogations of Zubaydah, the allegations establish that the CIA and Defendants mutually agreed that the CIA could do so. *See* Restatement (Third) of Agency § 1.01 cmt. c. (A.L.I. 2006) ("A principal's failure to exercise the right of control does not eliminate it . . . .").

### 3. *Where, if at all, Defendants lacked authority, the CIA ratified their actions.*

For the reasons discussed in Parts II.A.1 and II.A.2 above, the complaint makes clear that Defendants generally acted as agents of the CIA in their interrogations of Zubaydah, and that is all the MCA requires to deny jurisdiction over an "action against the United States or its agents relating to any aspect of" Zubaydah's detention and treatment. 28 U.S.C. § 2241(e)(2). But to the extent Zubaydah argues that Defendants' particular acts at issue were unauthorized or uncontrolled by the CIA, the complaint also shows that the CIA ratified those acts.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with . . . authority." Restatement (Third) of Agency § 4.01 (1) (A.L.I. 2006). For ratification to result in authority, an alleged agent must first "act[] or purport[] to act on behalf" of the principal. *Id.* § 4.01 cmt. b. Then, the principal can ratify the alleged agent's acts by "knowing acceptance of the benefit" of the actions. *Id.* § 4.01 cmt. d. To knowingly accept the benefit, the principal must have "actual knowledge" of the alleged agent's actions. *Id.* § 4.06.

Ratification, if established, "may create an agency relationship [even] when none existed before." *Henderson*, 918 F.3d at 1074; *see also* Restatement (Third) of Agency § 4.01 cmt. b (A.L.I. 2006).

The complaint alleges facts supporting ratification too. Throughout the interrogations, Defendants "pretended and demonstrably assumed to act" on behalf of the CIA, *Henderson*, 918 F.3d at 1074, by working alongside government personnel in Zubaydah's presence, and "demand[ing] additional information on terrorist operations planned against the United States." The CIA benefited from Defendants' interrogations of Zubaydah and had actual knowledge of Defendants' acts. *See id.* at 1073 (citing Restatement (Third) of Agency § 4.01 cmt. d (A.L.I. 2006)). The CIA obtained some intelligence—a benefit—from Defendants' interrogations of Zubaydah, even if it was intelligence that, Zubaydah alleges, the Government already possessed. CIA also had actual knowledge of Defendants' treatment of Zubaydah. *See id.* at 1073 (citing Restatement (Third) of Agency § 4.06 (A.L.I. 2006)). The CIA operated the black site in Thailand where Defendants interrogated Zubaydah, Defendants sent the CIA daily summaries, and, at times, CIA personnel observed Defendants' interrogations of Zubaydah. Thus, the allegations establish that Defendants' acted as if they were the CIA's agents in their treatment of Zubaydah, and the CIA knew of and accepted any benefits from that treatment. Beyond this, the CIA affirmed its relationship with Defendants by extending their contracts.

Therefore, even if Defendants did not have prior authorization to undertake all the alleged acts—including those that went beyond the practices used in SERE training and the DOJ's memos addressing criminal liability for

torture—the CIA ratified those acts, thereby creating an agency relationship where none may have existed before. The complaint's allegations show that Defendants acted as agents of the CIA in their interrogations of Zubaydah because the CIA authorized them to do it and controlled them while doing it. And when the Defendants may have exceeded that authority, the CIA ratified what they did.

## III. The district court lacked jurisdiction over Zubaydah's claims.

In agency law, the doctrine of respondeat superior holds the principal legally accountable for its agents' acts. Congress inverted this rule in the Detainee Treatment Act and Military Commissions Act. By denying jurisdiction over enemy combatant claims, the Military Commissions Act leaves government agents—including independent contractors—unaccountable in court for their acts done on behalf of the United States. That happened here: the United States authorized, controlled, and ratified the Defendants' treatment of Zubaydah. The district court correctly held that it lacked jurisdiction to hear his claims.

**AFFIRMED.**